## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| Fareportal Holdings Inc., Fareportal Inc., WK Travel, Inc., and Travelong, Inc.,<br><br>Plaintiffs,<br><br>v.<br><br>JetBlue Airways Corporation,<br><br>Defendant. | Civil Action No. _____<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Fareportal Holdings Inc; Fareportal Inc.; WK Travel, Inc.; and Travelong, Inc. (collectively "Fareportal") bring this action against JetBlue Airways Corporation ("JetBlue") under the federal antitrust laws and New York state law, as follows:

## OVERVIEW

1.      Amidst the turbulence of the global pandemic, JetBlue is quietly pursuing a scheme to make it harder for American consumers to save money when they book air travel. JetBlue's plan is to ensure that, when the pandemic winds down and Americans exercise pent-up demand to travel, they will be unable to use online travel agencies ("OTAs") to compare the prices offered by JetBlue with those offered by other airlines. JetBlue's goal is simple: to make it difficult for consumers to comparison shop when they want to fly.

2.      To accomplish this plan, JetBlue is blocking Fareportal and other OTAs from making available to consumers accurate information about the flights that JetBlue provides and the prices that JetBlue charges. JetBlue is blocking Fareportal and other OTAs from providing

this information simply because OTAs display JetBlue's information alongside the flights and fares offered by *other* airlines.  JetBlue wants to prevent consumers from easily comparing its fares with those offered by its competitors on the routes that JetBlue flies.

3.      JetBlue revealed in a call with Wall Street analysts that it is pursuing this "distribution strategy" because it wants to stop its most "price-sensitive customers" from being able to use OTAs to book JetBlue tickets.  By the phrase "price-sensitive customers", JetBlue principally means middle- and working-class Americans who fly JetBlue—that is, those consumers for whom the price of a flight matters the most.  JetBlue knows that many consumers must try to save every dollar they can when they travel, and they rely on OTAs to help them do just that.  JetBlue's scheme is designed to block consumers from using this competition-enhancing tool to save money in the future.

4.      The development of OTAs, beginning in the early 1990s, marked a great step forward for American consumers.  For the first time, using the Internet, consumers could easily see their flight options laid out conveniently before them.  The resulting transparency in fares brought about by OTAs  dramatically increased competition and lowered fares for the benefit of American consumers.

5.      Fareportal is one such OTA.  Through its brands CheapOair and OneTravel, Fareportal provides information about flight availability and prices that enables American consumers to easily find the best flight options available at competitive prices.  Fareportal serves many customers for whom every dollar matters.

6.      OTAs have also made it easier for new airline competitors to enter the marketplace—especially airlines sometimes referred to as "low-cost carriers," which use OTAs

to attract customers by offering airline travel to consumers at lower prices than the legacy airlines.  The entry of these new carriers facilitated by OTAs has also benefited consumers.

7.       JetBlue originally entered the market as one of these low-cost carriers.  It gained market share and became profitable with the help of OTAs like Fareportal.  But JetBlue does not want to compete in a marketplace of low prices anymore.  Now that it has grown to dominate many airline routes itself, JetBlue is seeking to reduce price transparency and avoid price competition so it can charge consumers higher fares and protect its profit margins.

8.       JetBlue's new strategy is an effort to turn back the clock.  JetBlue longs to return to the old days, before OTAs, when airline content was hidden and manipulated to make it difficult for travelers to compare services and fares.  To accomplish this goal, JetBlue has told Fareportal and other OTAs that they can no longer display JetBlue's flight and price information to consumers, nor allow consumers to use OTAs' platforms to book JetBlue's available flights. JetBlue now dominates enough routes, especially for flights up and down the East Coast, such that OTAs will have little value to many consumers when JetBlue information is not available. JetBlue's aim is for consumers to have little choice, but eventually to abandon OTAs altogether.

9.       JetBlue wants to eliminate comparison shopping so it can raise ticket prices in the long run, especially over routes where it enjoys commanding market shares such as those to and from New York, Fort Lauderdale, Orlando, Boston, Los Angeles, and San Juan.  JetBlue's plan is to exploit this market power and pressure consumers to abandon OTAs, in favor of booking directly on jetblue.com, where JetBlue displays only its own flights and fares and those of its partner airlines, who are selected to extend, but not compete with, JetBlue's network.  If JetBlue's scheme succeeds, pro-consumer comparison shopping driven by OTAs will disappear.

10.     JetBlue knows that, to achieve its long-term goals, it must be prepared to suffer short-term losses.  Some travelers will choose another airline when they go to Fareportal to book a flight on a route serviced by JetBlue and do not see JetBlue options.  When that occurs, JetBlue will lose the revenue from that sale to one of its competitors.

11.     But JetBlue is prepared to suffer those short-term losses because it plans to recoup them in the long term, when consumers migrate away from OTAs.  Then, JetBlue will be able to raise its fares, sold on its own website, above competitive levels.  Those fares will no longer be subject to the price discipline caused by OTAs.

12.     JetBlue is also prepared to suffer short-term losses because it is using taxpayer dollars to defray them.  JetBlue is bearing some of the short-term losses arising from its scheme by taking handouts from American taxpayers in the form of COVID relief.  JetBlue is already set to receive over $685 million in direct support from American taxpayers and up to $1.14 billion in loans from the U.S. Treasury under the CARES Act, and is poised to receive even more.

13.     JetBlue, in other words, is having American taxpayers unwittingly fund its scheme to deprive them of the information they need to comparison shop when they want to fly.  JetBlue is using COVID-relief handouts from American taxpayers to take American consumers for a ride.

14.     JetBlue initially launched its scheme in October 2017, when, as part of "the first phase of a new online distribution strategy," JetBlue announced that it was blocking twelve smaller OTAs from being able to display and distribute its flight content.

15.     Notably, JetBlue waited to launch this "first phase" until after it had successfully worked to put on ice an investigation by the Department of Transportation ("DOT"), opened in October 2016, into airline practices to reduce price competition.  Those DOT proceedings had

the goal of "Exploring Industry Practices on Distribution and Display of Airline Fare, Schedule and Availability Information."  Among other things, the DOT was specifically investigating the consumer harm caused when airlines block OTAs from displaying accurate flight and fare information to consumers.

16.     The DOT received tens of thousands of comments from consumers as well as from business, government, travel, and consumer organizations.  One such response came from the Consumer Union, the policy and mobilization arm of Consumer Reports, and U.S. Public Interest Research Group, which observed:

> In our view, ***there is no sense in which airlines' withholding of critical information from third-party OTA and metasearch sites benefits consumers; on the contrary, the practice harms consumers by making it more difficult for consumers to conveniently and reliably comparison shop*** for the best flights and fares.  Our recent research underscores this.

17.     JetBlue, however, worked to stop the DOT proceedings in their tracks.  Airlines for America ("A4A"), a lobbyist group for airlines including JetBlue, pushed the DOT to suspend the proceedings.  On January 27, 2017, A4A wrote a letter to the DOT asserting that the proceedings should be suspended pursuant to the current administration's memorandum directing a "Regulatory Freeze Pending Review."

18.     The DOT obliged and suspended the comment period effective March 10, 2017. The inquiry has remained dormant ever since, despite requests to lift the suspension by United States Senators and prominent consumer advocacy groups, including the Consumer Federation of America, Consumer Reports, and the National Consumers League.

19.     In October 2017, having successfully halted the DOT investigation, JetBlue launched the first phase of its scheme by employing one of the very practices the DOT had been investigating—blocking a set of OTAs from displaying its content to consumers.  One of the

largest OTAs targeted by JetBlue during this first phase, Vayama, has since effectively gone out of business.

20.     Beginning in June 2020, JetBlue launched the second phase of its scheme, which now targets Fareportal.  In the midst of the pandemic, JetBlue informed Fareportal that it was going to terminate their nearly twenty-year relationship and cut off Fareportal's ability to provide its customers with JetBlue content for flights departing on or after January 5, 2021.

21.     JetBlue's decision to end this longstanding relationship came as a shock to Fareportal.  This statement did not just threaten to end the parties' historic course of dealing, but it also violated JetBlue's recent contractual commitments.  At JetBlue's request, Fareportal had been making large financial and technical investments to implement New Distribution Capability ("NDC"), a technology for connecting airlines to OTAs that enables OTAs to display more detailed airline content.  JetBlue requested Fareportal to make those investments as part of the parties' ongoing relationship, and Fareportal delivered.

22.     In fact, as detailed herein, by March 2020, JetBlue and Fareportal had agreed on *all* of the commercial terms governing the delivery of JetBlue content to Fareportal via NDC under a new multi-year deal.

23.     But even as JetBlue's commercial team was preparing to sign that agreement with Fareportal, JetBlue's senior management decided that, with the DOT proceedings on ice and with the cover provided by the pandemic, it was time to launch the next phase of its scheme. Despite publicly vowing to expand opportunities with businesses owned by minorities and women, JetBlue personnel informed Fareportal—very likely the *only* minority-owned OTA with whom JetBlue did business at the time—that JetBlue was going to begin pulling all of its content from Fareportal, as well as from all other remaining OTAs, including Expedia and Priceline.

6

24.     Fareportal later discovered that JetBlue allowed Expedia and Priceline to keep some of its content beyond January 5, 2021.  Those two OTAs currently retain access to JetBlue content through September 7, 2021.

25.     JetBlue is targeting Fareportal because it knows that Fareportal is an important conduit of airline fare and route information to American consumers.  Fareportal is the largest flight-focused OTA in the United States, serving millions of travelers flying domestically and internationally.  While other large OTAs, including Expedia and Priceline, focus on selling consumers hotel bookings and bundled vacation packages that prioritize hotel bookings, Fareportal prioritizes flight information.

26.     Fareportal's mission is to help consumers find their best available flight options at low cost by providing them with the ability to compare and book fares across airlines, and Fareportal uses a variety of innovative technological solutions to deliver that service to consumers.  Among many other innovations, Fareportal developed a proprietary algorithm that quickly and simultaneously searches all of the providers with which it has established a connection for the lowest fare, with available seats.  Fareportal also offers a user-friendly display that shows consumers the cheapest flight option, the shortest flight option, flights departing from or arriving at nearby airports, and flights departing or arriving on alternative dates.

27.     In an effort to salvage its ability to provide JetBlue flight and fare information to its customers, Fareportal informed JetBlue it would distribute JetBlue's content under NDC *for free*.  But JetBlue rejected that too, turning down *free* distribution of its flights.  This refusal confirms JetBlue's anticompetitive motivations, as it demonstrates that JetBlue is willing to reject an opportunity for no-cost sales, to lose some of those sales to competitors, and to sustain short-term losses all in order to achieve its long-term goal of stifling price competition.

28.     JetBlue's strategy is particularly effective in harming OTAs where travelers wish to fly city-to-city routes for which JetBlue has a large market share.  Once JetBlue has pulled its flights, the OTAs are then left with few, if any, flights to offer travelers on those routes.  Under such circumstances, if a customer wishes to fly at all, she must abandon the OTA entirely.  JetBlue knows that by cutting Fareportal off from its content, those travelers flying JetBlue-dominated routes will stop using Fareportal, and Fareportal will suffer significant harm as a result.

29.     JetBlue's anticompetitive conduct will cause irreparable harm to Fareportal's good will and business reputation.  JetBlue's decision to pull its content will cause Fareportal to lose not only JetBlue bookings, but also bookings with other carriers.  The success of Fareportal depends on its ability to provide the content of major airlines like JetBlue so that consumers can compare fares from as many airlines as possible and select the optimal flight and fare for their needs.  Without JetBlue's flights, Fareportal will also no longer be able to offer customers multicarrier or interline itineraries with flights from JetBlue and other airlines.  Many Fareportal customers will look elsewhere to book their flights and will not return to Fareportal in the future, even if JetBlue content is restored as a result of a trial on the merits in this litigation.

30.     The loss of JetBlue content will also place Fareportal at a substantial competitive disadvantage with Expedia and Priceline, which currently retain access to JetBlue content through September 7, 2021, causing unquantifiable damage to Fareportal in the form of lost business opportunities.

31.     Consistent with its strategy of cutting ties with OTAs, JetBlue also intends to terminate its relationships with Expedia and Priceline and to preclude them displaying and distributing JetBlue content in the near future, as it further cements its market power.  But even

before JetBlue pulls all of its content from Expedia and Priceline, JetBlue's conduct will harm consumers by dramatically reducing the number of OTAs available to book flights and specifically marginalizing Fareportal, the market leader in providing fare transparency to air travelers.

32.     In recent years, the OTA market has become increasingly concentrated as Expedia and Booking Holdings (Priceline's parent company) have acquired smaller competitors. For instance, Expedia acquired Orbitz and Travelocity in 2015.  Booking Holdings acquired Agoda in 2007 and has also acquired leading metasearch engines—Kayak in 2013 and Momodo and Cheapflights in 2017.  In an already concentrated market, eliminating or harming Fareportal will be the beginning of the end for OTAs' ability to provide effective airfare comparison information to American consumers.

33.     JetBlue had agreed to a deal with Fareportal to continue the parties' longstanding business relationship—a deal which would allow Fareportal to continue helping its customers find the cheapest and best available options when they want to fly.  All of the major terms were negotiated.  And the parties had agreed to finalize the details.  Then, JetBlue walked away.  Why?  Because JetBlue decided that continuing to allow Fareportal to display JetBlue's flights and fares would undermine its ability to raise the prices it charges to American consumers.

34.     Fareportal brings these claims to end JetBlue's anticompetitive scheme; to recover damages for harm suffered as a result of the scheme; and to restore and protect competition in the provision of air travel services and the distribution of flight and fare content. Fareportal also brings claims to enforce the parties' agreed-upon term sheet under which JetBlue

agreed to negotiate in good faith towards completing a deal under the commercial terms contained therein.

## THE PARTIES

35.     Plaintiff Fareportal Holdings Inc. is a corporation organized and existing under the laws of the State of Delaware.  Fareportal maintains a principal place of business at 137 West 25th Street, 11th Floor, New York, New York 10001.

36.     Plaintiff Fareportal Inc. is a corporation organized and existing under the laws of the State of New York.  Fareportal Inc., a subsidiary of Fareportal Holdings Inc., maintains a principal place of business at 137 West 25th Street, 11th Floor, New York, New York 10001. Fareportal Inc. conducts certain operations under the trade name "CheapOair."

37.     Plaintiff WK Travel, Inc. is a corporation organized and existing under the laws of the State of Nevada.  WK Travel, Inc. a subsidiary of Fareportal Inc., maintains a principal place of business at 1050 East Flamingo Rd., Suite 302, Las Vegas, Nevada 89119.  WK Travel, Inc. conducts certain operations under the trade name "OneTravel."

38.     Plaintiff Travelong, Inc. is a corporation organized and existing under the laws of the State of New Jersey.  Travelong, Inc. subsidiary of Fareportal Holdings Inc., maintains a principal place of business at 137 West 25th Street, 11th Floor, New York, New York 10001.

39.     Defendant JetBlue Airways Corporation is a corporation organized and existing under the laws of the State of Delaware with a principal place of business at 27-01 Queens Plaza North, Long Island City, New York 11101.

## JURISDICTION AND VENUE

40.     Fareportal brings this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26 to recover treble damages and injunctive relief for the injuries sustained by Fareportal, alleged herein, arising from Defendants' violations of Section 2 of the Sherman Act,

15 U.S.C. § 2.  This Court has subject matter jurisdiction over these claims under 28 U.S.C.

§§ 1331, 1337.

41.     This Court has subject matter jurisdiction over Fareportal's breach-of-contract

and promissor- estoppel claims against JetBlue under 28 U.S.C. § 1367(a) because these claims

are so related to Fareportal's antitrust claims that they form part of the same case or controversy.

42.      Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22 because

JetBlue resides, is found, or transacts business in this District.  Venue is also proper in this

District pursuant to 28 U.S.C. § 1391(b) and (c) because a substantial part of the events or

omissions giving rise to these claims occurred in this District and because JetBlue resides in and

regularly conducts business in this District.

43.     JetBlue's activities were within the flow of, were intended to, and had a

substantial effect on interstate commerce.

44.     This Court has personal jurisdiction over JetBlue pursuant to the nationwide

contacts test provided by 15 U.S.C. § 22.  This Court also has jurisdiction over JetBlue because

JetBlue's principal place of business is in the State of New York.  Additionally, JetBlue is

subject to personal jurisdiction because it transacted business throughout the United States,

including in this District, that was directly related to the claims at issue in this action.

Specifically, JetBlue's unlawful conduct occurred in large part at its New York headquarters;

JetBlue has purposefully distributed flights to consumers in New York; and JetBlue's conduct

harms Fareportal, whose principal place of business is in New York, and consumers in New

York who book JetBlue flights.

## FACTUAL ALLEGATIONS

**A.     Historical Origins of the Market for Airline Tickets**

45.     Airlines have long distributed tickets to travelers both directly and through travel agencies.  While travel agencies have traditionally charged airlines commissions on the sale of tickets, airlines have relied on travel agencies to market and sell tickets to travelers.

46.     In the early days of commercial air travel, consumers shopped for airline tickets over the telephone with a single airline or at an airline's ticket counter.  Travelers had little ability to shop around for the best fare, and it was cumbersome to do so.  Even savvy customers were limited to walking from ticket counter to ticket counter or calling multiple airlines to try to find the best price.  Shopping for fares took time and was complex and inefficient.  As a result, and further facilitated by the airlines' creation of frequent flyer programs, most travelers would pick a single, preferred airline and accept the fare that airline was charging.

47.     Travel agencies offered travelers more options.  Before the Internet, travelers could visit a brick-and-mortar travel agency or call a travel agent over the telephone.  A travel agent would have to independently look up the flight, call an airline, write a ticket manually, and complete the related accounting unassisted.

48.     In the 1970s, airlines set up computer reservation systems, now known as global distribution systems ("GDSs"), which are technology systems that aggregate information about flights and deliver them to travel agents.  Airlines believed that GDSs would better facilitate the distribution of flight information to travel agents.  Travel agents would no longer need to contact airlines for schedule, fare, and availability information; instead, that information would be delivered to the travel agents.

49.     Originally, many airlines owned their own GDSs.  American Airlines created a GDS known as Sabre.  Several foreign airlines founded Amadeus.  Travelport, which operates

using the trademarks Galileo, Apollo, and Worldspan, evolved from systems created by United, Delta, TWA, Northwest, and certain European carriers.

50. These GDSs altered the landscape for purchasing tickets. By delivering more information to travel agents, these agents were better able to facilitate fare comparison for their travelers. According to Congressional hearings at the time, however, the airlines also used their GDSs to engage in "display bias"—that is, in responding to a travel itinerary query, a GDS would display the flight options of the airline that owned the GDS first, even if another airline offered lower fares or more direct routes. For example, a travel agent requesting fares through Sabre would receive a display of flight options with American Airlines flights on top.

51. Airline-owned GDSs allowed major airlines to capture greater market share. By maintaining their own GDSs, airlines were able to push particular flights to travel agents, effectively controlling the competitive landscape.

52. Economic evidence from this period confirms the absence of robust competition for the sale of airline tickets. Consumers could not easily compare flights and fares across airlines. Brick-and-mortar travel agents, while able to compare flights across airlines, remained at the mercy of airline-controlled GDSs. These travel agents often received flight listings marked by display bias and would therefore deliver options to consumers that did not reflect the best possible pricing. The result was that consumers paid higher airfares and the airlines profited.

**B. The Emergence of OTAs and Price Transparency**

53. The Internet dramatically transformed the sale of airline tickets. Airlines rolled out airline-specific websites that showed airline routes, fares, and availability and allowed travelers to purchase flights directly through the website. These websites also enabled the

airlines to grow their frequent flyer programs by offering promotions and storing frequent flyers' personal information.

54.     As airlines were introducing their own websites, they were also spinning off the GDSs they once owned.  The DOT had regulated GDSs heavily following the rampant display biasing in the 1980s.  Because of that regulation, and because airlines believed their own websites could replace much of the GDSs' volume, they divested themselves of these businesses. In fact, because airline websites were able to connect travelers directly with an airline's own reservation system (bypassing GDSs), the airlines had significant leverage—for at least a time— when negotiating with the newly independent GDSs.  In turn, no longer beholden to the airlines, these GDSs facilitated the emergence of new competitors for the airlines.

55.     OTAs emerged in the mid- to late-1990s, around the same time that airlines launched websites.  Not restricted to brick-and-mortar or corporate travel agents, the OTAs, like airline-specific websites, provided an online platform through which the general public could search for and book flights.  OTAs offer a key advantage over airline-specific websites:  they allow consumers to easily compare the products and services of multiple travel suppliers and purchase those that best suit their needs.  OTAs—like traditional travel agencies—assist travelers in identifying and booking the *best available fares* for their desired itineraries.  OTAs also have the added benefit of offering multi-airline itineraries, which are not available through airline-specific websites for routes that do not involve one of the airline's partner airlines.

56.     The emergence and growth of OTAs were fueled in part by independent GDSs. An OTA will generally enter into an agreement with one or more GDSs pursuant to which the GDS provides the OTA with access to the aggregated airline information.  Like traditional travel agencies, OTAs typically use GDSs to provide the consumer with schedule, fare, and other

information.  Thus, when a consumer uses an OTA to search for travel options, the consumer is actually searching through the information collected by GDSs.  OTAs also typically complete bookings through GDSs.  For these services, under the "traditional" or "retail" model, GDSs are compensated by airlines based on the number of flight segments sold and then pay an incentive to OTAs.  Under the alternative "wholesale" model, airlines compensate OTAs directly, who in turn pay a technology fee to GDSs.

57.     JetBlue, like virtually every other airline, has long-term agreements to provide its "full content" to GDSs for distribution across the industry, including to OTAs.  JetBlue did this to ensure that its flights were available everywhere a traveler sought to access them.  As a result, for many years JetBlue flights have been widely sold through OTAs, including Fareportal.

58.     Consumers benefited from how OTAs revolutionized the distribution of airline tickets.  For the first time, travel agencies could process a large number of transactions quickly, efficiently, and reliably.  OTAs have enabled travelers to minimize the time and cost associated with searching for and booking a flight, to comparison shop to ensure the best overall value proposition for a traveler's needs, and to control and manage the cost of travel procurement.  A traveler using an OTA can compare competing airlines' routes, schedules, fares, and availability; book the itinerary that best suits the needs of the traveler; select seats; and identify and book hotel, car rental, and other travel products and services, and more—all quickly and efficiently, with one convenient tool.

59.     By providing an online platform through which the general public can efficiently shop for fares itself, OTAs dramatically enhanced transparency.  The result of this increased fare transparency was to force airlines to compete more aggressively on price, resulting in benefits to travelers.

60.     The positive, pro-consumer effects of OTAs on price transparency and competition cannot be overstated.  A number of peer-reviewed studies of the airline industry have confirmed that, with the emergence of OTAs, price transparency and price competition among airlines has increased.  This intense price competition and absolute transparency has greatly benefited travelers.

61.     Because of these procompetitive benefits of OTAs, today the majority of airline tickets are now purchased over the Internet.  OTAs facilitate the vast majority of those sales.  On average, fares sold through OTAs are 11% cheaper than those sold through brick-and-mortar travel agencies.  This change has been a substantial boon to consumers:  from 1978 to 2011, the average airfare for a U.S. domestic round trip fell by roughly 50% in inflation-adjusted dollars.

### C.     JetBlue Uses OTAs to Emerge as a Low-Cost Carrier

62.     JetBlue was founded in 1998 and commenced operations in February 2000. JetBlue started as a "low-cost carrier" and has historically targeted the leisure traveler.  About 80% of JetBlue's passengers are leisure travelers, while the industry average is about 70%.

63.     A study prepared by economists at Charles River Associates found that OTAs aid entry of new airlines into City-Pair markets, which are routes from a departure city to an arrival city.  Specifically, this study found "[i]n the absence of access to complete information on competitive airline offerings, consumers are more likely to choose incumbent airlines even if they are charging higher prices, simply because they have not learned about the lower-priced alternatives."  As one travel industry analyst has affirmed, Internet comparison shopping "allowed cheap airlines like Southwest, JetBlue, and Spirit to enter the market and grow."

64.     Other airlines also noted that OTAs helped low-cost carriers enter the market and grow.  American Airlines's principal economist at its bankruptcy proceeding, Daniel Kasper, testified that the existence of OTAs "was a huge boom for low cost carriers because they could

avoid . . . hav[ing] to spend a lot [on] advertising.  The combination of the spread of low cost carriers and the ease of finding low fares had a dramatic effect on prices; that is to say, brought down prices pretty dramatically."

65.     OTAs have helped JetBlue and other low-cost carriers enter into new markets and gain market share.  Without OTAs, most consumers would not discover when JetBlue had entered a City-Pair market or when its fares were lower than the incumbent airlines' fares.

66.     JetBlue is still perceived by many travelers as a low-cost carrier.  But, in reality, JetBlue has evolved over time to behave less like a low-cost carrier, and according to an industry analyst, it "became like any other airline."  For instance, in the last few years, JetBlue:  (a) became the first airline to charge $30 for checked bags, (b) increased ticket-change fees, (c) now offers a no-frills coach ticket to compete with basic economy on legacy airlines, and (d) now offers business-class tickets.  In early 2020, JetBlue became the first airline to charge $35 for the first checked bag.  Each time JetBlue raised its checked-bag fees, other major airlines followed its lead.

67.     Today, JetBlue is one of the largest airlines in America by passengers carried. As explained further below, JetBlue has a dominant or near-dominant market share over many City-Pair markets, most notably on the East Coast, Caribbean, and Latin America.  In contrast with the "hub-and-spoke" model adopted by most other airlines, JetBlue describes itself as a "point-to-point system carrier," with the majority of its routes touching at least one of its six focus cities:  New York, Fort Lauderdale, Orlando, Boston, Los Angeles, and San Juan.

68.     JetBlue's growth strategy has deliberately focused on increasing its dominance in these cities, which are popular origins and destinations with Fareportal's customer base. JetBlue recently stated that each of these focus cities has been "uniquely identified" as one in which JetBlue anticipates increasing demand for leisure travel.  From 2012 to 2017, 97% of

JetBlue's growth came from these six cities, with 92% from New York, Boston, and Fort Lauderdale alone.

69.     The anticompetitive strategy described herein is driven by JetBlue's goal of perpetuating that dominance and protecting its dominant share over routes to and from these cities from effective competition.  As part of its strategy for 2021 and beyond, JetBlue intends to continue building its presence in its six focus cities.  For instance, JetBlue will offer new non-stop service from Fort Lauderdale to destinations in the western United States, including many routes not currently served by any other airline.

### D.     Fareportal is the Leading Flight-Focused OTA

70.     Fareportal was founded in 2000 and formally incorporated in 2002.  Fareportal is a hybrid travel agency, operating both a robust online presence in multiple countries along with call centers where customers can call in to make travel arrangements.

71.     In 2006, Fareportal launched CheapOair, its flagship OTA.  CheapOair was one of the first OTAs, if not the first, to prominently display a customer service phone number on all pages of its website, allowing customers to book airline tickets online and talk to trained travel agents to answer questions and provide assistance.  This unique model allows for substantially greater customer service than other OTAs provide, a boon to both airlines and customers.  This approach also has helped serve older or other consumers who might prefer booking with a live agent than through a website.

72.     CheapOair offers a consumer-friendly display that shows a grid at the top of the search screen that transparently shows the airlines serving the searched-for route, with their lowest available prices for non-stop, one-stop, and multiple-stop flights.  CheapOair also has a "smart" recommendation engine to suggest a recommended flight among those available from all airlines for which it has content.  It flags the cheapest flight option, the shortest flight option, flights

departing from or arriving at nearby airports, and flights departing or arriving on alternative dates close to the searched-for itinerary.  Consumers can also set up fare alerts, which are automated emails sent to consumers whenever fares drop on their searched-for itinerary.  These features, not offered by JetBlue, help consumers find the best flights and prices across all available airlines.

73.      Additionally, unlike other major OTAs, CheapOair chose to maintain a primary focus on airline tickets instead of directing consumers towards hotel bookings, which make up a majority of other large OTAs' revenues.  CheapOair's algorithm hunts the cheapest flight options that fit consumer needs, including through innovative methods such as offering interline or multi-carrier itineraries.

74.      Fareportal has a reputation with airlines for being the most innovative OTA in adopting new technologies and collaborating with airlines' product development needs.  It was one of the first OTAs to provide fare family options—stratified ticket prices according to various attributes such as seat choice—and ancillary products and services, known as "ancillaries," for many U.S. and international airlines.  These ancillaries include seat selection, pre-paid baggage, priority boarding, meals, and airport-lounge access.  And Fareportal has been a market leader in adopting and implementing the NDC standard.  These innovations have allowed consumers to conduct more complete comparison shopping, comparing the total cost of travel rather than just base fares alone.

75.      The ability to comparison shop across total ticket prices on Fareportal provides incentives for airlines to compete on ancillaries in addition to base fares.  This is an increasingly important benefit to consumers, as ancillaries comprise a growing portion of revenue for airlines. In 2010, ancillaries made up almost five percent of overall airline revenue.  By 2019, ancillaries' share of overall revenue for airlines grew to over 12%.

76.     By 2014, Fareportal was already the largest privately owned OTA and the fourth largest OTA in the U.S. based on airline bookings.  Today, Fareportal is the largest flight-focused OTA, one of the top three largest OTAs in the U.S. by airline bookings, and is still in the growth phase of its business strategy.

77.     By providing an innovative platform for airfare sales, Fareportal made a marked impact on competition and price transparency in air travel.  Its added value is perhaps best illustrated by its growth during the financial crisis.  At a time when U.S. consumers were forced to be cost-conscious, they increasingly sought out Fareportal to find the best rates for air travel.

78.     On CheapOair's website, located at cheapoair.com, a customer can easily compare flight itineraries sorted by price and compare prices across airlines to identify the best possible itinerary.  For example, the following shows results for flights between New York and Fort Lauderdale on January 1, 2021:



79.     The price comparison and transparency offered by Fareportal's brands allows travelers to find the best price possible for their trips when choosing among many options.  By pulling its content from Fareportal for flights departing on or after January 5, 2021, JetBlue is limiting travelers' access to the type of meaningful price comparisons that economic studies show leads to lower fares.  For example, the following shows results for the same route—New York to Fort Lauderdale—but a week later, on January 8, 2021.  Consumers can no longer view JetBlue's flights, as shown below:



80.     The presence of Fareportal and the transparency that it brings to the market constrain the prices that JetBlue and other airlines can charge.  The existence of Fareportal also facilitates the entry of new airlines providing travel.  New entrants can compete aggressively against major airlines on price through an OTA like Fareportal.

**E.     JetBlue's Historical Relationship with Fareportal**

81.     Fareportal and JetBlue have had a long and successful business relationship for nearly twenty years.  This relationship has been mutually beneficial:  JetBlue has received access to Fareportal's approximately 10 million customers at low cost, while Fareportal has been able to increase the choices available to its customers by offering the option to purchase flights from one of the major airlines in the United States with market dominance over several City-Pair markets.

82.     This was aided by the fact that both JetBlue and Fareportal are members of the Airlines Reporting Corporation ("ARC").

83.     In 2019, Fareportal supplied JetBlue with over 520,000 passengers and approximately $170 million in fare revenue based on ticket sales on their platforms.  By pulling its content, JetBlue is now rejecting that revenue, even as it obtains taxpayer-funded relief from the U.S. government.

F.      **NDC Negotiations**

84.     Although OTAs generally receive a majority of their airline content through GDSs, some airlines opt not to provide their content to GDSs.  In these circumstances, Fareportal and other OTAs partner with airlines to receive airline content directly (known as a "Direct Connect") or through third-party aggregators (such as Python, Farelogix, or TravelFusion).

85.     Implementing a Direct Connect costs roughly $100,000 for Fareportal per airline and takes roughly six to nine months, as Fareportal has to invest in integrating the application programming interface ("API") of the airline with its own back-end system, a process that requires significant customized development and constant monitoring and maintenance once the Direct Connect goes live.  Nevertheless, Fareportal has agreed to take on this process because access to content is one of the main drivers of its success and necessary for consumers to compare fares and choose the optimal result.

86.     NDC was developed in 2010 as an XML API designed to enhance the communication capabilities between the airlines and OTA.  The International Air Transportation Association ("IATA"), a trade association for airlines, in 2012 adopted NDC as a uniform data transmission standard between airlines and online travel agencies.  The goal of NDC was also to allow OTAs to display more detailed airline content as well as ancillaries to consumers.

87.     In June of 2019, JetBlue advised Fareportal that it would be seeking to phase in NDC.  JetBlue told Fareportal that it was interested in partnering with Fareportal to develop NDC on its platform.

88.     Throughout the parties' relationship, Fareportal has undertaken substantial efforts to accommodate JetBlue's business needs.  For instance, when JetBlue sought to implement its fare family policy, Fareportal rose to the call.  Fareportal deployed its technology

team to display JetBlue's various price options as JetBlue desired.  Fareportal also allows consumers to select seats with a seat map for JetBlue flights.

89.     In order to formalize an NDC deal, the parties started work on two tracks.  First, they began negotiating commercial terms for NDC.  The parties exchanged several rounds of letters of intent ("LOIs").  On August 13, 2019, JetBlue sent Fareportal the first initial draft term sheet laying out the commercial terms for NDC integration.  Fareportal responded by sending a second proposed draft on September 6, 2019.  JetBlue sent Fareportal a third proposed draft on December 19, 2019, and a fourth proposed draft on January 29, 2020.

90.     Second, while the parties were working out the commercial terms, they commenced the process of technological integration.  Implementing NDC on Fareportal's platform required Fareportal to expend significant time and resources to integrate the two parties' complex software interfaces.  The two parties' technology teams met at JetBlue's headquarters in Long Island City in February of 2020 to discuss this integration.

91.     After this meeting, JetBlue provided Fareportal with access to its API, subject to an API agreement, and Fareportal's team started the integration process.  After several weeks of devoted labor to the process, Fareportal was able to confidently report to JetBlue that the integration process was going smoothly and that Fareportal had the capability to execute NDC on its website as soon as an agreement was reached.  JetBlue never expressed any concerns with Fareportal's technological ability to execute NDC integration.

### G.     JetBlue and Fareportal Reach Agreement on All Material Terms

92.     By early March of 2020—with the technology aspect of the deal largely squared away—the two parties reached agreement on all material terms.  In the middle of March, JetBlue's representatives told Fareportal that JetBlue had agreed to all commercial terms.

93.     On March 20, 2020, Sasha Barker, JetBlue's Manager of Distribution Strategy, sent Fareportal a final version of the LOI.  Barker confirmed that JetBlue was "***ready to sign it now***."  Barker indicated that it might take JetBlue two to three months to go live with NDC on its end.  But the commercial terms were confirmed.  Under the terms of this final and mutually agreed-upon LOI, Fareportal agreed to display and sell all JetBlue fare options and enhanced seating.

94.     On Friday April 3, 2020, Werner Kunz-Cho, Fareportal's co-Chief Executive Officer, signed the LOI.  On the following Monday, April 6, 2020, Fareportal returned the signed copy to JetBlue.

95.     At this point, it was Fareportal's clear and reasonable expectation that JetBlue would send back the LOI with JetBlue's signature and work promptly with Fareportal to finalize a formal NDC agreement.

### H.     JetBlue Unilaterally Abandons Deal and Cuts Ties with Fareportal

96.     Instead of returning the signed agreement, JetBlue essentially cut off communication with Fareportal for two months.  On June 1, 2020—around the time when JetBlue had represented it was expecting to go live with NDC—JetBlue had a phone call with Fareportal.  The call was attended by Dave Clark, JetBlue's Vice President for Sales and Revenue Management; Sasha Barker; Sam Jain, Fareportal's Chief Executive Officer; Werner Kunz-Cho, Glenn Cusano, Fareportal's Chief Financial Officer; José Maria Alvarado, Fareportal's Executive Vice President of Content and Supplier Relations; and Sanjay Hathiramani, Fareportal's Global Senior Vice President for Supplier Relations.

97.     Much to Fareportal's surprise, Clark and Barker stated on the call that JetBlue was abandoning the NDC deal and *terminating all dealings* with Fareportal and *all other* OTAs.  Shortly thereafter, JetBlue ceased to allow Fareportal to sell JetBlue flights departing on or after

January 5, 2021 on any of Fareportal's platforms. JetBlue's communications on this call represented a dramatic abandonment of the parties' preliminary agreement.

98.     Fareportal later discovered that JetBlue was keeping content on Expedia and Priceline—respectively the largest and third largest OTAs—for flights departing after January 5, 2021, because JetBlue has existing contracts with these OTAs. JetBlue has been extending Expedia's and Priceline's access to its content month-by-month, and they now have access to flights departing on or before September 7, 2021. Consistent with its phased strategy of terminating relationships with OTAs, however, JetBlue intends to terminate its relationships with Expedia and Priceline and cease to allow them to display and distribute JetBlue fares in the near future.

99.     On June 4, 2020, Glenn Cusano reached out to Dave Clark in an effort to keep JetBlue's content on Fareportal and give its customers as many options as possible. Cusano indicated that Fareportal was able to move to 100% NDC within 90 days, "eliminat[ing] all segment fees, thereby providing a No Cost solution for distribution."

100.    In other words, Fareportal would eliminate all segment fees (also known as "incentives") agreed to in the LOI, distributing JetBlue flights to all of Fareportal's customers at *no cost* to JetBlue. Cusano also indicated that Fareportal would work with JetBlue to differentiate its product and customize the display on Fareportal's sites.

101.    That same day, Clark responded that he did not "expect this will change our course of action in the short term." To this day, despite Fareportal's continual attempts to reach an agreement, JetBlue has rejected this *no cost solution*. Instead, it takes the position that Fareportal must stop providing consumers any information about JetBlue flights, even if Fareportal is willing to do so for free.

102.    Fareportal has attempted in good faith to bring JetBlue back to the negotiating table.  On July 1, 2020, Hathiramani emailed Barker and stated that Fareportal noticed that Expedia and Priceline were offering JetBlue content after January 5, 2021, contrary to JetBlue's earlier statements that it was terminating its dealings with *all* OTAs.  Barker confirmed JetBlue was providing content to Expedia and Priceline for flights departing after January 5, 2021.  Barker said JetBlue intended to revisit its terminated dealing with Fareportal after amending its existing contracts with Expedia and Priceline.

103.    On December 4, 2020, Cusano reached out to Clark to attempt to find a solution for Fareportal to display and distribute JetBlue content to consumers.  Cusano and Clark spoke via telephone on December 9, 2020, and Cusano reiterated Fareportal's willingness to provide a no-cost NDC solution to JetBlue.  Clark asked if Fareportal would be willing to enter into a wholesale agreement where Fareportal would receive JetBlue content through GDSs, and Cusano stated that Fareportal was willing to do so and that its number one priority was offering JetBlue content to consumers.

104.    On December 16, 2020, Clark emailed Cusano stating that JetBlue was unwilling to resume its dealing with Fareportal at the present time.  On December 18, 2020, Fareportal's counsel sent a letter to JetBlue's general counsel asking whether JetBlue would honor its obligation to negotiate in good faith based on the LOI.  Fareportal requested a response from JetBlue by December 23, 2020.  But JetBlue failed to respond *at all*.

105.    At this point, Fareportal understood JetBlue's conduct as a clear refusal to finalize a deal.  Fareportal is now faced with the prospect of immediate, irreparable harm as a result of JetBlue's anticompetitive scheme.

## I.   JetBlue's Anticompetitive Scheme

106.    By pulling its content from Fareportal and other OTAs, JetBlue has undertaken an anticompetitive scheme to eliminate OTAs like Fareportal.  JetBlue's principal weapon in executing its anticompetitive scheme has been the complete withdrawal of its business from Fareportal and other OTAs.  Even if JetBlue does not succeed in completely eliminating OTAs, it intends to distort the market for airline tickets in such a way so that it returns to the opaque regime similar to the one that preceded the 1990s.

107.    JetBlue implemented the first step in its scheme to stop allowing OTAs to distribute its flight and fare information in October 2017, when it announced it would cease doing business with the following OTAs and prevent them from selling JetBlue flights: SmartFares.com, MyFlightSearch.com, VacationExpress.com, FlyFar.ca, FlightNetwork.com, Vayama.com, WhatsCheaper.com, Vegas.com, JetsetVacations.com, CheapFlightFares.com, QuickTravels.com, and kiwi.com.

108.    These OTAs were some of the smaller ones that distributed JetBlue content.  Of these, Vayama was one of the largest.  Vayama effectively has gone out of business in the U.S., announcing that it was no longer offering flights, hotels, and car rentals in September 2020.

109.    A statement discussing JetBlue's OTA distribution strategy posted on JetBlue's website in October 2017 said that "[t]he change marks the first phase of a new online distribution strategy, which will focus on direct bookings through jetblue.com and select third-party channels."

110.    JetBlue called this "phase one" of a new distribution approach to steer more travelers to its own website.  Marty St. George, JetBlue's former Executive Vice President for Commercial and Planning, said:  "We are going to go channel by channel and partner by partner and make sure we are getting the most value."

111.     St. George also noted that some OTAs were not able to display JetBlue's different fare families—Blue, Blue Plus, and Blue Flex—or sell customers ancillary products like seats with extra legroom or pet bookings.

112.     As described above, on June 1, 2020, JetBlue informed Fareportal that it would pull its content for flights departing on or after January 5, 2021.  On June 4, 2020, Fareportal responded by offering to display JetBlue flights through NDC and eliminate segment fees, "thereby providing a No Cost solution for distribution" for JetBlue.  This offer would mean that Fareportal would continue to distribute JetBlue's fares at the same retail price that JetBlue offers consumers elsewhere, at *no additional cost* to JetBlue.  But, because JetBlue's refusal to deal with Fareportal is part of an anticompetitive scheme, and is not driven by legitimate business reasons, JetBlue summarily refused Fareportal's offer.  By turning this offer of no-cost retail distribution down, JetBlue is guaranteeing that it will lose some profitable flight sales to its competitors in the short run.  This course of action would be fundamentally irrational except for the profits JetBlue seeks to obtain from its long-term anticompetitive effects.

113.     JetBlue's anticompetitive acts are taken in furtherance of its ultimate objectives of (a) choosing which fares are available to OTAs and travelers and which more affordable fares remain hidden from OTAs and travelers; (b) making it harder for travelers to compare JetBlue's offerings with those of other airlines; and (c) leveraging the increased search costs borne by consumers and their lack of information to extract more revenue from the traveling public.  JetBlue's overall goal, and the effect of its actions, is to diminish price competition.

114.     JetBlue's scheme, which has directly harmed and threatens to harm Fareportal, other OTAs, and travelers, is anticompetitive in its purpose and effect.  JetBlue is intentionally trying to distort the competitive marketplace facilitated by OTAs such as Fareportal.  By

precluding Fareportal and other OTAs from carrying JetBlue flights, JetBlue will divert away from the OTAs both travelers that want to fly on JetBlue and travelers that *need* to fly on JetBlue because JetBlue is the only airline that provides service for their desired itinerary or because they are locked into JetBlue's frequent flyer program.

115.    Rather than competing on the merits to win travelers' business by lowering fares or improving its services, JetBlue aims to eliminate price transparency, to prevent efficient comparison shopping, and to make it difficult if not impossible for travelers to determine the airline that offers the best combination of price and service to suit their needs.  As price transparency declines, so too will JetBlue's incentives to offer competitive fares and services, leading to higher airline ticket prices, lower quality service offerings, and harm to consumers.

116.    All of this will allow JetBlue to maintain and grow its monopoly over specific routes between certain cities—including many routes that are popular with Fareportal's customers—and will facilitate JetBlue's ability to charge supracompetitive prices in these markets where it faces little or no competition.  JetBlue's conduct will also allow it to acquire monopoly power in markets in which it is currently a potential monopolist by picking and choosing which fares are available to which OTAs and travelers and hiding the best available fares from certain OTAs and travelers.  This will eliminate or marginalize OTAs, which will in turn harm startup airlines with less brand recognition who are less likely to attract consumers to their websites and therefore are dependent on OTAs.

117.    JetBlue has already suffered and will continue to suffer short-term losses from its anticompetitive scheme.  In 2019, over 520,000 passengers booked JetBlue flights through Fareportal, yielding JetBlue approximately $170 million in revenue.  When JetBlue ceased to allow Fareportal to sell its flights departing on or after January 5, 2021, some customers booked

and will continue to book on Fareportal with other airlines who compete with JetBlue. Some customers decided to and will continue to decide not to travel at all, as they lose exposure to OTAs like Fareportal, which create new travel demand by suggesting travel destinations and notifying consumers of promotional discounts. As a result, JetBlue will lose customers and sacrifice profits in the short term.

118. According to economic studies, OTAs like Fareportal also boost ticket sales on JetBlue's own website through a phenomenon known as the "billboard effect." Under this phenomenon, some consumers gain information about the pricing and availability of flights by searching for their itinerary on OTAs like Fareportal, but then complete booking their reservation on the sellers' direct channels, like jetblue.com. JetBlue's anticompetitive scheme will further cause it to sacrifice short-term profits by losing these customers, for which JetBlue was not paying any distribution costs, to rival airlines.

119. JetBlue's refusal to deal with Fareportal and other OTAs is not the result of a legitimate business or procompetitive justification. JetBlue admitted its true motivation in its earnings call with Wall Street analysts for the third quarter of 2017—to stop its "price-sensitive customers" from being able to use OTAs. JetBlue also admitted to Fareportal that it wanted to sell tickets through channels that did not focus on selling consumers the lowest price. This will reduce competition between airlines and allow JetBlue to charge supracompetitive fares and enjoy higher profits in the long term. To achieve these anticompetitive ends, JetBlue is specifically targeting price-sensitive, middle and working class Americans who need to spend as little as possible when they travel.

120. JetBlue has expressed two justifications for its conduct, but both are mere pretext for JetBlue's refusal to deal with Fareportal. First, JetBlue claims that its conduct is

motivated by cutting distribution costs.  But JetBlue refused an offer from Fareportal to host information about its flights *at no cost to JetBlue*.  Second, JetBlue told Fareportal that it wants to control the customer experience.  But JetBlue has given Expedia and Priceline access to its content for flights departing on or before September 7, 2021, even though those OTAs are offering JetBlue flights without NDC, while Fareportal is ready and able to sell JetBlue flights through NDC with the ability to offer these ancillaries.  Thus, neither of JetBlue's explanations hold up.

121.    JetBlue's refusal to deal with Fareportal is also not the result of any failure to perform or misconduct by Fareportal.  The parties successfully collaborated for nearly twenty years and JetBlue never expressed any concerns with Fareportal's ability to display and distribute its content.  Furthermore, at no point did JetBlue express any concerns with Fareportal's ability to integrate its technology with JetBlue's and implement NDC.

122.    JetBlue's anticompetitive acts, including its refusal to deal with OTAs, have had serious anticompetitive effects on Fareportal and other OTAs as well as on competition in the JetBlue Dominant City Pair and JetBlue Near Dominant City Pair markets (defined below), including on United States consumers buying airline tickets in those markets.

123.    Through these anticompetitive acts, JetBlue is costing Fareportal and other OTAs considerable amounts of money and risking putting them out of business.

124.    These anticompetitive acts will also cause substantial injury to consumers in the form of higher prices on airline tickets.  By removing its content from OTAs and eliminating or harming them, JetBlue will remove the primary driver of price transparency and competition in air travel markets.  For the markets in which JetBlue has monopoly power or has the potential to acquire monopoly power, this opacity will allow it to charge supracompetitive prices for JetBlue

flights.  This monopoly power will also facilitate its exclusion of new entrants, because without the OTA platforms for the dissemination of tickets, new competing airlines will not be able to generate enough ticket sales to compete.  JetBlue intends to return the market for ticket sales to the structure of the 1970s, without meaningful price competition or transparency—an outcome particularly costly to consumers.

## INTERSTATE TRADE AND COMMERCE

125.    The activities of JetBlue as alleged herein were within the flow of, and substantially affected, interstate commerce.  At the end of 2020, JetBlue provided scheduled jet service to nearly 100 destinations, including interstate flights within the United States and flights between the United States and international destinations.

## RELEVANT MARKETS

126.    JetBlue is one of the largest airlines in the United States.  It serves nearly 100 destinations with, on average, 1,000 daily flights.  JetBlue's route network has focus cities in important business centers and tourist destinations, including New York, Fort Lauderdale, Orlando, Boston, Los Angeles, and San Juan.  JetBlue dominates many flights departing from or arriving at these focus cities.

127.    Empirical studies of the airline industry support a city-pair approach to market definition.  In general, there are no reasonable substitutes for air travel between two cities.  For example, travel from Boston to Las Vegas is not a substitute for travel from Boston to Orlando. In major metropolitan areas with multiple airports, these airports are grouped together if consumers view them as sufficient substitutes.

128.    JetBlue has market power in a large number of City-Pair markets.  For example, JetBlue has market power in at least the following city-pair routes, among others, where its market share of air passenger travel is approximately 40% or higher:

a.   Orlando to Ponce, Puerto Rico

b.   White Plains to West Palm Beach/Palm Beach

c.   White Plains to Orlando

d.   White Plains to Miami/Fort Lauderdale

e.   Hartford to San Juan

f.   Boston to San Juan

g.   Boston to Savannah

h.   Boston to West Palm Beach/Palm Beach

i.   Hartford to West Palm Beach/Palm Beach

j.   Boston to Fort Myers

k.   Boston to Buffalo

l.   Boston to Charleston

m.   Aguadilla, Puerto Rico to Orlando

n.   Boston to Richmond

o.   Aguadilla, Puerto Rico to New York City

p.   Boston to Pittsburgh

q.   Boston to Santo Domingo, Dominican Republic

r.   New York City to Port-au-Prince, Haiti

s.   Aruba to Boston

t.   Cancun, Mexico to Orlando

u.   New York City to Saint Lucia

v.   Santo Domingo, Dominican Republic to San Juan

w.   New York City to Barbados

x.   Boston to Santiago de los Caballeros, Dominican Republic

y.   Cartagena, Colombia to New York City

z.   Orlando to Santo Domingo, Dominican Republic

aa.  Montego Bay, Jamaica to Orlando

bb.  St. George's, Grenada to New York City

cc.  Punta Cana, Dominican Republic to San Juan

dd.  San Juan to St. Thomas, U.S. Virgin Islands

ee.  New York City to Liberia, Costa Rica

ff.  Orlando to Port-au-Prince, Haiti

gg.  Curacao to New York City

hh.  Havana. Cuba to New York City

ii.  New York City to San Juan

jj.  Boston to Jacksonville

kk.  Boston to Las Vegas

ll.  New York to Ontario, California

mm.  Boston to Tampa

nn.  New York City to West Palm Beach/Palm Beach

oo.  Boston to Orlando

pp.  Albany to Miami/Fort Lauderdale

qq.  Orlando to Richmond

rr.  Boston to Cleveland

ss.  Boston to San Diego

tt.  Boston to New Orleans

uu. Orlando to Syracuse

vv. Boston to Raleigh/Durham

ww. New York City to Fort Myers

129.　　For many of these city-pair routes, JetBlue has a market share of approximately 70% of higher.  These include, but are not limited to:

a.  Orlando to Ponce, Puerto Rico

b.  White Plains to West Palm Beach/Palm Beach

c.  White Plains to Orlando

d.  White Plains to Miami/Fort Lauderdale

e.  Hartford to San Juan

f.  Boston to San Juan

g.  Boston to Savannah

h.  Boston to West Palm Beach/Palm Beach

i.  Hartford to West Palm Beach/Palm Beach

j.  Boston to Fort Myers

k.  New York City to Port-au-Prince, Haiti

l.  New York City to Saint Lucia

m.  Santo Domingo, Dominican Republic to San Juan

n.  New York City to Barbados

o.  Boston to Santiago de los Caballeros, Dominican Republic

p.  St. George's, Grenada to New York City

q.  Punta Cana, Dominican Republic to San Juan

r.  Orlando to Port-au-Prince, Haiti

    s.   Curacao to New York City

    t.   Havana, Cuba to New York City

130.    JetBlue's conduct is designed to protect its market power in all of these markets, including the markets in which it has substantial market power ("Dominant City-Pair markets"). This substantial market power is sometimes called monopoly power.  For example, Dominant City-Pair markets include, but are not limited to, White Plains to West Palm Beach/Palm Beach, Boston to San Juan, Boston to West Palm Beach/Palm Beach, New York City to Barbados, and New York City to Saint Lucia.

131.    JetBlue's conduct is also designed to help it achieve monopoly power in the City-Pair markets where it is not yet dominant but is nearly dominant ("Near-Dominant City-Pair markets").   For example, Near-Dominant City-Pair markets include, but are not limited to, New York City to San Juan, Boston to Las Vegas, and Boston to Orlando.  On these Near-Dominant City-Pair markets, JetBlue has market power and a dangerous probability of achieving monopoly power.

132.    JetBlue's market power is particularly strong in the East Coast of the United States, the Caribbean, and Latin America.  One third of JetBlue's route network is in the Caribbean and Latin America.  As noted, JetBlue's market dominance is particularly strong in its focus cities.  JetBlue has more flights than any other airline at Logan International Airport in Boston, Fort Lauderdale-Hollywood International Airport, and Luis Munoz Marin International Airport in San Juan.

133.    JetBlue's market power is enhanced by significant barriers to entry that exist in the City-Pair markets where it flies.  These significant barriers to entry that protect JetBlue's market power include the need for a potential new entrant to a City-Pair market to purchase very

expensive equipment; to obtain an FAA license, gates and takeoff slots at the relevant airports; and to develop a consumer reputation.

134.     Another barrier to entry is created by JetBlue's TrueBlue frequent flyer program, which locks in consumers and creates high switching costs, further cementing JetBlue's market power.  Travelers in areas dominated by JetBlue—such as Boston or San Juan—tend to accumulate "points" or "miles" in JetBlue's frequent flyer program.  Frequent flyer programs foster customer loyalty (*i.e.*, the use of a particular carrier even when a competing carrier has a lower fare or otherwise has a more competitive alternative) by offering free tickets and highly coveted benefits—such as complimentary seat upgrades, priority check-in service, and priority boarding, among others—for meeting certain flight-mile benchmarks.  As part of its effort to steer customers to jetblue.com, JetBlue offers triple TrueBlue points for flights booked directly on jetblue.com.

## CLAIMS FOR RELIEF

### Count 1:  Monopolization of Passenger Air Travel in the JetBlue Dominant City-Pair Markets (Section 2 of the Sherman Act)

135.     Fareportal alleges and incorporates all prior paragraphs as though set forth fully herein.

136.     JetBlue possesses monopoly power over passenger air travel in the JetBlue Dominant City-Pair markets.  JetBlue has willfully acted to acquire, enhance, and maintain that power through the anticompetitive, deceptive, and exclusionary acts and practices described herein, including: (a) withholding content from and refusing to deal with OTAs such as Fareportal, in a departure from its long-standing practices, without legitimate business justification, and with the sacrifice of great profits; and (b) eliminating the availability of full fare information in order to minimize price transparency.  JetBlue will continue to engage in this anticompetitive, deceptive, and exclusionary conduct unless stopped and restrained by this Court.

137.     The direct effect of JetBlue's exclusionary conduct is the harming and destruction of Fareportal and other OTAs that facilitate transparent and efficient fare comparisons.  Through the harming and destruction of Fareportal and other OTAs, JetBlue's exclusionary conduct decreases the ability of United States-based travelers to identify and book the best available fares for their desired itineraries; reduces price competition among airlines; raises barriers to entry in the JetBlue Dominant City-Pair markets; preserves JetBlue's ability to charge supracompetitive prices in the JetBlue Dominant City-Pair markets; and enhances JetBlue's ability to increase prices in JetBlue Dominant City-Pair markets.

138.     JetBlue has acted with intent to illegally acquire, enhance, and maintain its monopoly over passenger air travel in the JetBlue Dominant City-Pair markets.

139.     JetBlue's conduct violates Section 2 of the Sherman Act, 15 U.S.C. § 2.

140.     There is no lawful justification for JetBlue's conduct.

141.     JetBlue's illegal conduct has directly and proximately caused injury to interstate commerce and to Fareportal's business and property, and also presents an imminent threat of causing further significant injury.

### Count 2:  Attempted Monopolization of Passenger Air Travel in the JetBlue Near-Dominant City-Pair markets (Section 2 of the Sherman Act)

142.     Fareportal alleges and incorporates all prior paragraphs as though set forth fully herein.

143.     JetBlue possesses market power over passenger air travel in the JetBlue Near-Dominant City-Pair market.  JetBlue has willfully engaged in the anticompetitive, deceptive, and exclusionary acts and practices described herein, including: (a) withholding content from and refusing to deal with OTAs such as Fareportal, in a departure from its

long-standing practices, without legitimate business justification, and with the sacrifice of great profits; and (b) eliminating the availability of full fare information in order to minimize price transparency. JetBlue engaged in the above conduct with the specific intent to destroy competition and to acquire, enhance, and maintain monopoly power over passenger air travel in the JetBlue Near-Dominant City-Pair markets.

144. The direct effect of JetBlue's exclusionary conduct is the harming and destruction of Fareportal and other OTAs that facilitate transparent and efficient fare comparisons. Through the harming and destruction of Fareportal and other OTAs, JetBlue's exclusionary conduct decreases the ability of United States-based travelers to identify and book the best available fares for their desired itineraries; reduces price competition among airlines; pushes travelers into unwittingly paying higher prices for JetBlue tickets and otherwise increases JetBlue's ability to raise prices in the JetBlue Near-Dominant City-Pair markets; and enables JetBlue to attain monopoly power in the JetBlue Near-Dominant City-Pair markets other than through competition on the merits.

145. Unless restrained by this Court, there is thus a dangerous probability that JetBlue will succeed in obtaining monopoly power over passenger air travel in the JetBlue Near-Dominant City-Pair markets.

146. JetBlue's conduct violates Section 2 of the Sherman Act, 15 U.S.C. § 2.

147. There is no lawful justification for JetBlue's conduct.

148. JetBlue's illegal conduct has directly and proximately caused injury to interstate commerce and to Fareportal's business and property, and also presents an imminent threat of causing further significant injury.

## Count 3: Breach of Contract with Fareportal

149.    Fareportal alleges and incorporates all prior paragraphs as though set forth fully herein.

150.    On March 20, 2020, JetBlue sent Fareportal the LOI and indicated that it was "*ready to sign it now*."

151.    Fareportal signed the LOI on April 3, 2020, and sent JetBlue the signed copy on April 6, 2020.

152.    The mutually agreed upon LOI imposes an obligation on the parties to negotiate with each other in good faith to close the transaction contemplated under the LOI on the terms set forth therein.

153.    Fareportal has performed or is ready, willing, and able to perform all of its obligations under the LOI.

154.    JetBlue breached its duty to negotiate in good faith by, among other things, ceasing communications and abandoning negotiations with Fareportal to finalize and close the transaction and communicating to Fareportal on June 1, 2020, that it intended to pull all content from Fareportal.

155.    As a result of JetBlue's breach, Fareportal has incurred substantial damages, including but not limited to the time and expense incurred on NDC implementation, loss of revenue from customers booking JetBlue flights on Fareportal, and loss of good will and harm to Fareportal's business reputation.

## Count 4: Promissory Estoppel

156.    Fareportal alleges and incorporates all prior paragraphs as though set forth fully herein.

157.    In June of 2019, JetBlue represented to Fareportal that it was seeking to phase in NDC and that it was interested in partnering with Fareportal as part of this strategy.  Throughout the parties' nearly twenty-year relationship, Fareportal has undertaken substantial efforts to accommodate JetBlue's business needs, such as the deploying of its technology to display JetBlue fare families and ancillaries.

158.    JetBlue then requested that Fareportal muster its expertise and resources to integrate the two parties' complex software interfaces.  Establishing the customized connection necessary to implement NDC is a difficult process that requires significant financial and technological investment.  Fareportal has been a market leader in executing NDC with airlines.

159.    In reasonable and foreseeable reliance on JetBlue's promises regarding its NDC strategy and the stability of the parties' business relationship, Fareportal readily accepted this request.  Fareportal's technology team received access to JetBlue's API in February 2020 and then expended its own resources and labor on the integration process.  After several weeks of devoted work, Fareportal confirmed with JetBlue that it had the capability to execute NDC.

160.    Fareportal relied on JetBlue's promises to its detriment.  After stonewalling Fareportal for over two months, JetBlue repudiated its promises on a call with Fareportal on June 1, 2020.  JetBlue communicated that it would not be moving forward with NDC.  Moreover—in direct contradiction with JetBlue's representations prior to Fareportal's commencement of the integration process—JetBlue stated that it would be ceasing *all dealings* with Fareportal.  JetBlue's conduct has left Fareportal worse off by, among other things, inducing Fareportal to spend substantial time and money on implementing NDC.

161.    As a direct and proximate consequence of JetBlue's conduct, Fareportal has suffered damages; further, under the circumstances, it would be inequitable to allow JetBlue to revoke the promises it made.

## **PRAYER FOR RELIEF**

WHEREFORE, Fareportal prays for entry of judgment in its favor and against JetBlue and for the following relief:

A.    A decree that JetBlue has violated, and threatens to continue violating, the Sherman Act;

B.    Preliminary relief enjoining JetBlue from blocking Fareportal's ability to display and offer its content;

C.    A permanent injunction prohibiting JetBlue and its agents, servants, employees, affiliates, divisions, and subsidiaries, and those in association with them from engaging in conduct that violates the antitrust laws;

D.    An award of treble damages for JetBlue's antitrust violations;

E.    A decree that JetBlue must negotiate in good faith with Fareportal to reach a commercial deal allowing Fareportal to display JetBlue content under the terms of the LOI;

F.    An award of damages resulting from JetBlue's breach of its agreed-upon duty to negotiate in good faith to reach a commercial agreement under the terms of the LOI;

G.    An award of damages resulting from Fareportal's reasonable and detrimental reliance on JetBlue's promises;

H.    An award of all costs and fees in this action, including attorney's fees and pre- and post-judgment interest; and

I.     Such other relief as this Court deems just and proper.

## **<u>JURY DEMAND</u>**

Fareportal hereby demands a trial by jury of all issues properly triable thereby.

Dated:  New York, New York
         January 5, 2021

Respectfully submitted,


**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

By */s/  Steig D. Olson*　　　　　　　

Steig D. Olson
Corey Worcester
Todd Anten
Avi Grunfeld (*pro hac vice* forthcoming)
Anna Deknatel
steigolson@quinnemanuel.com
coreyworcester@quinnemanuel.com
toddanten@quinnemanuel.com
avigrunfeld@quinnemanuel.com
annadeknatel@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, New York 10011
Tel: (212) 849-7000
Fax: (212) 849-7100