**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

---

FAREPORTAL HOLDINGS INC. *et al.*,

                Plaintiffs,

    v.

JETBLUE AIRWAYS CORPORATION,

           Defendant**.**

No. 1:21 Civ. 00061 (CBA)(LB)

## FAREPORTAL'S MEMORANDUM OF LAW IN OPPOSITION TO
## <u>JETBLUE AIRWAYS CORPORATION'S MOTION TO DISMISS</u>

**TABLE OF CONTENTS**

                                                                                          **Page**

PRELIMINARY STATEMENT ....................................................................................1

STATEMENT OF FACTS .........................................................................................4

    A.    The Procompetitive And Pro-Consumer Emergence Of OTAs.............................4

    B.    JetBlue's Evolution From Low-Cost Carrier To City-Pair Monopolist .................6

    C.    JetBlue Launches Its Anticompetitive Effort ........................................................6

    D.    JetBlue And Fareportal Form A Binding Preliminary Agreement ........................7

    E.    JetBlue Abandons The Parties' Type II Agreement And Completely Cuts
          Off Fareportal's Ability to Display And Sell Its Flights.........................................8

ARGUMENT ............................................................................................................9

I.      THE COMPLAINT STATES PLAUSIBLE ANTITRUST CLAIMS.............................10

    A.    JetBlue's Conduct Fits Squarely Within The Refusal-To-Deal Framework
          Set Forth By The Supreme Court In *Aspen Skiing* ............................................10

    B.    JetBlue's Arguments Do Not Undermine The Plausibility Of Fareportal's
          Antitrust Claims ...................................................................................................17

          1.    Trading Short Term Losses For Long Term Profits .................................18

          2.    Increased Search Costs Generate Higher Prices ......................................19

    C.    Fareportal Has Antitrust Standing Because Its Alleged Injury Is The "Very
          Means" By Which JetBlue Is Harming Competition.............................................25

    D.    The Complaint Adequately Alleges Market Power ..............................................28

    E.    The Complaint Repeatedly Alleges that JetBlue Acted With Specific
          Intent ...................................................................................................................31

II.    THE COMPLAINT ADEQUATELY ALLEGES THAT JETBLUE BREACHED
      ITS TYPE II PRELIMINARY AGREEMENT.......................................................31

    A.    The Parties Entered Into A Type II Agreement ...................................................31

          1.    JetBlue's Signature Was Not Required For Its Agreement To The
              LOI..........................................................................................................32

          2.    All Five Factors Support The Existence Of A Type II Agreement ..........35

    B.    JetBlue Breached Its Type II Obligation, Causing Significant Damage To
          Fareportal .............................................................................................................42

III.   THE COMPLAINT ADEQUATELY PLEADS A PROMISSORY ESTOPPEL
      CLAIM...............................................................................................................43

CONCLUSION.......................................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.I.B. Express, Inc. v. FedEx Corp.*,
   358 F. Supp. 2d 239 (S.D.N.Y. 2004) ........................................................................... 11

*Allen v. Dairy Farmers of Am., Inc.*,
   748 F. Supp. 2d 323 (D. Vt. 2010) ............................................................................... 28

*Am. Cent. E. Texas Gas Co. v. Union Pac. Res. Grp., Inc.*,
   93 F. App'x 1 (5th Cir. 2004) ...................................................................................... 11

*American Airlines Inc. v. Despegar.com USA, Inc.*,
   No. 13-cv-22773 (S.D. Fla. Dec. 17, 2014) ................................................................. 12

*Anderson News, L.L.C. v. Am. Media, Inc.*,
   680 F.3d 162 (2d Cir. 2012) ......................................................................................... 10

*Apotex Corp. v. Hospira Healthcare India Priv. Ltd.*,
   2020 WL 58247 (S.D.N.Y. Jan. 6, 2020) ..................................................................... 16

*Arcadian Phosphates, Inc. v. Arcadian Corp.*,
   884 F.2d 69 (2d Cir. 1989) ........................................................................................... 39

*Arcesium, LLC v. Advent Software, Inc.*,
   2021 WL 1225446 (S.D.N.Y. Mar. 31, 2021) .................................................. 14, 25, 26

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ........................................................................................................ 9

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
   472 U.S. 585 (1985) .................................... 1, 2, 10, 11, 12, 13, 14, 15, 17, 18, 26

*Atl. Richfield Co. v. USA Petroleum Co.*,
   495 U.S. 328 (1990) ...................................................................................................... 26

*Bear Stearns Inv. Prod., Inc. v. Hitachi Auto. Prod. (USA), Inc.*,
   401 B.R. 598 (S.D.N.Y. 2009) ......................................................................... 33, 35, 37

*Blue Shield of Virginia v. McCready*,
   457 U.S. 465 (1982) ......................................................................................... 25, 26, 27

*Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*,
   985 F. Supp. 2d 612 (S.D.N.Y. 2013) ......................................................................... 30

*Braun v. United Recovery Sys., LP*,
   14 F. Supp. 3d 159 (S.D.N.Y. 2014) ........................................................................... 20

*Brighton Inv., Ltd. v. Har-ZVI*,
   88 A.D.3d 1220 (3rd Dep't 2011) ..................................................................... 33, 34, 35

*Brown v. Cara*,
   420 F.3d 148 (2d Cir. 2005) .............................................................. 32, 35, 36, 38, 40, 42

*Browning-Ferris Indus. v. Muszynski,*
    899 F.2d 151 (2d Cir. 1990) ................................................................................ 20

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
    429 U.S. 477 (1977) ........................................................................................... 26

*CAC Grp. Inc. v. Maxim Grp. LLC,*
    523 F. App'x 802 (2d Cir. 2013) ...................................................................... 40

*Covad Comms. Co. v. Bell Atl. Corp.,*
    398 F.3d 666 (D.C. Cir. 2005) .......................................................................... 17

*Creative Copier Servs. v. Xerox Corp.,*
    344 F. Supp. 2d 858 (D. Conn. 2004) .............................................................. 12

*Ctr. For Biological Diversity v. Morgenweck,*
    351 F. Supp. 2d 1137 (D. Colo. 2004) ............................................................. 20

*Cyberchron Corp. v. Calldata Sys. Dev., Inc.,*
    47 F.3d 39 (2d Cir. 1995) .................................................................................. 43

*Delaware & Hudson Ry. Co. v. Consol. Rail Corp.,*
    902 F.2d 174 (2d Cir. 1990) .............................................................................. 10

*Eastman Kodak Co. v. Image Tech. Servs., Inc.,*
    504 U.S. 451 (1992) ............................................................................... 14, 28, 30

*EQT Infrastructure Ltd. v. Smith,*
    861 F. Supp. 2d 220 (S.D.N.Y. 2012) ........................................... 31, 36, 37, 41, 42

*FCOF UB Sec. LLC v. MorEquity, Inc.,*
    663 F. Supp. 2d 224 (S.D.N.Y. 2009) .............................................................. 41

*G.K.A. Beverage Corp. v. Honickman,*
    55 F.3d 762 ........................................................................................................ 27

*Gas Nat., Inc. v. Iberdrola, S.A.,*
    33 F. Supp. 3d 373 (S.D.N.Y. 2014) ..................................................... 37, 38, 39

*Gatt Comms., Inc. v. PMC Assocs., L.L.C.,*
    711 F.3d 68 (2d Cir. 2013) ................................................................................ 27

*Gelboim v. Bank of Am. Corp.,*
    823 F.3d 759 (2d Cir. 2016) .............................................................................. 26

*Global Discount Travel Services., LLC v. Trans World Airlines, Inc.,*
    960 F. Supp. 701 (S.D.N.Y. 1997) ............................................................. 29, 30

*Harry v. Total Gas & Power N. Am., Inc.,*
    889 F.3d 104 (2d Cir. 2018) .............................................................................. 27

*Hinds Cnty., Miss. v. Wachovia Bank N.A.,*
    700 F. Supp. 2d 378 (S.D.N.Y. 2010) .............................................................. 22

*Illinois ex rel. Burris v. Panhandle Eastern Pipe Line Co.,*
    935 F.2d 1469 (7th Cir. 1991) .......................................................................... 17

*Iqvia Inc. v. Veeva Sys. Inc.*,
2018 WL 4815547 (D.N.J. Oct. 3, 2018)...................................................... 12

*Knight v. Koenigsmann*,
2019 WL 2615977 (S.D.N.Y. June 26, 2019) ............................................. 28

*Kolchins v. Evolution Markets, Inc.*,
128 A.D.3d 47 (1st Dep't 2015), *aff'd*, 31 N.Y.3d 100 (2018) ............................................. 33

*Kowalchuk v. Stroup*,
61 A.D.3d 118 (1st Dep't 2009) ............................................. 35

*L-7 Designs, Inc. v. Old Navy, LLC*,
647 F.3d 419 (2d Cir. 2011)...................................................... 42

*Learning Annex Holdings, LLC v. Whitney Educ. Grp., Inc.*,
765 F. Supp. 2d 403 (S.D.N.Y. 2011)......................................... 38, 39, 40, 43

*Lorain Journal Co. v. United States*,
342 U.S. 143 (1951)................................................................ 15, 26

*Meltzer, Lippe, Goldstein & Breitstone, LLP v. Malfetti*,
2018 WL 4627667 (E.D.N.Y. Sept. 27, 2018) ...................................... 33, 34

*Network Enterprises, Inc. gv. APBA Offshore Prods., Inc.*,
264 F. App'x 36 (2d Cir. 2008) ......................................................... 41

*Official Airlines Guides, Inc. v. F.T.C.*,
630 F.2d 920 (2d Cir. 1980)...................................................... 29

*PharmacyChecker.com, LLC v. Nat'l Ass'n of Boards of Pharmacy*,
2021 WL 1199363 (S.D.N.Y. Mar. 30, 2021) .................................. 26, 27

*Port Dock & Stone Corp. v. Oldcastle Northeast., Inc.*,
507 F.3d 117 (2d Cir. 2007).................................................. 15, 16, 27

*Pro Search Plus, LLC v. VFM Leonardo, Inc.*,
2013 WL 6229141 (C.D. Cal. Dec. 2, 2013) ....................................... 25

*Roth v. Jennings*,
489 F.3d 499 (2d Cir. 2007)...................................................... 28

*Safeway Inc. v. Abbott Labs.*,
2010 WL 147988 (N.D. Cal. Jan. 12, 2010) .......................................... 12

*Scheck v. Francis*,
26 N.Y.2d 466 (1970) ................................................................... 34

*Spirit Airlines v. Northwest Airlines*,
431 F.3d 917 (6th Cir. 2005) ............................................................. 29, 30

*Starr v. Sony BMG Music Ent.*,
592 F.3d 314 (2d Cir. 2010).................................................. 22

*Steward Health Care Sys. v. Blue Cross & Blue Shield of Rhode Island*,
2014 WL 630678 (D.R.I. Feb. 19, 2014)............................................. 12

iv

*Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co.*,
  670 F. Supp. 491 (S.D.N.Y. 1987)................................................................. 37, 38, 40, 42, 43

*Tichy v. Hyatt Hotels Corp.*,
  376 F. Supp. 3d 821 (N.D. Ill. 2019) ........................................................... 3, 21, 23, 25

*Thompson v. 1-800 Contacts, Inc.*,
  2018 WL 2271024 (D. Utah May 17, 2018)................................................................. 21, 23

*Tops Markets, Inc. v. Quality Markets, Inc.*,
  142 F.3d 90 (2d Cir. 1998)................................................................. 30

*trueEX, LLC v. MarkitSERV Ltd.*,
  266 F. Supp. 3d 705 (S.D.N.Y. 2016)................................................................. 11, 14

*Tucker v. Apple Computers, Inc.*,
  493 F. Supp. 2d 1090 (N.D. Cal. 2006) ................................................................. 12

*United States v. Dentsply Int'l, Inc.*,
  399 F.3d 181 (3d Cir. 2005)................................................................. 15, 25

*United States v. E. I. du Pont de Nemours & Co.*,
  351 U.S. 377 (1956)................................................................. 28

*Vacold LLC v. Cerami*,
  545 F.3d 114 (2d Cir. 2008)................................................................. 39

*Verizon Comms. Inc. v. Law Offices of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004)................................................................. 11, 12, 14, 18

*Viamedia, Inc. v. Comcast Corp.*,
  951 F.3d 429 (7th Cir. 2020) ................................................................. 14, 17

*Virgin Atl. Airways Ltd. v. Brit. Airways PLC*,
  872 F. Supp. 52 (S.D.N.Y. 1994)................................................................. 29

*Wacker v. JP Morgan Chase & Co*,
  678 F. App'x 27 (2d Cir. 2017) ................................................................. 9

**Statutory Authorities**

15 U.S.C. § 2................................................................. 26

**Additional Authorities**

Berry, Steven and Jia, Panle, *Tracing the Woes: An Empirical Analysis of the Airline Industry*,
  2(3) American Economic Journal: Microeconomics 1 (2010) ................................................................. 20

Bilotkach, Volodymyr, *Reputation, Search Cost, and Airfares*, 16 Journal of Air Transport
  Management 252 (2010)................................................................. 21

Borenstein, Severin and Rose, Nancy L., *How Airline Markets Work… or Do They? Regulatory
  Reform in the Airline Industry*, Economic Regulation and Its Reform: What Have We
  Learned? 63 (Nancy L. Rose ed., 2014) ................................................................. 20

Brueckner, Jan K., et al., *City-Pairs Versus Airport-Pairs: A Market-Definition Methodology for
  the Airline Industry*, 44(1) Review of Industrial Organization 1 (2013) ................................................................. 29

Diamond, Peter A., *A Model of Price Adjustment*, 3 Journal of Economic
  Theory 156 (1971) ........................................................................................... 3, 19

*Exploring Industry Practices on Distribution and Display of Airline Fare, Schedule, and
  Availability Information*, 81 Fed. Reg. 75481 (Oct. 31, 2016) .......................................... 22, 24

Orlov, Eugene, *How Does the Internet Affect Price Dispersion? Evidence from the Airline
  Industry*, 59(1) Journal of Industrial Economics 21 (2011) ...................................................... 20

Royal Swedish Academy of Sciences, "*The Prize in Economic Sciences 2010*" Press Release
  (October 11, 2010), available at https://www.nobelprize.org/uploads/2018/06/press-12.pdf .... 3

Scott Morton, Fiona, et al., "*Benefits of Preserving Consumers' Ability to Compare Airline
  Fares*," (May 19, 2015), available at https://www.regulations.gov/document/DOT-OST-2016-
  0204-36831 ..................................................................................................................... 20, 30

Plaintiffs Fareportal Holdings Inc.; Fareportal Inc.; WK Travel, Inc.; and Travelong, Inc. (collectively "Fareportal") respectfully submit this memorandum of law in opposition to JetBlue Airways Corporation's motion to dismiss the Amended Complaint (Dkt. No. 18) ("Complaint").

## PRELIMINARY STATEMENT

This case concerns a concerted effort by JetBlue to make it harder for consumers to save money when they book air travel. JetBlue has cut off the ability of Fareportal and twelve other online travel agencies ("OTAs") to display and sell to consumers JetBlue's flights and fares. The OTAs did nothing wrong—they displayed accurate information about flight options, sold JetBlue fares, and boosted JetBlue's profits. But after relying for nearly twenty years on the price transparency and accessible marketplace that OTAs provide in order to fuel its own growth—from a new-entrant to a now-dominant airline on numerous flight routes—JetBlue has reversed course. JetBlue no longer wants consumers to be able to easily compare its flights and fares to those of other airlines. Instead, it wants to turn back the clock to a time before OTAs, when consumers had little price transparency or ability to comparison shop for airline fares. Its goal is to stifle price competition and to block new entry on the routes that it now dominates.

In its motion to dismiss ("MTD"), JetBlue tries to dodge Fareportal's antitrust claims, calling them "conclusory, contradictory and implausible." (MTD 1.) They are nothing of the sort. The Complaint's allegations are clear and largely undeniable: JetBlue abandoned a prior course of dealing that had benefitted consumers and facilitated competition for nearly twenty years by cutting off the ability of Fareportal and twelve other OTAs to display and distribute its flights and fares to consumers. The Supreme Court in *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985) held that this type of conduct—where an entity with monopoly power "elected to make an important change in a pattern of distribution that had originated in a competitive market and persisted for several years" and which "impaired competition in an unnecessarily restrictive

1

way"—can give rise to antitrust liability.  *Id.* at 605.  This case fits squarely within the *Aspen Skiing* framework.  JetBlue's attempts to argue otherwise—by inventing new requirements for antitrust liability or raising disputed questions of fact about its intent—all fail.

JetBlue also raises a variety of premature challenges to the Complaint's allegations about the economic consequences of its actions.  For example, it accuses Fareportal of ignoring that JetBlue's "domestic market share is less than 5%" (MTD 1), suggesting that it is too small to pose any competitive concern.  But as JetBlue well knows, airline market power in antitrust cases is not measured on a total domestic basis, but is instead evaluated over specific airline routes.  That is because antitrust market definition looks to reasonable substitutability, and air travel between two particular cities is not substitutable for air travel between two different cities.  Accordingly, courts have consistently held that airline market power is appropriately defined in terms of specific "City-Pair" routes.  And, as the Complaint details, JetBlue has a commanding market share over many such routes, in many cases exceeding 70%; these routes often involve one of its six "focus" cities (New York, Fort Lauderdale, Orlando, Boston, Los Angeles, and San Juan).  The Complaint's well-supported allegations that JetBlue's effort will stifle price competition and protect JetBlue's dominance over those routes are more than plausible.

In a similar vein, JetBlue asserts that its termination of OTAs could not hurt competition because "there are numerous other ways for consumers to compare air carrier prices."  (MTD 2.) But, in addition to being outside the bounds of a motion to dismiss, JetBlue's assertions are self-serving and inaccurate.  It says that consumers can look "on JetBlue's and other carriers' websites" or "well-known metasearch engines" (MTD 2), but these proffered alternatives are far inferior to OTAs, which, as the Complaint alleges, provide accessible marketplaces that revolutionized airfare competition and have driven down fares industry-wide.

There is ample support for the Complaint's allegations that the display of airline fares on OTAs leads to more competition and lower prices and, conversely, that JetBlue's decision to deprive OTAs from being able to display its fares will allow it to raise prices and avoid competition on the airline routes it dominates. These conclusions stem from Nobel Prize-winning economic literature that demonstrates how even small search costs can facilitate monopoly pricing.[1] And these principles apply to the airline industry in ways that provide compelling support for Fareportal's claims. Indeed, in similar contexts, courts have sustained antitrust claims where suppliers restricted the ability of OTAs to provide price comparison information to consumers. *See Tichy v. Hyatt Hotels Corp.,* 376 F. Supp. 3d 821, 846 (N.D. Ill. 2019) (finding plausible that by making hotel-focused OTAs less prominent for consumers, the defendants "face less pressure to price competitively, prices increase, and consumers pay more"). Consequently, none of JetBlue's various efforts to dispute the Complaint's allegations can succeed at the pleading stage.

In addition to pleading antitrust claims, the Complaint also alleges that, in furtherance of its strategy of depriving Fareportal of access to JetBlue's flights and fares, JetBlue walked away from its commitment to negotiate a final contract with Fareportal to implement a new technology for delivering airline content to OTAs—called the New Distribution Capability ("NDC"). JetBlue and Fareportal worked for almost a year towards formalizing the deal and, by March 2020, agreed on all of the core commercial terms and memorialized them in what they called a Letter of Intent or "LOI." The purpose of the LOI was for the parties to commit to a framework for the ongoing negotiations so they could move forward to finalize and implement an ultimate contract for NDC

---

[1] The documents referenced herein are attached as exhibits to the Declaration of Steig D. Olson, dated May 17, 2021. (*See* Olson Ex. 1 at 156-68 (Peter Diamond, *A Model of Price Adjustment*, 3 Journal of Economic Theory, 156 (1971)).) Professor Diamond won a Nobel Prize in Economic Sciences for this theory. (*See* Olson Ex. 2 (Press Release, Royal Swedish Academy of Sciences, *The Prize in Economic Sciences 2010* (Oct. 11, 2010)).)

distribution.  In New York, such an LOI is known as a "Type II" preliminary agreement, and its existence requires the parties to negotiate in good faith to complete the final contract.

But, after agreeing to the LOI, JetBlue reversed course and decided to add Fareportal to the growing list of OTAs that it was terminating.  That abandonment, after the parties had worked together for nearly a year and had committed to negotiate in good faith towards the ultimate contract, separately violates New York contract law.

JetBlue argues that the LOI had no effect because JetBlue did not sign it.  But it was JetBlue who drafted and sent the LOI to Fareportal, offering a full set of terms to which JetBlue stated it had already agreed.  And Fareportal signed and returned that LOI without changing even a comma, accepting JetBlue's offer.  The parties then moved toward the final contract on the premise that the LOI governed.  Under New York law, therefore, Fareportal has sufficiently alleged that:  (1) the LOI's terms, the parties' conduct, and their explicit communications were sufficient to form a binding Type II agreement; and (2) JetBlue breached that agreement by renouncing the LOI and abandoning the negotiations towards a final contract.

Accordingly, Fareportal's Complaint pleads viable claims for monopolization and attempted monopolization, breach of  the parties' Type II agreement, and promissory estoppel. JetBlue's motion to dismiss should be denied in its entirety.

## STATEMENT OF FACTS

### A.    The Procompetitive And Pro-Consumer Emergence Of OTAs

For decades, consumers were largely in the dark when they shopped for airline tickets. (¶¶ 45-52.)[2]  Airlines distributed tickets directly to travelers or through brick-and-mortar travel agencies.  (¶ 46.)  Trying to compare prices required time-consuming endeavors such as calling up

---

[2]   All paragraph citations (¶) are to Fareportal's Amended Complaint, Docket No. 18.

one airline at a time for price quotes.  (*Id.*)  As a result, most consumers used a single airline for their travel needs and accepted whatever fare that airline charged.  (*Id.*)

In the 1970s, the advent of multi-airline computer reservation systems, known as global distribution systems or "GDSs," delivered aggregated flight information to travel agents, facilitating fare comparisons.  (¶ 48.)  But the airlines owned the GDSs and used their control to display their own flights favorably, a practice known as "display bias."  (¶¶ 49-50.)  Economic evidence confirms the lack of robust price competition in this period, as consumers remained unable to comparison shop and travel agents depended on airline-controlled GDSs.  (¶ 52.)

Beginning in the 1990s, OTAs emerged and dramatically revolutionized the sale of airline tickets.  (¶¶ 4, 53, 59-60.)  OTAs receive aggregated airline information from GDSs and display this information in a user-friendly way that allows consumers to directly and easily compare fares across airlines.  (¶¶ 4, 26, 55-56, 58.)  OTAs greatly reduced search costs and enhanced price transparency.  (¶¶ 4, 26, 33, 59-61, 77-80, 124.)  This transparency forced airlines to compete more aggressively on price, resulting in significantly lower fares for the traveling public.  (¶¶ 4, 59-61.)

Fareportal is one of the OTAs instrumental in providing these benefits to consumers. (¶¶ 76, 81.)  Today, following consolidation in the industry, Fareportal is one of the three largest OTAs in the United States, serving around 10 million customers.  (*Id.*)  Among the large OTAs, however, Fareportal is the only one that has maintained a primary focus on airline tickets rather than directing consumers towards hotel bookings, which make up a majority of other large OTAs' revenues.  (¶¶ 25, 73.)  Fareportal's largest OTA for leisure travel, CheapOair, offers a "smart" recommendation engine that identifies for customers the cheapest flight option, the shortest flight option, flights departing from or arriving at nearby airports, and flights departing or arriving on alternative dates close to the searched-for itinerary.  (¶ 72.)  Proprietary algorithms hunt for the

cheapest flights that meet a traveler's needs through innovative methods, such as finding multi-airline itineraries.  (¶¶ 27, 29, 55, 73.)  Fareportal also offers features that allow consumers to compare the total cost of travel, instead of only base fares.  (¶¶ 74-75.)

### B.    JetBlue's Evolution From Low-Cost Carrier To City-Pair Monopolist

OTAs like Fareportal enabled JetBlue to enter the market and grow.  (¶¶ 63-65.)  JetBlue started in 2000 as a "low-cost carrier," aimed at leisure travelers.  (¶ 62.)  JetBlue's flights were widely sold through OTAs, via JetBlue's long-term agreements to provide its full set of flight and fare data to GDSs for distribution across the industry.  (¶ 57.)  In 2019, over 520,000 passengers booked JetBlue tickets on Fareportal, netting it approximately $170 million in revenue.  (¶ 83.)

Over time, as its market share has grown, JetBlue has begun to behave like an older, legacy airline.  For example, JetBlue was the first airline to charge $30 (and then $35) for bags.  (¶ 66.)  But its perception as a low-cost carrier makes it especially important to Fareportal's cost-conscious customers.  (¶¶ 26-27, 33, 72-73, 77.)

Today, JetBlue is one of the largest airlines in the U.S. by passengers carried.  (¶ 67.)  It has a dominant or near-dominant market share over many airline routes between cities, most notably on and between the East Coast, Caribbean, and Latin America.  (*Id*.)  Many of the routes JetBlue dominates touch one of its six focus cities:  New York, Fort Lauderdale, Orlando, Boston, Los Angeles, and San Juan.  (*Id*.)  Ninety-seven percent of JetBlue's growth between 2012 and 2017 came from these six focus cities.  (¶ 68.)

### C.    JetBlue Launches Its Anticompetitive Effort

JetBlue's growth into a large airline with market power has led it to a new strategy of looking to raise prices and avoid competition on the routes it dominates and nearly dominates.  In October 2017, JetBlue commenced the first phase of its plan by cutting off twelve smaller OTAs

6

from displaying and distributing its flight content.  (¶ 118.)  Vayama, one of the largest of the OTAs targeted in this phase, has since gone out of business.  (¶ 119.)

In a call with Wall Street investors, JetBlue stated it was cutting off these OTAs as "the first phase of a broader strategy to drive our most price-sensitive customers towards direct distribution."  (¶¶ 3, 130.)  By "direct distribution" JetBlue means its own website, where consumers are unable to compare JetBlue's fares and ancillaries to those of other carriers.  JetBlue separately admitted to Fareportal that it wanted to avoid selling tickets through channels that were focused on providing consumers with the lowest-price fares.  (¶ 130.)

### D.     JetBlue And Fareportal Form A Binding Preliminary Agreement

In June 2019, JetBlue advised Fareportal that it wanted to partner to phase in NDC, a technology standard for connecting airlines to OTAs that enables OTAs to display more detailed airline content.  (¶ 87.)  Fareportal agreed, and the parties began discussing commercial terms and exchanging drafts of an agreement to negotiate towards an ultimate contract, which they referred to as a Letter of Intent (the "LOI").  (¶ 89.)  JetBlue prepared the first draft in August 2019, laying out proposed commercial terms for NDC integration.  (*Id*.)  The parties' technology teams started early steps towards implementation, by working to integrate their software interfaces.  (¶ 90.)

The parties agreed on a final version of the LOI in March 2020.  On March 4, Fareportal sent a counter-proposal to JetBlue's most recent LOI draft, and on March 11, the parties agreed to Fareportal's March 4 proposal, thereby reaching agreement on all core commercial terms for NDC distribution.  (¶¶ 92-96.)  But it was JetBlue that drafted the final LOI:  On March 20, JetBlue sent Fareportal a final version of the LOI reflecting terms agreed to on the March 11 phone call.  (¶ 100.)  In the cover email, JetBlue confirmed its agreement to the terms, stating it was "***ready to sign it now.***"  (¶ 100; Olson Ex. 3 at 3 (Mar. 20, 2020 S. Barker Email).)  The agreed-upon LOI contained all the core commercial terms of the NDC deal.  (¶¶ 100, 102; Olson Ex. 4 (LOI).)  The

7

LOI also specified a "Development" period for the parties to complete NDC integration and negotiate any remaining terms in the final contract, which the parties called the "API License Agreement," in the second quarter of 2020.  (Olson Ex. 4 (LOI).)

After the parties made sure that the Development period in the LOI did not need to be altered (¶ 100; Olson Ex. 3 at 1-2 (Mar. 20, 25 & 26, 2020 S. Barker & S. Hathiramani Emails) (confirming that the parties would plan for "late Q2" as the slot for the Development period)), JetBlue then asked Fareportal to confirm it was "***ready to proceed with the LOI***."  (Olson Ex. 3 at 1 (Mar. 26, 2020 S. Barker Email).).  Fareportal replied that the LOI had been "cleared by legal," and then returned a signed copy of the LOI to JetBlue on April 6, changing nothing from the terms that JetBlue had offered.  (¶ 102; Ex. 4 (LOI).)  At this point, therefore, the parties had mutually agreed to work towards finalizing a formal NDC agreement under the terms set forth in the LOI.

During this period, the parties also got to work on next steps—drafting the final contract and working on the technological integration.  (¶ 98.)  On March 18, Fareportal sent JetBlue a redlined draft of the API License Agreement, containing the commercial terms the parties had agreed to on March 11.  (¶ 99; Olson Ex. 5 at 1 (Mar. 18, 2020 S. Hathiramani Email).)  In its March 20 email, JetBlue indicated its legal team was 75% finished with reviewing the draft API License Agreement—that is, the final contract.  (Olson Ex. 3 at 3 (Mar. 20, 2020 S. Barker Email).)

**E.    JetBlue Abandons The Parties' Type II Agreement And Completely Cuts Off Fareportal's Ability to Display And Sell Its Flights**

On May 27, Fareportal emailed JetBlue to suggest the parties "move ahead" with executing the API License Agreement once JetBlue had "the update from [its] legal" on the draft Fareportal sent earlier.  (¶ 104; Olson Ex. 6 at 1 (May, 27, 2020 S. Hathiramani Email).)  JetBlue said it expected to respond in a few business days.  (¶ 104; Olson Ex. 6 at 1 (May, 27, 2020 S. Barker Email).)  Then, during a June 1 call, to Fareportal's surprise, JetBlue stated it was abandoning the

NDC deal *and* terminating all dealings with Fareportal and all other OTAs.  (¶ 107.)  Shortly thereafter, JetBlue told Fareportal it was cutting off its ability to display or distribute JetBlue flights departing on or after January 5, 2021.  (*Id.*)

Fareportal now understands that JetBlue was initiating the next phase of the plan it had launched in 2017 to make it more difficult for consumers to comparison shop when they book flights.  (¶¶ 14, 19-20, 117-18.)  By doing so, JetBlue terminated its nearly twenty-year prior course of dealing by which consumers could view and book JetBlue's flights and fares on Fareportal—a course of dealing which had been profitable for JetBlue.  (¶¶ 20, 107, 123.)

On June 4, 2020, Fareportal reached out to JetBlue in an effort to salvage its ability to display and distribute JetBlue content, proposing to move to 100% NDC within 90 days, "eliminat[ing] all segment fees, *thereby providing a No Cost solution for distribution*." (¶¶ 109-10; Olson Ex. 7 at 1 (June 4, 2020 G. Cusano Email).)  JetBlue rejected this no-cost proposal that same day.  (¶ 111; Olson Ex. 7 at 1 (June 4, 2020 D. Clark Email).)

Fareportal attempted to bring JetBlue back to the negotiating table.  (¶¶ 112-16.)  But JetBlue was unwilling to negotiate at all, let alone under the terms of the LOI.  (*Id.*)  By December 2020, Fareportal understood JetBlue's conduct to indicate a refusal to finalize the NDC deal or preserve any dealings between the parties, and therefore commenced this action.  (¶ 116.)

## **ARGUMENT**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).  "A claim has 'facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Wacker v. JP Morgan Chase & Co*, 678 F. App'x 27, 29 (2d Cir. 2017) (quoting *Iqbal*, 556 U.S. at 678).  The Court may not choose "between two

plausible inferences that may both be drawn from the factual allegations." *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012). "Fact-specific questions cannot be resolved on the pleadings." *Id.* (alterations omitted).

## I.   THE COMPLAINT STATES PLAUSIBLE ANTITRUST CLAIMS

### A.   JetBlue's Conduct Fits Squarely Within The Refusal-To-Deal Framework Set Forth By The Supreme Court In *Aspen Skiing*

The Complaint sufficiently pleads claims for monopolization and attempted monopolization under Section 2 of the Sherman Act.[3]  Section 2's prohibition reaches anticompetitive decisions by businesses with monopoly power that alter an existing distribution pattern to restrict competition or protect market dominance.  Liability for "refusing to deal" has been articulated by the Supreme Court:  "The high value that we have placed on the right to refuse to deal with other firms does not mean that the right is unqualified." *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 601 (1985).

In *Aspen Skiing*, the Supreme Court affirmed a finding of liability against the owner of three Aspen ski mountains that discontinued a long-standing marketing arrangement with the owner of a neighboring mountain, pursuant to which customers could purchase a pass providing access to all four ski areas. *Id.*  The defendant exercised its monopoly power in the market for downhill skiing in the city of Aspen to thwart a joint ticket pass, popular in other multi-mountain areas, which the Supreme Court "inferr[ed] … satisf[ies] consumer demand in free competitive markets." *Id.* at 603.  The termination of the joint pass "impaired competition in an unnecessarily restrictive way" by depriving consumers of a superior option without adequate justification. *Id.* at

---

[3]  To establish a Section 2 monopolization claim, a plaintiff must demonstrate "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *Delaware & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990).

607-08.  The Supreme Court held that the defendant's anticompetitive intent was evident from the fact that it "elected to make an important change in a pattern of distribution that had originated in a competitive market and had persisted for several years."  *Id.* at 603.

Subsequent Supreme Court precedent confirms the essential elements of a refusal-to-deal claim, all of which are met here.  In *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko*, LLP, 540 U.S. 398 (2004), the Court reiterated that a plaintiff can establish that a defendant acted with the requisite anticompetitive intent by showing a "unilateral termination of a voluntary (and thus presumably profitable) course of dealing suggest[ing] a willingness to forsake short-term profits to achieve an anticompetitive end."  *Id.* at 409.

Since *Aspen Skiing* and *Trinko*, courts have considered these factors—especially a monopolist's decision to sacrifice short-run profits by terminating a voluntary course of dealing— to plausibly indicate an unlawful anticompetitive intent.  *See, e.g.*, *trueEX, LLC v. MarkitSERV Ltd.*, 266 F. Supp. 3d 705, 720 (S.D.N.Y. 2016) (granting preliminary injunction in refusal-to-deal case where defendant "voluntarily has dealt with [plaintiff] for several years," showing "it has been profitable for [defendant] to at least some extent, else it would not have continued the relationship"); *A.I.B. Express, Inc. v. FedEx Corp.*, 358 F. Supp. 2d 239, 251 (S.D.N.Y. 2004) (denying motion to dismiss *Aspen Skiing* claim where plaintiff alleged "that in the year in which [defendant] terminated the pricing agreement, the relationship would have generated approximately two million dollars in revenues for [defendant]" and it was thus "reasonable to infer that the course of dealing between the parties was profitable to [defendant]" and that "the decision to terminate revealed an anticompetitive bent"); *Am. Cent. E. Texas Gas Co. v. Union Pac. Res. Grp., Inc.*, 93 F. App'x 1, 7 (5th Cir. 2004) (affirming that "refus[al] to negotiate fairly and in good

faith" with plaintiff "to maintain a supra competitive price" in relevant market "represented a willful maintenance of [defendant's] monopoly power in the relevant market").[4]

Those indicia of anticompetitive intent are all present here as well. Just like the defendant in *Aspen Skiing*, JetBlue terminated a course of dealing that originated in a competitive market, persisted for many years, and satisfied consumer demand.[5] (¶¶ 57-58, 63, 81-83, 132.) JetBlue's termination of that course of dealing will cause it short-term profit losses because some customers who would have booked a JetBlue ticket on Fareportal (or another terminated OTA) will instead book flights with other airlines on those OTAs. (¶¶ 10, 27, 123, 128-29.) But JetBlue is willing to take those short-term losses because it calculates the long-term gains from reduced competition will outweigh them. (¶¶ 8-11, 27, 123, 130.)

JetBlue's anticompetitive intent is further demonstrated by its refusal to allow Fareportal to sell its tickets at retail prices, which in *Aspen Skiing* "revealed a distinctly anticompetitive bent." *Trinko*, 540 U.S. at 409 (discussing *Aspen Skiing*). There, in a last-ditch effort, the smaller rival (Highlands) tried to sell its own multi-mountain ski pass, including lift passes for the monopolist's (Ski Co.) mountains. But Ski Co. refused to sell lift tickets to its smaller rival, even at retail prices, and refused to honor Highlands's multi-mountain passes. *Aspen Skiing*, 472 U.S. at 593-94. The

---

[4]   *See also, e.g., Safeway Inc. v. Abbott Labs.*, 2010 WL 147988, at *7 (N.D. Cal. Jan. 12, 2010) (plaintiff sufficiently pleaded refusal to deal claim); *Iqvia Inc. v. Veeva Sys. Inc.*, 2018 WL 4815547, at *2-3 (D.N.J. Oct. 3, 2018) (same); *Steward Health Care Sys. v. Blue Cross & Blue Shield of Rhode Island*, 2014 WL 630678, at *4 (D.R.I. Feb. 19, 2014) (same); *Tucker v. Apple Computers, Inc.*, 493 F. Supp. 2d 1090, 1101 (N.D. Cal. 2006) (same); *Creative Copier Servs. v. Xerox Corp.*, 344 F. Supp. 2d 858, 866 (D. Conn. 2004) (same); *American Airlines Inc. v. Despegar.com USA, Inc.*, No. 13-cv-22773, ECF No. 119 (S.D. Fla. Dec. 17, 2014) (order denying motion to dismiss defendant's counterclaims where OTA alleged that airline engaged in a refusal to deal by pulling its content from the OTA's platforms); *see also Despegar.com*, ECF No. 122 at 53:12-16 (hearing transcript, denying motion as to counterclaims).

[5]   JetBlue argues that the parties never had a contract governing distribution. (MTD 5.) But a contract is not required for the parties to have a prior course of dealing—in fact, the parties in *Aspen Skiing* did not enter into a contract with each other. JetBlue authorized GDSs to distribute content to Fareportal for nearly twenty years, and then terminated this course of dealing by prohibiting Fareportal from distributing or even displaying its flights. (¶¶ 20, 57, 81-82, 107, 132, 169.)

Supreme Court found that Ski Co.'s refusal to sell lift passes to Highlands at retail prices and to accept Highlands's multi-mountain pass "was apparently motivated entirely by a decision to avoid providing any benefit to Highlands even though accepting the coupons would have entailed no cost to Ski Co. itself, would have provided it with immediate benefits, and would have satisfied its potential customers." *Id.* at 610.

Here, Fareportal made a similar offer to keep JetBlue from terminating the parties' prior course of dealing—to permit Fareportal to sell JetBlue flights at the same retail prices that JetBlue offers elsewhere, without the segment fees and incentives typically paid to OTAs. (¶¶ 109-11.) Fareportal's no-cost offer would have given JetBlue "immediate benefits," and rejecting it caused JetBlue to lose sales. (¶¶ 83, 129.) But JetBlue refused this offer anyway.

Despite these similarities, JetBlue makes four arguments attempting to distinguish this case from *Aspen Skiing* and related cases finding Section 2 liability. But all of these efforts fail.

*First*, JetBlue incorrectly argues that the Complaint fails to plausibly allege that it has monopoly power in any relevant market, unlike the defendant in *Aspen Skiing*. (MTD 14.) But, as discussed further below, *infra* at 28-30, the Complaint alleges that JetBlue has market and monopoly power in a number of relevant markets, as such markets are properly defined for air travel. (¶¶ 127, 135, 139-45, 147, 154-56.) JetBlue's arguments to the contrary rely on the mistaken premise, which finds no support in the law, that airline market power should be considered on a nationwide basis, rather than on specific City-Pair routes.

*Second*, JetBlue attempts to invent a new requirement for liability under *Aspen Skiing*, by arguing that there can be no liability unless the plaintiff and defendant are the *only* participants in the market. (MTD 14-15.) *Aspen Skiing* imposed no such limitation, which would elevate form over substance. Under JetBlue's version of the doctrine, *Aspen Skiing* would have been decided

13

differently if, in addition to the plaintiff and the defendant, there was one more tiny ski mountain somewhere in Aspen.  The Supreme Court never imposed such a requirement for good reason:  It is well established that a defendant can impose anticompetitive harm when it has market power—"the ability of a single seller to raise price and restrict output," *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 464 (1992)—regardless of how many other players exist in the market.  Supreme Court precedent does not distinguish between monopolists in markets that happen to also have smaller participants with monopolists in markets that do not.

As the Supreme Court made clear in *Trinko*, pleading a refusal-to-deal claim requires two essential factors:  (1) "The unilateral termination of a voluntary (and thus presumably profitable) course of dealing suggest[ing] a willingness to forsake short-term profits to achieve an anticompetitive end," and (2) "the defendant's unwillingness to renew the ticket even if compensated at retail price."  *Trinko*, 540 U.S. at 409.  "*[N]o more is required*" than pleading these "key elements that were missing in *Trinko*."  *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 463 (7th Cir. 2020).  Those elements are present here.[6]

---

[6]  JetBlue's reliance on *Arcesium, LLC v. Advent Software, Inc.*, 2021 WL 1225446 (S.D.N.Y. Mar. 31, 2021) is unavailing.  There, the court recognized that "[t]he *Aspen Skiing* exception essentially is that a defendant's refusal to deal may be anticompetitive where the parties had previously been engaged in a voluntary, cooperative, and profitable venture that the defendant terminated and where the defendant's decision to do so cannot be explained by anything other than a desire to harm competitors."  *Id.* at *6.  Whereas Fareportal pleads these essential elements, the plaintiff in *Arcesium* did not in large part due to a failure to plead a refusal to deal at retail prices.  *Id.*  ("For example, *Aspen Skiing* relied heavily on the fact that the plaintiff and defendant were the only participants in the market *and that the defendant refused to deal with plaintiff even at retail price.*") (emphasis added).

Whatever significance *Arcesium* ascribed to the parties' not being the only market participants, JetBlue provides no reason why this fact would be probative of its anticompetitive intent here.  *See trueEX*, 266 F. Supp. 3d at 721 (holding that the fact the parties' relationship "did not 'originate in a competitive market'" "distinguishes this case from *Aspen Skiing*" but "is not legally significant" where other "evidence shows that the monopolist was motivated at least in material part by anticompetitive desire").  Neither *Aspen Skiing* nor *Trinko* required the parties to be the only participants in the market in order to give rise to liability, and there is no basis to either inject this requirement into the standard or to find it dispositive.

JetBlue also argues that Fareportal seeks to impose an obligation for JetBlue to deal with Fareportal beyond the routes its dominates.  (MTD 14-15.)  But this argument concerns the remedy that Fareportal seeks, and is therefore premature at the pleading stage.  In any event, the majority of JetBlue's routes touch one of its six focus cities, where JetBlue's market dominance is particularly strong and growing.  (¶¶ 67-69, 143.)  It is over those routes where JetBlue's termination of OTAs will cause price competition to suffer the most because consumers traveling on those routes are most likely to switch to booking JetBlue flights directly on jetblue.com.  (¶ 29.)

*Third*, contrary to JetBlue's assertion (MTD 15), *Aspen Skiing* and its progeny are not limited to instances where a monopolist refuses to deal with a competitor.  This argument too elevates form over substance in a way that finds no support in the decision itself.  Indeed, *Aspen Skiing* relied on *Lorain Journal Co. v. United States*, 342 U.S. 143 (1951), where the Supreme Court upheld a finding that a newspaper unlawfully refused to deal with *customers* who advertised with a new radio station.  *Id.* at 153-55; *see also United States v. Dentsply Int'l, Inc.*, 399 F.3d 181 (3d Cir. 2005) (dominant manufacturer of artificial teeth violated Section 2 by prohibiting *distributors* from carrying teeth made by competing manufacturer).

JetBlue relies on *Port Dock & Stone Corp. v. Oldcastle Northeast., Inc.*, 507 F.3d 117 (2d Cir. 2007), but there, the court *acknowledged* that a monopolist's termination of a relationship with a distributor *can* violate the antitrust laws when, for example, "the monopolist uses the vertical integration … to preserve its production monopoly by putting up entry barriers to new competitors seeking to enter at the production level."  *Id.* at 125.  JetBlue is doing just that, because OTAs promote entry of new airlines into City-Pair markets by helping consumers learn about these new

lower-priced alternatives.[7]  (¶¶ 6-7, 63, 65.)  Moreover, JetBlue is not just terminating Fareportal's ability to *distribute* flights, but is also preventing Fareportal and other OTAs from even *displaying* flight information to consumers, which bears no relation to JetBlue's alleged desire to "more efficiently sell" its flights directly.  (MTD 15.)[8]

*Fourth*, JetBlue raises an improper factual dispute by contending that it had a "legitimate business reason" for cutting off Fareportal and the other OTAs.  (MTD 14-15.)  But this assertion is outside the pleadings and is contradicted by the Complaint's allegations that JetBlue admitted its real intent to steer price-sensitive consumers away from OTAs and towards channels that do not focus on selling consumers the lowest-price fare.  (¶¶ 3, 130.)  And while JetBlue claims that its intent is to control the "customer experience" in order to offer ancillary products and services, such as fare classes (known as "fare families"), seats, or baggage options (¶ 131; MTD 22), Fareportal already offered JetBlue "fare families" on its platforms.  (¶¶ 88, 169.)  And the Complaint squarely alleges that these and other justifications given by JetBlue are pretextual.[9]

JetBlue's proffered justification that it is cutting off OTAs to cut distribution costs (¶¶ 123,131; MTD 16, 22) is pretextual as well, as demonstrated by JetBlue's rejection of Fareportal's offer to display and sell its flights without segment fees, thereby reducing distribution

---

[7]  The court in *Port Dock* rejected a claim for monopolization of a distribution market because the defendant "had no anticompetitive incentive to create a *downstream* monopoly," *id.* at 124 (emphasis added), a holding wholly irrelevant to Fareportal's claims that JetBlue is protecting and expanding its *upstream* market power by stifling comparison shopping, transparency, and competition.  The plaintiff also alleged that the defendant was monopolizing the upstream market, but that claim, which is discussed below, *infra* at 27, was dismissed on antitrust standing grounds because the defendant's acquisition of monopoly power by acquiring its only rival was unrelated to its termination of the plaintiff as a distributor.

[8]  The outcome in *Apotex Corp. v. Hospira Healthcare India Priv. Ltd.*, 2020 WL 58247, at *1 (S.D.N.Y. Jan. 6, 2020) (cited at MTD 15) was based on the plaintiff's failure to adequately plead market power or short-term profit sacrifice.  *Id.* at *4-5.  The Complaint here pleads these elements.

[9]  JetBlue's assertion that "the Amended Complaint pleads that JetBlue had a legitimate business reason for seeking to deal directly with consumers," (MTD 12), is a brazen mischaracterization.  The Complaint actually pleads that "JetBlue has expressed two justifications for its conduct, but *both are mere pretext* for JetBlue's refusal to deal with Fareportal."  (¶ 131 (emphasis added).)

costs.  (¶ 131; Olson Ex. 7 at 1 (June 4, 2020 G. Cusano Email).)  JetBlue's assertion that implementing NDC would have been a costly undertaking for the airline (MTD 16) is impermissible at this stage and also ignores that, at JetBlue's request, *Fareportal* had agreed to take on the costs of implementing this technology for JetBlue's benefit.  (¶ 87.)

In any event, these factual disputes highlight why courts hold that this type of determination—whether JetBlue's decision to terminate Fareportal and other OTAs was motivated by anticompetitive aims or legitimate business reasons—cannot be made at the pleading stage.  In *Viamedia*, for example, the Seventh Circuit reversed a dismissal of a Section 2 refusal-to-deal claim because "balancing anticompetitive effects against hypothesized justifications depends on evidence and is not amenable to resolution on the pleadings, at least where the plaintiff has alleged conduct similar to that in *Aspen Skiing*."  951 F.3d at 460; *see also Illinois ex rel. Burris v. Panhandle Eastern Pipe Line Co.*, 935 F.2d 1469, 1482 (7th Cir. 1991) ("Whether valid business reasons motivated a monopolist's conduct is a question of fact.").  The D.C. Circuit reached the same conclusion in *Covad Communications Co. v. Bell Atl. Corp.*, 398 F.3d 666 (D.C. Cir. 2005), where it reversed dismissal of a refusal-to-deal claim and held that the defendant's argument that its refusal to deal was a reasonable business decision "depends upon a question of fact and therefore is not cognizable in support of a motion to dismiss."  *Id.* at 676.

Here too, JetBlue's request for the Court to prematurely find in its favor as to the legitimacy of its proffered justifications for its actions must be rejected.

## B.      JetBlue's Arguments Do Not Undermine The Plausibility Of Fareportal's Antitrust Claims

The Complaint alleges how JetBlue has made an important change to its nearly twenty-year course of dealing by cutting off OTAs including Fareportal with the goals of driving price-sensitive customers to JetBlue's own website and reducing price transparency, so it can later increase prices.

17

Such a plan is not based on "farfetched conjecture and a brazen disregard for the realities of the air travel market" (MTD 2), but rather is alleged in specific detail and supported by caselaw, economic literature, and a federal investigation into precisely the conduct alleged here.

### 1.    Trading Short Term Losses For Long Term Profits

*First*, JetBlue argues that the Complaint makes "conflicting allegations" when it alleges that JetBlue will lose some sales in the short term after terminating the OTAs but is prepared to withstand such losses because it will make them up through higher prices in the long term.  (MTD 9.)  There is no conflict at all—these allegations are fully consistent.  It is common sense that JetBlue will lose some amount of sales after terminating the OTAs that had distributed its content for nearly twenty years.  Consider a consumer who for years has used Fareportal to book her family's annual spring break trip from Boston to Fort Myers (a route that JetBlue dominates).  When she visits Fareportal this spring, she may choose the lowest priced flight listed without noticing that JetBlue is not there.  A competing airline will get that sale—one that JetBlue might have won if it had been on the site.  With Fareportal's prior volume of JetBlue sales, there can be no doubt this consumer behavior will happen in some measure.

But JetBlue stopped listing its fares on Fareportal despite these lost sales because it plans, over time, to make this money back and more.  Consumers, especially in JetBlue focus cities like Boston, will eventually learn that JetBlue fares are unavailable on Fareportal.  JetBlue's goal is that, instead of going to Fareportal, that Boston resident will start going directly to JetBlue's website to book her trip.  The more customers who do the same, the more JetBlue will be able to raise prices above competitive levels.  Far from being implausible, JetBlue's willingness to forsake short term profits that it will recoup in the long term is a well-recognized indicia of its anticompetitive intent.  *See, e.g.*, *Trinko*, 540 U.S. at 409; *Aspen Skiing*, 472 U.S. at 608.

## 2.   Increased Search Costs Generate Higher Prices

*Second*, JetBlue claims not to understand how its blocking of OTAs from displaying and distributing its flights could increase "search costs" and lead to higher prices (MTD 10-11), but its arguments rely on factually disputing economic principles that provide compelling support for Fareportal's allegations.

### (a)   Small Increases In Search Costs Permit Monopolistic Pricing

The economic principles are clear  and well-understood.  When a consumer must visit many different sites (such as jetblue.com and websites of other airlines) to attempt to piece together flight-price comparisons herself, she experiences higher search costs than when she can see all her options conveniently laid out in a single location by an OTA devoted to this goal.  (¶¶ 58, 124.)

And it is also well-understood that even small increases in search costs give suppliers like JetBlue the ability to raise prices above competitive levels.  (¶¶ 60, 79.)  That was the central insight of Nobel Prize-winning economic work, which explains that, in the absence of easily accessible, publicly posted prices, even a  small search cost can lead to monopoly pricing.[10]  The reasoning behind this finding is simple:  A consumer will continue to search for better prices only if she thinks she can obtain a price not only lower, but lower by more than the cost of the search. Each seller knows this about consumers and therefore has an incentive to price just above other sellers.  Because each seller has the same incentive to raise prices, prices rise to monopoly levels.

Forcing consumers to try to price compare across different websites raises search costs, and JetBlue knows that some consumers will decide that additional searches are not worth their time and settle for a fare that is not the best available option.  This well-recognized search-cost

---

[10]   (Olson Ex. 1 at 156-68 (Peter Diamond, *A Model of Price Adjustment*, 3 Journal of Economic Theory, 156 (1971)).)

problem is why OTAs like Fareportal are the lifeblood of price competition in airline travel.  And

it is why economists have consistently found that OTAs constrain the prices airlines can charge.[11]

(¶¶ 52, 59-60, 79.)   OTAs reduce search costs to almost zero by enabling consumers to

instantaneously compare prices and schedules across competing airlines.  (¶¶ 26, 55, 58, 60, 79.)

This has led to lower prices and to new entry, including JetBlue's.  (¶ 63; Olson Ex. 11 at 33 (Fiona

Scott Morton et al., *Benefits of Preserving Consumers' Ability to Compare Airlines Fares* (May

19, 2015)).)   By cutting off OTAs from displaying its content, JetBlue will hamper price

competition and stifle this check from potential new entrants in the City-Pair routes it dominates.

In retort, JetBlue yet again improperly asserts facts outside the pleadings, arguing that

Fareportal's claims are implausible because Southwest Airlines does not allow Fareportal or other

OTAs to display or distribute its content.[12]  (MTD 4.)   In any event, Southwest's experience

corroborates Fareportal's allegations.   Academic research has found that for last-minute

bookings—where search costs are highest—lack of access to Southwest's prices on OTAs enables

Southwest fares to be significantly *higher* than fares from other airlines.  (Olson Ex. 12 at 252-57

---

[11]   Economists have found that OTAs "have dramatically reduced consumers' search costs, and allowed [consumers] to easily find the most desirable flights." (Olson Ex. 8 at 3 (Steven Berry & Panle Jia, *Tracing the Woes: An Empirical Analysis of the Airline Industry*, 2(3) American Economic Journal: Microeconomics 1 (2010)).)  For instance, studies have shown that the introduction of OTAs around 2001 led to a dramatic reduction in price dispersion—the variation in prices from the lowest price to the higher price. (Olson Ex. 9 at 84,86, 119-20 (Severin Borenstein & Nancy L. Rose, *How Airline Markets Work…or Do They? Regulatory Reform in the Airline Industry, in* Economic Regulation and Its Reform: What Have We Learned? 63 (Nancy L. Rose ed., 2014)).)  Another study found that lower search costs from internet penetration lowers air fares. (Olson Ex. 10 (Eugene Orlov, *How Does the Internet Affect Price Dispersion? Evidence from the Airline Industry*, 59(1) Journal of Industrial Economics 21 (2011)).)  Courts "may take judicial notice of the existence of a body of scientific literature."  *Browning-Ferris Indus. v. Muszynski*, 899 F.2d 151, 161 (2d Cir. 1990); *see also, e.g.*, *Ctr. For Biological Diversity v. Morgenweck*, 351 F. Supp. 2d 1137, 1144 (D. Colo. 2004) (taking judicial notice of the contents of academic articles "for the limited purpose of establishing that the view … is not necessarily shared by all in the scientific … communities").

[12]   JetBlue's assertions about Southwest's restrictions on Fareportal are not fully accurate, highlighting their impropriety at this stage.  The Court cannot take judicial notice of JetBlue's internet sources for the truth of the matters asserted therein. *See Braun v. United Recovery Sys., LP*, 14 F. Supp. 3d 159, 169 (S.D.N.Y. 2014).

(Volodymyr Bilotkach, *Reputation, Search Cost, and Airfares*, 16 Journal of Air Transport Management 252 (2010)).)  These findings thus confirm that, when it comes to airline travel, search costs and higher prices go hand in hand.  (¶¶ 55-56, 58-61, 124.)

> (b)   Courts Have Sustained Antitrust Claims Applying Similar Theories

Courts have consistently affirmed these same  economic principles.  In *Tichy*, the court upheld antitrust allegations against major hotel companies for blocking OTAs from purchasing advertisements that allowed the OTAs to appear as sponsored results in searches for hotel's branded keywords (for example, "New York Hilton" or "Honolulu Hyatt") on popular search engines like Google and Bing.  376 F. Supp. 3d 821.  The court was satisfied with the plaintiff's allegations that "armed with knowledge that consumers are seeing inferior comparative information in a popular forum where Defendants once vigorously competed, Defendants face less pressure to price competitively, prices increase, and consumers pay more."  *Id*. at 846.  The court relied on the allegations that small increases in search costs are enough to reduce competition and increase prices, even if consumers can still compare prices on OTAs or other avenues.  *Id.* at 826, 848; *see also Thompson v. 1-800 Contacts, Inc.*, 2018 WL 2271024, at *4 (D. Utah May 17, 2018) (determining plaintiffs' theory that "advertising restrictions (even partial ones) resulted in higher search costs and higher prices for contact lenses purchased online" to be plausible).

Notably, in *Tichy*, the hotels did not prevent any OTA from displaying their content; they only increased search costs by making it harder for consumers to find these OTAs from internet searches.  Here, JetBlue is cutting off the very ability of OTAs to display accurate information to consumers as they have done for nearly twenty years.  The harm to comparison shopping and competition is even greater.

(c)      The Federal Government Has Investigated The Same Concerns

As a further demonstration of the plausibility of Fareportal's claims, the Complaint notes that, in 2016, the Department of Transportation ("DOT") opened up an investigation into these very issues, stemming from "concerns … regarding airlines restrictions on the distribution and display of airline flight schedule, fare, and availability information." (¶ 15; Olson Ex. 13 at 75481 (*Exploring Industry Practices on Distribution and Display of Airline Fare, Schedule, and Availability Information*, 81 Fed. Reg. 75481 (Oct. 31, 2016)).)

The DOT was specifically interested in to "what extent" consumers "benefit from saved search costs, greater confidence in search results, access to lower fares, or more travel options than they would have obtained from separate searches of individual airline Web sites?" (*Id.* at 75486.)[13] The DOT received tens of thousands of comments. One came from the Consumer Union:

> In our view, there is no sense in which airlines' withholding of critical information from third-party OTA and metasearch sites benefits consumers; on the contrary, the practice harms consumers by making it more difficult for consumers to conveniently and reliably comparison shop for the best flights and fares. Our recent research underscores this.

(¶ 16.) This investigation and these comments "bolster the plausibility" of Fareportal's claims that JetBlue's conduct harms competition. *See, e.g.*, *Hinds Cnty., Miss. v. Wachovia Bank N.A.*, 700 F. Supp. 2d 378, 394 (S.D.N.Y. 2010) (government inquiries can "bolster the plausibility" of antitrust allegations) (citing *Starr v. Sony BMG Music Ent.*, 592 F.3d 314, 324-25 (2d Cir. 2010)).

(d)      Metasearch Sites Or Other OTAs Do Not Compensate For These Increased Search Costs

JetBlue nonetheless seeks to avoid the Complaint's allegations about the economic effects of increasing search costs, arguing the allegations are implausible because JetBlue has not yet

---

[13]   The DOT suspended the comment period in 2017 pursuant to the new administration's directives and at the urging of Airlines for America, a lobbyist group for airlines. (¶ 17.) United States Senators and prominent consumer advocacy groups have asked the DOT to reopen these proceedings. (¶ 18.)

terminated the ability of two other OTAs (Expedia and Priceline) to display its content and because metasearch sites also list airline fares.  But, as the Complaint alleges, merely *increasing* search costs by distorting the market and making it more difficult for consumers to know which fares are available on which sites is enough to reduce competition.  (¶¶ 117, 124-25); *see also Tichy*, 376 F. Supp. 3d at 846, 848 (denying motion to dismiss where plaintiff alleged that "consumers are seeing inferior comparative information" and incurring higher search costs, which allowed defendants to raise prices); *Thompson*, 2018 WL 2271024, at *3-4 (denying motion to dismiss claims that contact lens retailers agreed to restrict branded keyword advertising where plaintiffs alleged consumers incurred "higher search costs and higher prices").

With JetBlue having terminated over a dozen OTAs, it has already dramatically changed its course of dealing in a way that affects tens of millions of consumers.  In this increasingly concentrated market, cutting off Fareportal means that its millions of customers are deprived of the sole remaining OTA focused on air travel, as Expedia and Priceline are now more focused on hotel packages.  (¶¶ 31, 107-08.)  Further, as the Complaint alleges, JetBlue admitted to Fareportal that it plans to cut off Expedia and Priceline too.[14]  (¶¶ 31, 107-08.)

Nor can JetBlue demonstrate at this stage that metasearch sites are adequate replacements for OTAs.  As the Complaint alleges, OTAs were uniquely important in revolutionizing the industry by promoting entry and price competition.  (¶¶ 4, 26, 33, 59-61, 77-80, 124.)  And the Complaint alleges that Fareportal provides valuable price-transparency enhancing services that go well beyond the passive listing services provided by metasearch sites.  For instance, it uses

---

[14]  Contrary to JetBlue's assertions, none of Fareportal's claims depend on proving that JetBlue will completely destroy Fareportal or OTAs in general.  Simply harming them, raising search costs for consumers, and distorting the market is sufficient for JetBlue to reduce competition and raise prices. (¶¶ 117, 124-25.)  Nevertheless, JetBlue's conduct has imposed serious and irreparable harm to Fareportal, with customers leaving who may never come back.  (¶¶ 28-29, 116, 125.)

proprietary technology to quickly search all available providers and find the best value flight tickets, including through innovative methods such as offering interline or multi-carrier itineraries. (¶¶ 29, 55, 72-73).  Fareportal also allows consumers to book fare family options—tiered tickets that vary based on options like seat choice—and "ancillaries" like seat-selection, pre-paid baggage, and priority boarding, allowing consumers to comparison shop across total tickets price rather than just base fares.  (¶ 74.)  This service compels airlines to compete on ancillaries, a fast-growing portion of revenue for airlines and thus an increasingly important service for consumers.  (¶ 75.)

Metasearch sites are also an inadequate comparison shopping substitute because they are themselves subject to airline restrictions and interference.  The DOT investigation noted above specifically looked into how airlines preclude or limit *metasearch sites* from displaying their fares. (Olson Ex. 13.)  The DOT expressed concern, for example, with "airlines providing flight information to an OTA but restricting the OTA from distributing that information to a metasearch entity that operates a flight search tool but does not itself sell tickets."  (*Id*. at 75482.)[15]  JetBlue itself engages in this conduct to restrict what content metasearch engines can display.  In fact, the LOI at issue here would have prevented Fareportal from "display[ing] JetBlue content to meta searches no matter the source."  (Olson Ex. 4 (LOI).)  Thus, JetBlue and other airlines are both restricting metasearch sites from displaying their flight and fare information *and* prohibiting OTAs from sharing the same information with metasearch sites.  And by removing fares from OTAs like Fareportal, JetBlue cut off another of metasearch sites' sources of flight and fare information.

These issues demonstrate that JetBlue's assertion that other avenues of distribution could fully make up for the termination of Fareportal and other OTAs cannot be credited at this stage.  It

---

[15]  "Additionally, some airlines have issued letters to metasearch entities operating flight search tools demanding that these companies stop displaying the airline's flight information or limiting how the entities display the airline's flight information on their flight search tools."  (*Id*.)

is well recognized that "[t]he mere existence of other avenues of distribution is insufficient" to deny a Section 2 claim, "without an assessment of their overall significance to the market." *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 196 (3d Cir. 2005).  That assessment is necessarily factual and economic in nature, and therefore premature.  *See Pro Search Plus, LLC v. VFM Leonardo, Inc.*, 2013 WL 6229141, at *7 (C.D. Cal. Dec. 2, 2013) ("the fact that an alternative channel could theoretically be used does not mean that it actually is used" and thus on a motion to dismiss it is "premature to determine whether the [alleged anticompetitive acts] do in fact leave open alternative channels of distribution") (citation omitted); *cf. Tichy*, 376 F. Supp. 3d at 846 (defendants' argument that "advertisements for OTAs and competing hotels still appear somewhere in … search results" did not undermine plaintiffs' claims).

### C.  Fareportal Has Antitrust Standing Because Its Alleged Injury Is The "Very Means" By Which JetBlue Is Harming Competition

Next, JetBlue wrongly argues that Fareportal does not have antitrust standing because it does not plead harm to competition.  (MTD 12.)  That argument is meritless.  The Complaint plainly alleges that JetBlue's termination of the ability of Fareportal and other OTAs to display and distribute JetBlue's content will protect JetBlue from price competition and new entry, and thus cause *consumers* to pay higher prices, a clear allegation of harm to *competition generally*.  (¶¶ 9, 11, 27, 59-60, 123-127, 130, 135); *see also Blue Shield of Va. v. McCready*, 457 U.S. 465, 482-83 (1982) ("an increase in price resulting from a dampening of competitive market forces is assuredly one type of injury for which § 4 [of the Clayton Act] potentially offers redress").

*Arcesium*, on which JetBlue relies, is inapposite—there, the plaintiff lacked antitrust standing because it alleged only that the market would lose its product, but not that competition

would suffer overall.  2021 WL 1225446 at *7 (S.D.N.Y. Mar. 31, 2021).[16]  JetBlue then misconstrues the Complaint and caselaw to argue that Fareportal cannot allege "that its injury 'flows from' the purported anticompetitive effect of JetBlue's conduct rather than JetBlue's mere exercise of its commercial right not to contract with Fareportal." (MTD 12.)  Fareportal's antitrust claims do not arise from JetBlue's abandonment and breach of the LOI.  They arise instead from its decision "to make an important change *in a pattern of distribution* that had originated in a competitive market and had persisted for several years."  *Aspen Skiing*, 472 U.S. at 603.  The harm to Fareportal, competition, and consumers flows directly from this important change.

JetBlue's narrow reading of antitrust standing principles was rejected by the Supreme Court in *McCready*, which held that the language from *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977), upon which JetBlue relies, is not so limiting" to apply only to those who pay higher prices as a result of the defendants' anticompetitive conduct.  457 U.S. at 482-83.[17]

Rather, *McCready* held that an antitrust remedy "cannot reasonably be restricted to [] competitors" where an injury alleged is "a necessary step" or the "very means" by which a defendant achieved its anticompetitive ends.  457 U.S. at 479; *see also id.* at 484 n.21 (where a provider of services refuses to deal with a distributor to monopolize the provider's market, the

---

[16]   To the extent *Arcesium* also held that allegations that prices will rise in the future, as opposed to allegations that the defendant's conduct has already raised prices, are insufficient, it misstated the law. Section 2 of the Sherman Act proscribes both monopolization and attempted monopolization.  15 U.S.C. § 2; *see also Lorain Journal Co. v. United States*, 342 U.S. 143, 153 (1951) ("To establish this violation of [Section] 2 as charged, it was not necessary to show that success rewarded appellants' attempt to monopolize.").

[17]   Similarly, in *Gelboim v. Bank of America Corp.*, 823 F.3d 759 (2d Cir. 2016), the Second Circuit noted that the language quoted by JetBlue from *Brunswick* and *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328 (1990) are "over-read[]," and "[a]t most, these cases stand for the proposition that competitors who complain of *low fixed prices* do not suffer antitrust injury."  *Gelboim*, 823 F.3d at 776-77 (emphasis added); *see also PharmacyChecker.com, LLC v. Nat'l Ass'n of Boards of Pharmacy*, 2021 WL 1199363, at *12 (S.D.N.Y. Mar. 30, 2021) (distinguishing *Brunswick*).

distributor would "*no doubt*" have standing to pursue an antitrust claim) (emphasis added).[18]  The Court further held that a plaintiff has antitrust standing when her injury is "inextricably intertwined with the injury the [defendant] sought to inflict on … the market." *Id.* at 484; *see also Harry v. Total Gas & Power N. Am., Inc.*, 889 F.3d 104, 116 (2d Cir. 2018) ("An injury is 'inextricably intertwined' when the defendants 'use the plaintiff's injury as the means, fulcrum, conduit, or market force to realize their illegal ends,' or when they 'corrupt a separate market [in which a plaintiff is a participant] in order to achieve [their] illegal ends.'") (citation omitted).  Here, terminating Fareportal is "a necessary step" and the "very means" by which JetBlue is raising search costs and harming competition in City-Pair markets.

JetBlue also relies on other inapposite cases.  (MTD 12-13.)  In *Port Dock*, the terminated distributor did not have standing to assert a claim for monopolization of the upstream market because its termination was wholly unrelated to the defendant's newly obtained market power that resulted from its acquisition of its only upstream competitor.  507 F.3d at 123; *see also G.K.A. Beverage Corp. v. Honickman*, 55 F.3d 762, 767 (same).  Here, JetBlue's market is protected and enhanced by its termination of Fareportal and the other OTAs.  (¶¶ 1, 9, 11, 33, 125, 149, 154.)

*Gatt Communications, Inc. v. PMC Associates, L.L.C.*, 711 F.3d 68 (2d Cir. 2013), is also inapplicable, as the plaintiff there complained of being excluded from an unlawful bid-rigging scheme.  Exclusion from an illegal cartel bears no relationship to Fareportal's allegations here. *See PharmacyChecker.com*, 2021 WL 1199363, at *12 (S.D.N.Y. Mar. 30, 2021) (distinguishing *Gatt* where the complaint "does not allege an injury based on the Plaintiff's exclusion from a conspiracy or cartel").  Fareportal has antitrust standing because the Complaint alleges that

---

[18]  In *McCready*, the plaintiff, a group health plan subscriber, alleged the defendant, an insurer, conspired with psychiatrists to deny reimbursement for services provided by psychologists. *Id.* at 468-69. The Court rejected the defendants'' argument that since the alleged conspiracy was directed at their competitors—psychologists—the plaintiff's injury was too "remote."

competition will suffer and consumers will pay higher prices as a direct consequence of JetBlue's termination of Fareportal.

### D.    The Complaint Adequately Alleges Market Power

The Complaint pleads that JetBlue has above 70% market share in a number of City-Pair markets, and over 40% in numerous others.  (¶¶ 139-42.)  The Complaint further alleges that JetBlue's high market shares are protected by numerous barriers to entry.  (¶¶ 144-45.)  These allegations are more than enough to plead JetBlue has monopoly power and a dangerous probability of achieving monopoly power in certain City-Pair markets.  *See e.g.*, *Eastman Kodak Co.*, 504 U.S. at 481 (1992) ("[O]ver two-thirds of the market is a monopoly.") (citation omitted).

JetBlue tries to defeat these allegations with "the easily ascertainable fact that JetBlue's market share is less than 5%."  (MTD 4, 17.)  But that figure (*not* suitable for judicial notice[19]) refers to JetBlue's total share of  "domestic revenue passenger miles," irrelevant to these claims. Relevant markets are "composed of products that have reasonable interchangeability," and products between which "there is a cross-elasticity of demand."  *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 380, 404 (1956).  JetBlue's claim that the United States comprises the relevant market is akin to arguing that a consumer views as interchangeable a flight from New York to Orlando and a flight from Los Angeles to Alaska, such that if the price of one flight drops, the consumer would switch to the other.  This is facially absurd.  As the Complaint alleges, "there are no reasonable substitutes for air travel between two cities."  (¶ 138.)  A consumer who lives in

---

[19]    Contrary to JetBlue's assertion, courts do not take "judicial notice" of market share, as this is inevitably a contested economic concept in antitrust cases.  *See Allen v. Dairy Farmers of Am., Inc.*, 748 F. Supp. 2d 323, 340 n.6 (D. Vt. 2010).  Nor does it matter that this (irrelevant) figure came from a government website (MTD 4 n.2), as courts cannot take judicial notice of such information for their truth. *See Knight v. Koenigsmann*, 2019 WL 2615977, at *8 (S.D.N.Y. June 26, 2019) (on motion to dismiss, court cannot accept as true information retrieved from government websites because judicial notice is available "*only* 'to determine *what* statements they contained and *not* for the truth of the matters asserted'") (quoting *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007)) (alterations omitted).

New York and wants to visit family in Orlando will shop for flights between *those* cities, and would be displeased to be told her return ticket is interchangeable with one to Anchorage instead.

This basic reality is why airline markets are defined as City-Pair routes, as overwhelmingly supported by the caselaw. *See, e.g.*, *Spirit Airlines v. Northwest Airlines*, 431 F.3d 917, 933 (6th Cir. 2005) (citing government research supporting a city-pair approach to market definition in the aviation industry); *Official Airlines Guides, Inc. v. F.T.C.*, 630 F.2d 920, 922 (2d Cir. 1980) (defining markets as city pairs); *Glob. Disc. Travel Servs., LLC v. Trans World Airlines, Inc.*, 960 F. Supp. 701, 705 (S.D.N.Y. 1997) ("The rule of reasonable interchangeability dictates that the relevant product market in this case be at least the market for all airline tickets between the relevant city pairs…."); *Virgin Atl. Airways Ltd. v. Brit. Airways PLC*, 872 F. Supp. 52, 57 (S.D.N.Y. 1994) (denying motion to dismiss where plaintiff alleged British Airways had monopoly power over certain city-pair markets).[20]

JetBlue attempts to distinguish *Spirit Airlines* on the ground that it concerned predatory pricing on specific routes. (MTD 19 n.12.) But here too, the relevant markets defined in the Complaint are those over which JetBlue's anticompetitive conduct will cause the most harm. They are the routes where JetBlue will be able to raise prices and stifle competition once freed of the disciplining constraints of OTAs.

---

[20]   Academic papers reach the same conclusion that airline markets are defined as City-Pairs. (*See, e.g.*, Olson Ex. 14 at 2 (Jan K. Brueckner et al., *City-Pairs Versus Airport-Pairs: A Market-Definition Methodology for the Airline Industry*, 44(1) Review of Industrial Organization 1 (2013)) (noting that it is "obvious on one level" that "a market involves travel between two cities" and collecting extensive supporting literature).) The Brueckner study also refutes JetBlue's assertion that defining airline markets on a City-Pair basis is "cherry picking." (MTD 19.) If anything, *JetBlue* is engaging in cherry picking by critiquing that Fareportal includes routes to and from White Plains as separate from routes to and from New York City. (MTD 18-19.) To the contrary, the Brueckner study concluded based on regression analysis that White Plains should *not* be grouped with the major airports in the New York area. (Olson Ex. 14 at 3-8, 18.)

JetBlue also argues that its alleged market share is not high enough to sustain antitrust claims.  (MTD 19.)  But the Second Circuit has held that "a market share of over 70 percent is usually strong evidence of monopoly power."  *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 99 (2d Cir. 1998) (internal quotation marks omitted); *see also Eastman Kodak*, 504 U.S. at 481 (possession of "over two-thirds of the market is a monopoly") (citation omitted); *cf. Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*, 985 F. Supp. 2d 612, 622 (S.D.N.Y. 2013) (60% market share without any allegations of barriers to entry did not suggest monopoly power).  Here, Fareportal's Complaint alleges that JetBlue has over *70%* market share *and* that numerous barriers to entry exist.[21]  (¶¶ 140, 144-45.)

JetBlue yet again raises premature factual disputes about whether the alleged barriers to entry are sufficient, contending that existing carriers can compete with JetBlue in City-Pair markets in which it has high market shares and that its frequent flier program is not a barrier to entry.  (MTD 19-20.)  But the case to which JetBlue points, *Global Discount Travel Services., LLC v. Trans World Airlines, Inc.*, 960 F. Supp. 701 (S.D.N.Y. 1997), says nothing about frequent flyer programs.  And it is well known that obtaining gates at busy airports can prevent carriers from entering new City-Pair markets.[22]  Once again, JetBlue's efforts to counter the alleged facts must fail at this stage.  *See Spirit* 431 F.3d at 947 ("In sum, the facts and the economics of this [airline] industry could reasonably be found to establish significant barriers to entry.").

---

[21]   As to its attempted monopolization claims, Fareportal also pleads that JetBlue has a dangerous probability of achieving monopoly power in certain City-Pair markets.  (¶¶ 139, 142.)

[22]   For example, Virgin America struggled for three years before getting a slot at Chicago O'Hare.  (Olson Ex. 11 at 42-43 (Fiona Scott Morton et al., *Benefits of Preserving Consumers' Ability to Compare Airlines Fares* (May 19, 2015)).)

### E.     The Complaint Repeatedly Alleges that JetBlue Acted With Specific Intent

Finally, JetBlue blatantly disregards countless allegations in the Complaint that plead JetBlue acted with the specific intent to protect or gain market power.  (¶¶ 1, 3, 9, 11, 33, 125, 130, 149, 154.)  JetBlue claims that the transcript of the earnings call quoted in the Complaint shows that it had a benign intent.  (MTD 22.)  But it merely points to self-serving comments about JetBlue's interest in lowering its *own* costs.  *Id*.  Such comments do nothing to undermine JetBlue's admission that it is steering "price sensitive" customers away from OTAs and to direct distribution channels like jetblue.com because, as JetBlue admitted to Fareportal, it does not want those customers using OTAs that facilitate competition on price.  (¶ 130.)  JetBlue's goal is to stifle competition where it matters the most.  (¶¶ 8-11, 27, 123, 130.)

## II.     THE COMPLAINT ADEQUATELY ALLEGES THAT JETBLUE BREACHED ITS TYPE II PRELIMINARY AGREEMENT

Separate from its violations of the antitrust laws, JetBlue's decision to abandon the LOI governing NDC distribution is a violation of New York contract law.  Put simply, JetBlue agreed to the LOI, a "Type II" agreement under New York law that bound it to negotiate in good faith.  Having done so, JetBlue was not free to abandon the LOI and walk away from the negotiating table.  The Complaint pleads all of the required elements for such a claim under New York law: the existence of a Type II preliminary agreement, JetBlue's breach of this agreement by unilaterally terminating negotiations, Fareportal's performance of its obligations under the agreement prior to the breach, and the resulting damage to Fareportal's business.  *See EQT Infrastructure Ltd. v. Smith*, 861 F. Supp. 2d 220, 226 (S.D.N.Y. 2012).

### A.     The Parties Entered Into A Type II Agreement

New York law recognizes "two types of preliminary agreements that create binding obligations: 'Type I' and 'Type II.'"  *EQT*, 861 F. Supp. 2d at 226.  "Type II preliminary

31

agreements," the type at issue here, "reflect[] agreement on certain major terms, but leaving other terms open for further negotiation." *Brown v. Cara*, 420 F.3d 148, 153 (2d Cir. 2005) (internal quotation marks and alterations omitted). The "essence" of such an agreement "is that it creates an obligation to negotiate the open issues in good faith in an attempt to reach the ultimate contractual objective within the agreed framework." *Brown*, 420 F.3d at 157 (internal quotation marks and alterations omitted).

Recognizing the binding effect of Type II agreements serves a "valuable function in the marketplace" by "permitting parties to make plans in reliance upon their preliminary agreements and present market conditions without expending enormous sums negotiating every detail of final contract documentation before knowing whether they have an agreement, and if so, on what terms." *Brown*, 420 F.3d at 157 (brackets and ellipses omitted). Courts applying New York law consider five factors in determining whether a preliminary agreement is a binding Type II agreement, and each confirms the existence of a Type II agreement here.

### 1.    JetBlue's Signature Was Not Required For Its Agreement To The LOI

JetBlue does not meaningfully contest that the relevant indicia of a Type II agreement are present here. (MTD 29-31.) Instead, JetBlue claims that its signature was required to effectuate the LOI. This is simply incorrect. JetBlue drafted the LOI, sent the LOI to Fareportal as an offer of terms, and twice confirmed its agreement to these terms in writing. (¶¶ 100-01; Olson Ex. 3 at 1, 3 (Mar. 20 & 26, 2020 S. Barker Emails).) For its part, Fareportal expressly accepted JetBlue's terms and signed the LOI, without changing a comma. (¶¶ 101-02; Olson Ex. 4 (LOI).) With both parties having clearly communicated their agreement to the LOI, JetBlue cannot now rely on the lack of its signature to avoid responsibility.

In the Type II context, "[t]he fact that documents needed to be completed does not eliminate the possibility that the parties agreed to be bound by the 'general framework' of the deal." *Bear*

*Stearns Inv. Prod., Inc. v. Hitachi Auto. Prod. (USA), Inc.*, 401 B.R. 598, 625 (S.D.N.Y. 2009).  In *Bear Stearns*, the court found that the parties reached a Type II agreement on a phone call despite testimony that the parties "agreed that there would be 'documents that needed to be completed'" after the phone call.  *Id.* at 626.  Even for final contracts, courts have repeatedly held that "exchange of e-mails may constitute an enforceable contract, even if a party subsequently fails to sign implementing documents" when, as here, there is "sufficiently clear and concrete" evidence "to establish such an intent."  *Brighton Inv., Ltd. v. Har-ZVI*, 88 A.D.3d 1220,1223 (3rd Dep't 2011).

Here, there is ample support for the allegations that the parties agreed to the terms of the LOI in mid-March of 2020.  On March 20, JetBlue sent Fareportal the final LOI and confirmed that it was "*ready to sign it now*."  (¶ 100; Olson Ex. 3 at 3 (Mar. 20, 2020 S. Barker Email).)  JetBlue then *reaffirmed* its agreement to the terms of the LOI less than a week after representing it was "ready to sign it now" when it followed up with Fareportal and asked whether Fareportal was "*ready to proceed with the LOI*." (¶ 101; Olson Ex. 3 at 1 (Mar. 26, 2020 S. Barker Email).)

These representations by JetBlue are enough to plead a Type II agreement.  In *Meltzer, Lippe, Goldstein & Breitstone, LLP v. Malfetti*, 2018 WL 4627667 (E.D.N.Y. Sept. 27, 2018), for example, the court held that a party's "reply" to an email attaching "the essential terms" of an attorney-recruiter's fee agreement with "[t]his is fine – provided the invoices are emailed to me" was sufficient evidence of the party's intent to be bound by the agreement's terms, notwithstanding its failure to sign the contract.  *Id.* at *10 (E.D.N.Y. Sept. 27, 2018), *aff'd*, 777 F. App'x 571 (2d Cir. 2019); *see also Kolchins v. Evolution Markets, Inc.*, 128 A.D.3d 47, 59 (1st Dep't 2015), *aff'd*, 31 N.Y.3d 100 (2018) (replying to an email that outlined the terms of the contract with "I accept please send the contract" was sufficient to find "the parties had entered into an agreement" despite their failure to formally execute the contract).  "Given [this] objective evidence, there was no

requirement for [JetBlue] to sign the [LOI] for it to be enforceable." *Meltzer*, 2018 WL 4627667, at *9.

JetBlue tries to get around its "ready to sign it now" language  by making the improper factual assertion that there was some uncertainty about the exact timeline for NDC integration. (MTD 25.)  There was no such uncertainty.  To the contrary, the Complaint alleges that the parties expressly confirmed the timeline and agreed they did not need to change it in the LOI.  (¶ 100; Olson Ex. 3 at 1-2 (Mar. 20, 25 & 26, 2020 S. Barker & S. Hathiramani Emails) (confirming that the parties would plan for "late Q2" as the slot for the Development period).)

Further, JetBlue does not account for the fact that it *reaffirmed* its agreement to the terms of the LOI and that Fareportal confirmed the LOI had been "cleared by legal"—which would be unnecessary if it was not binding in nature, an understanding which JetBlue made no attempt to counter or correct.  (*Id.*; Olson Ex. 3 at 1 (Mar. 26, 2020 S. Barker & S. Hathiramani Emails).) JetBlue also ignores Fareportal's partial performance at JetBlue's request, *infra* at 41-42, which provides further evidence of the parties' intent to be bound.  *Meltzer*, 2018 WL 4627667, at *9.

JetBlue argues, without any support, that the "signature blocks" in the LOI "manifested [the parties'] clear intent that the term sheet should have no force absent ***both*** parties' signatures."[23] (MTD 25.)  As noted, New York courts have repeatedly declined such a proposition.  *Brighton*,

---

[23]   JetBlue's reliance on *Scheck v. Francis*, 26 N.Y.2d 466, 470 (1970), where the court considered whether there was a writing sufficient to overcome the Statute of Frauds, is also misplaced.  In trying to satisfy the Statute of Frauds, plaintiff pointed to a letter from defendant's attorney "instruct[ing] the plaintiff that he was to sign them and 'have [defendant] sign' them, expressly advising him to call if there were 'any questions or comments.'"  *Id*. at 469-70.  The Court of Appeals found that this letter did "not constitute a memorandum sufficient to satisfy the statute [of frauds]," because the letter said "nothing about the terms of the contracts and authenticate[d] no information contained in them."  *Id.* at 473.  The Statute of Frauds is not implicated here.  Furthermore, unlike here, where JetBlue *twice* affirmed its clear assent to the terms of the deal, no such representation was made by the defendant in *Scheck*; rather, the writing at issue made it plaintiff's responsibility to try to secure defendant's signature after the parties "*read and approved*" the terms of the contract.  *Id.* (emphasis added).

34

88 A.D.3d at 1223 (the impact of the "inclusion of signature blanks in the [unsigned] MOU" was a determination that "must be made by the trier of fact"); *cf. Kowalchuk v. Stroup*, 61 A.D.3d 118, 124 (1st Dep't 2009) ("[T]he language that '[t]he Agreement is complete and binding upon its execution by all signatories' is simply insufficient to be treated as an explicit reservation that the parties should not be bound by the terms of their agreement until the written agreement is fully executed.").[24]

At bottom, JetBlue's attempt to characterize its lack of signature as a threshold legal issue is misguided.  The relevant inquiry is the five-factor test laid out by the Second Circuit, *see Bear Stearns*, 401 B.R. at 425-26 (analyzing oral Type II agreement based on the five factors), an analysis of which JetBlue largely avoids because all five of these factors strongly support the plausibility of Fareportal's claim.

### 2.      All Five Factors Support The Existence Of A Type II Agreement

The broad purpose of a Type II agreement is to provide a "general framework within which" the parties can "proceed" toward their ultimate contractual goal, "while preserving flexibility in the face of future uncertainty." *Brown*, 420 F.3d at 158.  To identify such agreements, courts in this Circuit consider:  "(1) whether the intent to be bound is revealed by the language of the agreement; (2) the context of the negotiations; (3) the existence of open terms; (4) partial performance; and (5) the necessity of putting the agreement in final form, as indicated by the customary form of such transactions." *Id.* at 157 (citation omitted).  This is precisely how the LOI was designed to function here:  The LOI memorialized the parties' agreement on the core commercial terms of the NDC deal and provided the foundation for the parties to work together in

---

[24]   At the very least, this is a question inapt for resolution on a motion to dismiss:  "When a written instrument is free from ambiguity, a court may decide the question of intent as a matter of law, but where, as here, the written language is ambiguous and cannot be interpreted without resort to extrinsic evidence, the parties' intent must be decided by the factfinder." *Brighton*, 88 A.D.3d at 1222-23.

good faith on the NDC integration process and to finalize the ultimate NDC deal.   (¶ 100.)
Naturally then, all five factors support the existence of a Type II agreement.

(a)   First Factor:  The Terms Of The LOI Reflect An Intent To Be
Bound To Negotiate In Good Faith

The first factor is clearly met because the parties' "intent to be bound" by the terms of the
LOI as a general framework for negotiation is "revealed by the language of the agreement."  *EQT
Infrastructure*, 861 F. Supp. 2d at 229.  In addition to covering all the material terms of NDC
integration, the LOI sets forth a timeline for the parties' implementation of these agreed-on terms
as well as any remaining terms that the parties were negotiating as part of the final deal.

The timeline contemplates, for example, that the parties' dealings would transition from
mainly GDS bookings (10% of bookings via NDC in 2020) to majority NDC bookings (60% of
bookings via NDC by the end of 2022).  (Olson Ex. 4 (LOI).)  This timeline also lays out a period
prior to implementation, in which the parties would work together to ready their connection for
NDC implementation while finalizing the API License Agreement.  Where, as here, a preliminary
agreement expressly references the parties' collaboration while negotiations are to be ongoing, the
Second Circuit has held that it "cannot imagine more clear evidence of an intention to be bound to
the [agreement] as a general framework in which the parties will proceed in good faith toward the
goal of [the agreement] while preserving for later negotiation the specific details of necessary …
terms."  *Brown*, 420 F.3d at 158.

The timeline here clearly provides this framework:  "Development" of the remaining
technological items was to "begin[] Q2 2020" with the parties working in good faith towards the
goal of NDC implementation while finalizing the final contract.  (Olson Ex. 4 (LOI).)  Similarly,
in *Brown*, the first factor was established where the Memorandum of Understanding ("MOU")
referenced the parties' agreement "to work together."  420 F.3d at 158; *see also Gas Nat., Inc. v.*

36

*Iberdrola, S.A.*, 33 F. Supp. 3d 373, 381 (S.D.N.Y. 2014) (first factor met where an LOI referenced a 45 day "due diligence" period); *EQT Infrastructure*, 861 F. Supp. 2d. at 228 ("Paragraph four [of the LOI] also reflects Defendants' agreement to 'work with' Plaintiff 'with respect to a possible transaction' … language similar to that which the Second Circuit has found to indicate a Type II agreement.").[25]

Moreover, the LOI expressly states that the parties have "[a]cknowledged and *agreed*" to the terms contained therein, (Olson Ex. 4 (LOI)), language which has consistently been found to indicate an intent to enter into a Type II agreement. *See, e.g.*, *Iberdrola*, 33 F. Supp. 3d at 381 ("Describing the LOI as an 'agreement' weighs heavily in favor of finding that it imposed obligations consistent with a Type II agreement."); *Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co.*, 670 F. Supp. 491, 499 (S.D.N.Y. 1987) ("[t]he intention to create mutually binding contractual obligations is stated with unmistakable clarity" from "the words 'Accepted and agreed to'"). Indeed, a Letter of *Intent*, which is how both parties referred to the agreement (¶ 101), reflects an understanding between two or more parties that they *intend* to formalize in an agreement. *See, e.g.*, *Tribune*, 670 F. Supp. at 497 ("Labels such as 'letter of intent'" can be "indicators of the parties' intentions").

JetBlue misstates the implications of the LOI's header "SUBJECT TO CONTRACT" as contrary to the presence of an agreement, when it is the *description* of a Type II agreement. (MTD 29.) The point of a Type II agreement is to commit to negotiations of a final contract. Here, this phrase contemplated the parties' agreement to negotiate the API License Agreement, and its use *supports* the existence of a Type II agreement. *See Bear Stearns*, 401 B.R. at 625-26 (S.D.N.Y.

---

[25] While JetBlue argues that the "court found the first factor to be ambiguous" in *EQT* (MTD 29), the only ambiguity was as to the *duration* of the obligation, not whether the LOI was sufficient to bind the parties in a commitment to negotiate in good faith. 861 F. Supp. 2d at 229.

2009) ("Contracts of preliminary commitment characteristically contain language reserving rights of approval and establishing conditions such as the preparation and execution of documents satisfactory to the contracting party.") (quoting *Tribune,* 670 F.Supp. at 500); *see also Tribune*, 670 F. Supp at 500 (a reservation of rights has a distinct meaning for an inquiry into "whether [the parties] had entered into a binding preliminary commitment which required further steps" as compared to "whether the parties had concluded their deal").  In fact, even JetBlue concedes that the parties contemplated a future contract.  (MTD 29); *see also Learning Annex Holdings, LLC v. Whitney Educ. Grp., Inc.*, 765 F. Supp. 2d 403, 415 (S.D.N.Y. 2011) (finding the first factor met where, as here, "even [defendant] concedes that [the term sheet] is a summation of points for *future contract negotiations*").

Similarly, as courts have held, the parties' decision to label the LOI as a "non-binding commercial term sheet" "is not dispositive here because Type II preliminary agreements," unlike Type I agreements "are not binding legal obligations," but instead obligations to negotiate in good faith toward a final contract.  *Learning Annex*, 765 F. Supp. 2d 403; *see also Iberdrola*, 33 F. Supp. 3d at 381 ("The parties' description of the LOI as a 'non-binding letter of intent,' … is not determinative."); *cf. Brown*, 420 F.3d at 158 (finding "clear evidence" of the parties' intent to be bound by a Type II agreement even though "the MOU does not disclose an intention by the parties to be bound to the ultimate goal of the contract").

And the "other language in the LOI supports the conclusion" that the parties' use of "non-binding" is best "construed as indicating only the parties' intent" to not yet "be bound to execute the *ultimate*" API License Agreement, but instead to make a commitment to negotiate in good faith.  *Iberdrola*, 33 F. Supp. 3d at 380-81 (emphasis added).  "Indeed, adopting the opposite construction would render a number of other terms in the contract"—such as the Development

period and the parties' acknowledged agreement—"superfluous," an impermissible outcome under basic contract interpretation principles. *Id.* at 381. The sole case JetBlue cites in its favor on this point is plainly distinguishable. (MTD 28-30). In *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69 (2d Cir. 1989), the memorandum at issue contained multiple indications *contrary* to a commitment to negotiate, "two references to the possibility that *negotiations might fail.*" *Id.* at 72 (emphasis added). Further, the memorandum's language stated that the parties' "agreement" was expressly "*subject to the approval* of [defendant's] board." *Id.* at 70 (emphasis added). The LOI here contains no such phrases.

> (b)   Second Factor: The Context Of The Negotiations Supports The Existence Of A Type II Agreement

The context of the parties' negotiations further confirms the parties' intent to form a binding Type II agreement. JetBlue and Fareportal "had dealings for years." *Learning Annex*, 765 F. Supp. 2d at 415; (¶¶ 81-83). The LOI was "the culmination of several months of discussions and negotiations between" JetBlue and Fareportal regarding NDC distribution, *Learning Annex*, 765 F. Supp. 2d at 415, with the parties exchanging various iterations of the LOI before agreeing on its final form. (¶ 89); *see also Iberdrola*, 33 F. Supp. 3d at 382 (factor two weighed "in favor of Plaintiff" where the parties "exchanged several drafts of the LOI … which has been found to support the existence of a Type II agreement").

Fareportal's understanding of the binding nature of this obligation is further evidenced by the fact that it had its legal team review the LOI, and communicated as much to JetBlue. (¶¶ 89, 101; Olson Ex. 3 at 1 (Mar. 26, 2020 S. Hathiramani Email)); *cf. Vacold LLC v. Cerami*, 545 F.3d 114, 127 (2d Cir. 2008) (that a letter in question "was styled a 'letter agreement,' whereas all five previous drafts were styled a 'summary of discussions' or the like" supported the finding of a Type

I agreement). "Therefore, the context from which [the LOI] arose" supports the inference that the parties intended to commit to further negotiations.[26] *Learning Annex*, 765 F. Supp. 2d at 415.

(c)    <u>Third Factor:  The Parties Agreed To All Material Terms</u>

JetBlue and Fareportal agreed to *all* core commercial terms and a complete framework for the parties to finalize implementation, strongly weighing in favor of a Type II agreement. (¶¶ 99-100); *Tribune*, 670 F. Supp. at 501 (third factor met where "two page term sheet attached to the commitment letter covered the important economic terms of a loan").  All that remained for a final contract was for JetBlue and Fareportal's legal teams to finalize the additional terms in the API License Agreement, but the core commercial terms for that agreement were already reflected and agreed to in the LOI.  (¶¶ 99-100).

As noted, JetBlue factually asserts that the purportedly "unsettled nature of the NDC integration timeline" should cause the agreement to be disregarded.  But the NDC integration was not unsettled—the parties agreed to *keep* the period set for Q2.  *See supra* at 33.  Furthermore, JetBlue's argument ignores the *other* commercial terms agreed to by the parties.  *See Brown*, 420 F.3d at 158 ("The MOU leaves open terms-critical to every aspect of the … Project ….  However, these omissions do not warrant against finding the MOU enforceable as a Type II agreement."); *Learning Annex*, 765 F. Supp. 2d at 415 ("[T]he existence of open terms may actually support a finding that the parties were bound to proceed in good faith toward finalizing these terms.").  This factor, therefore, too weighs in favor of the allegations that the LOI was a Type II agreement.

---

[26] JetBlue effectively concedes as much, simply referencing its lack of signature (MTD 30) and citing an inapposite case outside the Type II context in which the Second Circuit declined to infer a binding contract from an email exchange where plaintiff's counsel indicated "he was 'still waiting for client approval'" and where there was no indication of an agreement by defendant. *CAC Grp. Inc. v. Maxim Grp. LLC*, 523 F. App'x 802, 803 (2d Cir. 2013).

(d)      Fourth Factor:  The Parties Engaged In Partial Performance

At JetBlue's request, Fareportal engaged in partial performance, "such as completing due diligence and legal steps in furtherance of achieving the ultimate contractual goal," which "can give rise to binding obligations contemplated in preliminary agreements."  *EQT Infrastructure*, 861 F. Supp. 2d at 230.  The parties discussed the precise start date of NDC implementation over email and a phone call, and, upon JetBlue's request, Fareportal performed the necessary due diligence with its technology team to determine this timeline was feasible, and the team prepared for this schedule accordingly.  (¶¶ 100, 103.)

Further, the parties were both working towards the final API License Agreement when JetBlue broke off negotiations:  Fareportal sent JetBlue a draft of this agreement, and JetBlue represented that its legal team was 75% finished with its review and progressing.  (¶ 99; Olson Ex. 3 at 3 (March 20, 2020 A. Barker Email).)  Just a few days before JetBlue terminated all dealings, JetBlue represented to Fareportal that it would have an update from its legal team on the final API License Agreement.  (¶ 104; Olson Ex. 6 at 1 (May 27, 2020 S. Barker Email)); *see also EQT Infrastructure*, 861 F. Supp. 2d at 230 ("draft[ing] documents necessary to complete the Possible Transaction" established partial performance); *FCOF UB Sec. LLC v. MorEquity, Inc.*, 663 F. Supp. 2d 224, 230 (S.D.N.Y. 2009) ("that both parties were in the midst of working toward a final agreement … when [one party] broke off negotiations" supported a finding of "an enforceable obligation to negotiate toward a final agreement").  "This effort weighs in favor of finding that [the parties] were bound to continue to negotiate in good faith."  *EQT Infrastructure*, 861 F. Supp. 2d at 230.

Even if furthering the NDC integration process were all that could constitute partial performance, Fareportal's technology team adjusted the technological integration process to fit JetBlue's timeline.  (¶ 103); *Network Enterprises, Inc. v. APBA Offshore Prods., Inc.*, 264 F. App'x

41

36, 39 (2d Cir. 2008) (cable network "partially performed" its Type II obligations "by reserving air time" for its counterparty's shows).  Fareportal's efforts to finalize the NDC deal and JetBlue's apparent consent to them raises a strong inference in favor of a Type II agreement.

          (e)      Fifth Factor:  The LOI Contemplated Future Formalization Of The Parties' Ultimate Agreement

JetBlue tries to transform the fact that "the parties would have expected to execute a formal contract" into evidence that weighs *against* a Type II agreement.  (MTD 31.)  That fact has the opposite significance.  Courts have routinely found preliminary agreements to have been created where, as here, the "necessity" of further formalization is "explicitly contemplated."  *EQT Infrastructure*, 861 F. Supp. 2d at 230; *see also Brown*, 420 F.3d at 158 (reversing district court's finding of no preliminary agreement where "there [could] be little debate that [the terms] all required more formal and extensive contracts").  As the language and course of the parties' conduct here indicates, this is the very purpose of a Type II agreement.

Accordingly, because all five factors weigh in favor of the Complaint's allegations that the parties entered into a Type II agreement, and because JetBlue's contentions at best rely on disputed factual arguments, its arguments for dismissal of this claim on the pleadings should be rejected.

**B.**    **JetBlue Breached Its Type II Obligation, Causing Significant Damage To Fareportal**

A Type II agreement "bars a party from 'renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to the preliminary agreement.'"  *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 430 (2d Cir. 2011) (quoting *Tribune*, 670 F. Supp. at 409); *see also EQT*, 861 F. Supp. 2d at 228 ("If an agreement is a Type II agreement, the parties are obliged to negotiate in good faith during its existence, an obligation that precludes the imposition of conditions not found in the preliminary agreement.").  Here, JetBlue breached its agreement

precisely by renouncing the deal and abandoning negotiations, and by summarily dismissing Fareportal's good faith attempts to revive negotiations.  (¶¶ 103-16.)

JetBlue attempts to raise the bar, arguing that Fareportal must show JetBlue's unilateral termination of the deal was in "furtherance of a grand anticompetitive scheme" or "dishonest."[27] But the caselaw provides that JetBlue was permitted to "abandon the transaction" only after "hav[ing] made a good faith effort to close the deal and hav[ing] not insisted on conditions that do not conform to the preliminary writing," *Learning Annex*, 765 F. Supp. 2d. at 411.  JetBlue does not—nor could it—assert that such an effort was made.  JetBlue's breach of the Type II agreement has harmed Fareportal's business, causing customers to book their flights elsewhere.  (¶¶ 28-29.)

## III.   THE COMPLAINT ADEQUATELY PLEADS A PROMISSORY ESTOPPEL CLAIM

Finally, the Complaint pleads each element of promissory estoppel under New York law: "a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made, and an injury sustained by the party asserting the estoppel by reason of the reliance." *Cyberchron Corp. v. Calldata Sys. Dev., Inc.*, 47 F.3d 39, 44 (2d Cir. 1995) (internal quotation marks omitted).

JetBlue's promise to continue the status quo relationship with Fareportal was clear and unambiguous.  In June of 2019, JetBlue approached Fareportal and represented it was initiating a shift in corporate strategy towards direct connections with OTAs through NDC.  (¶¶ 87, 169-70.) Fareportal has a reputation in the industry as a pioneer and market leader in technological

---

[27]   JetBlue also misquotes *Tribune* to argue that it had a right to back out of the deal "if it were 'to lose interest as circumstances change.'" (MTD 31 (quoting *Tribune*, 670 F. Supp. at 498).)  In fact, the court in *Tribune* was referring to the fact that Type II agreements leave open the possibility that "*the parties* will lose interest as circumstances change and *will mutually abandon* the negotiation."  670 F. Supp. at 498 (emphasis added); *see also id.* at 500 (Type II agreements prevent a party from "walk[ing] away from its deal merely because it later decides that the deal is not in its interest").

innovation to create more sophisticated connections with airlines.  (¶ 170.)  JetBlue's shift to NDC therefore represented another opportunity for Fareportal to enhance its relationship and connection with JetBlue.  (*Id.*)  Implementing an NDC deal would require significant work to create a customized connection between the parties' software interfaces, and JetBlue requested that Fareportal expend these resources and guide JetBlue through the process.  (*Id.* ¶¶ 85, 170.)

In reasonable and foreseeable reliance on this promise, Fareportal started the substantial project of integrating the two parties' API, devoting significant resources and labor to this process. (¶ 171.)  After several weeks of devoted work, Fareportal confirmed with JetBlue that it had the capability to execute NDC.  (*Id.*)  JetBlue attempts to paint this reliance as unreasonable by arguing that Fareportal understood the parties were not obligated complete the NDC deal.  (MTD 32-33.) But the Complaint alleges that Fareportal was reasonably relying on JetBlue's assurances as to the ongoing stability of the parties' relationship, which it had no reason to doubt.  (¶ 171.)

Finally, Fareportal has suffered injury as a result.  Despite its assurances and Fareportal's efforts in reliance on its assurances, JetBlue terminated *all* dealings with Fareportal, causing significant damage to Fareportal in the form of substantial labor and capital Fareportal expended on implementing NDC, and irreparable harm Fareportal continues to suffer to this day.  (¶¶ 29, 171.)  JetBlue's factual dispute with Fareportal's clear allegation that it expended capital on NDC implementation should be disregarded at the pleading stage.[28]  (MTD 34.)

---

[28]   Similarly, JetBlue's factual insertion that Fareportal could use its NDC implementation work with other airlines is not only external to the pleadings but, in fact, contradicts them.  (¶ 170 (discussing the "*customized* connection" Fareportal was required to implement) (emphasis added).)

## CONCLUSION

For the foregoing reasons, Fareportal respectfully requests that the Court deny JetBlue's motion to dismiss the amended Complaint. In the alternative, Fareportal requests leave to amend the Complaint to address any issues found by the Court.

Dated: May 17, 2021                           Respectfully submitted,

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

By _/s/_ Steig D. Olson
Steig D. Olson
Corey Worcester
Todd Anten
Avi Grunfeld
Anna Deknatel
steigolson@quinnemanuel.com
coreyworcester@quinnemanuel.com
toddanten@quinnemanuel.com
avigrunfeld@quinnemanuel.com
annadeknatel@quinnemanuel.com
51 Madison Avenue, 22nd Floor
New York, New York 10011
Tel: (212) 849-7000
Fax: (212) 849-7100