**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------x
                                                :
Fareportal Holdings Inc., Fareportal Inc.,      :
WK Travel, Inc. and Travelong, Inc.,            :
                                                :
                              Plaintiffs,        :       Case No. 1:21-cv-00061-CBA-LB
                                                :
              v.                                :
                                                :
JetBlue Airways Corporation,                    :
                                                :
                              Defendant.         :
                                                :
-------------------------------------------------------------x
```

**JETBLUE AIRWAYS CORPORATION'S MEMORANDUM OF LAW**
**IN SUPPORT OF ITS MOTION TO DISMISS THE AMENDED COMPLAINT**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT .................................................................................1

STATEMENT OF FACTS ....................................................................................4

    A.    The Parties .....................................................................................4

    B.    JetBlue And Fareportal Have Never Had A Contractual Relationship..................5

        1.    Prior To January 5, 2021, Fareportal Relied On Intermediary Global Distribution Systems To Sell JetBlue Tickets ...............................5

        2.    JetBlue And Fareportal Considered Building A Direct Distribution Connection And Entering Into A Direct Distribution Relationship ...........5

        3.    The Parties Never Implemented A Direct NDC Connection Or Entered Into A Binding Contract .................................................7

    C.    Fareportal Commences This Action .......................................................8

ARGUMENT ...................................................................................................8

I.    THE AMENDED COMPLAINT FAILS TO PLEAD AN ANTITRUST VIOLATION.....8

    A.    Fareportal's Alleged Anticompetitive Scheme Is Implausible ...............................8

    B.    Fareportal Lacks Antitrust Standing Because Its Purported Injury Does Not Flow From Harm To Competition .........................................................11

    C.    The Amended Complaint Fails To Allege Anticompetitive Conduct Because JetBlue Has No Duty To Deal With Fareportal .......................................13

    D.    The Amended Complaint Does Not Sufficiently Plead That JetBlue Has Or Is Likely To Obtain Monopoly Power.....................................................17

        1.    The Amended Complaint Is Devoid Of Factual Allegations Showing That JetBlue Can Charge Supracompetitive Prices ...................................17

        2.    Fareportal's Theory That JetBlue Is Likely To Obtain The Ability To Charge Supracompetitive Prices Is Implausible .......................................20

    E.    The Amended Complaint Fails To Allege That JetBlue Had The Requisite Specific Intent To Monopolize ...........................................................20

        1.    The Amended Complaint's Conclusory And Contradictory Allegations Of Specific Intent Should Be Afforded No Weight ..............21

2.      The Amended Complaint's Allegations That JetBlue Acted For Legitimate Business Reasons Confirm The Lack Of Specific Intent To Monopolize ...................................................................................................22

II.    FAREPORTAL'S STATE LAW CLAIMS SHOULD BE DISMISSED FOR LACK OF FEDERAL JURISDICTION ...................................................................23

III.   EVEN IF THIS COURT EXERCISES SUPPLEMENTAL JURISDICTION, FAREPORTAL'S STATE LAW CLAIMS SHOULD BE DISMISSED .........................23

A.     Fareportal's Breach Of Contract Claim Should Be Dismissed.............................23

1.      The Unexecuted Term Sheet Has No Legal Force ....................................24

2.      Even If JetBlue Had Executed The Term Sheet, Fareportal's Breach Of Contract Claim Would Still Be Defective As A Matter Of Law ..........27

(a)      New York Courts Distinguish Between Binding "Type I" And "Type II" Preliminary Agreements .................................................27

(b)      The Four Corners Of The Term Sheet Unambiguously Reflect That It Is Not Even A "Type II" Preliminary Agreement.............28

(c)      The Amended Complaint Fails To Plead That JetBlue Acted In Bad Faith In Choosing Not To Enter Into A Binding Contract...............................................................................................31

B.     Fareportal's Promissory Estoppel Claim Is Defective As A Matter Of Law ........31

1.      The Amended Complaint Fails To Allege A Requisite "Clear And Unambiguous" Promise ..........................................................................32

2.      The Amended Complaint Fails To Allege Reasonable Reliance...............33

3.      The Amended Complaint Fails To Sufficiently Allege Any Injury ..........33

CONCLUSION....................................................................................................................35

# TABLE OF AUTHORITIES

**Page**

**Cases**

*A.G.S. Elecs., Ltd. v. B.S.R. (U.S.A.), Ltd.*, 460 F. Supp. 707 (S.D.N.Y. 1948), *aff'd*, 591 F.2d 1329 (2d Cir. 1978) ...............................................................................13

*AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216 (2d Cir. 1999).........................17

*In re Adderall XR Antitrust Litig.*, 754 F.3d 128  (2d Cir. 2014), *as corrected* (June 19, 2014).....................................................................................................................14, 15

*Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.*, 145 F.3d 543 (2d Cir. 1998) ....................27, 28, 33

*Aksman v. Xiongwei Ju*, 799 N.Y.S.2d 493 (N.Y. App. Div. 2005)...........................................27

*In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151 (2d Cir. 2016)...............................11

*Apotex Corp. v. Hospira Healthcare India Priv. Ltd.*, No. 18-CV-4903 (JMF), 2020 WL 58247 (S.D.N.Y. Jan. 6, 2020) ...............................................................14, 15, 20

*Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69 (2d Cir. 1989) .....................28, 29, 30

*Arcesium, LLC v. Advent Software, Inc.*, No. 1:20-CV-04389 (MKV), 2021 WL 1225446 (S.D.N.Y. Mar. 31, 2021) .......................................................... *passim*

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...........................................................................8, 21

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985)................13, 14, 15, 16

*Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328 (1990)....................................................11

*Attestor Value Master Fund v. Republic of Argentina*, 940 F.3d 825 (2d Cir. 2019)...................25

*Balaklaw v. Lovell*, 14 F.3d 793 (2d Cir. 1994)........................................................................12

*Banco Espirito Santo de Investimento, S.A. v. Citibank, N.A.*, No. 03 Civ. 1537, 2003 WL 23018888 (S.D.N.Y. Dec. 22, 2003) .........................................................23

*Bell Atl. Corp. v. Twombly*. 550 U.S. 544 (2007) ........................................................2, 8, 9, 11

*Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*, 985 F. Supp. 2d 612 (S.D.N.Y. 2013) .............................................................................................9, 19

*Brown v. Cara*, 420 F.3d 148 (2d Cir. 2005)...........................................................27, 28, 29, 30

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977) ...........................................11

iii

*CAC Grp. Inc. v. Maxim Grp. LLC*, 523 F. App'x 802 (2d Cir. 2013)..........................30

*Castellotti v. Free*, 27 N.Y.S.3d 507 (2016) ...................................................................32

*Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230 (2d Cir. 2008)............................18

*Chatterjee Fund Mgmt., L.P. v. Dimensional Media Assocs.*, 687 N.Y.S.2d 364
(N.Y. App. Div. 1999) ................................................................................34

*Cohen v. Singer*, 4 F. App'x 38 (2d Cir. 2001).............................................................27

*Doron Precision Sys., Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173 (S.D.N.Y. 2006) .........4

*Eatoni Ergonomics, Inc. v. Research In Motion Corp.*, 826 F. Supp. 2d 705
(S.D.N.Y. 2011), *aff'd*, 486 F. App'x 186 (2d Cir. 2012) .......................................14

*EQT Infrastructure Ltd. v. Smith*, 861 F. Supp. 2d 220 (S.D.N.Y. 2012) ............................. *passim*

*Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196
(S.D.N.Y. 2018), *aff'd sub nom. Kapitalforeningen Lægernes Inv. v. United
Techs. Corp.*, 779 F. App'x 69 (2d Cir. 2019)..........................................................22

*Frutico S.A. de C.V. v. Bankers Tr. Co.*, 833 F. Supp. 288 (S.D.N.Y. 1993)................32

*Full Circle United, LLC v. Skee-Ball, Inc.*, No. 11 CV 5476 (LB), 2014 WL
12829195 (E.D.N.Y. May 13, 2014) ......................................................................9

*G.K.A. Beverage Corp. v. Honickman*, 55 F.3d 762 (2d Cir. 1995)..............................13

*Gas Nat., Inc. v. Iberdrola, S.A.*, 33 F. Supp. 3d 373 (S.D.N.Y. 2014)...................23, 33

*Gatt Commc'ns, Inc. v. PMC Assocs., LLC*, 711 F.3d 68 (2d Cir. 2013)................11, 12

*Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485 (2d Cir. 2004) ..............18

*George Haug Co., Inc. v. Rolls Royce Motor Cars Inc.*, 148 F.3d 136 (2d Cir.
1998) .........................................................................................................12

*Glob. Disc. Travel Servs., LLC v. Trans World Airlines, Inc.*, 960 F. Supp. 701
(S.D.N.Y. 1997)...............................................................................................20

*Greco v. Verizon Commc'ns, Inc.*, No. 03 CV 718 (KMW), 2005 WL 659200
(S.D.N.Y. Mar. 22, 2005) .................................................................................14

*Int'l Bus. Machs. Corp. v. Platform Sols. Inc.*, 658 F. Supp. 2d 603 (S.D.N.Y.
2009) .....................................................................................................13, 14

*Learning Annex Holdings, LLC v. Whitney Educ. Grp., Inc.*, 765 F. Supp. 2d 403
(S.D.N.Y. 2011)...........................................................................................29, 30

*Michael E. Jones M.D., P.C. v. UnitedHealth Grp., Inc.*, No. 19-CV-7972 (VEC), 2020 WL 4895675 (S.D.N.Y. Aug. 19, 2020) .........................................................................9

*Olde Monmouth Stock Transfer Co. v. Depository Tr. & Clearing Corp.*, 485 F. Supp. 2d 387 (S.D.N.Y. 2007) ..........................................................................................14

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438 (2009) ............................................13

*PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101 (2d Cir. 2002) .................................................17, 20

*Placide-Eugene v. Visiting Nurse Serv. of New York*, No. 12-CV-2785 ADS ARL, 2013 WL 2383310 (E.D.N.Y. May 30, 2013) ...........................................................................4

*Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117 (2d Cir. 2007) ...........12, 14, 15, 23

*Prestige Foods, Inc. v. Whale Sec. Co.*, L.P., 663 N.Y.S.2d 14 (N.Y. App. Div. 1997) ............................................................................................................................32, 33

*Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013) ........................................................................21

*Scheck v. Francis*, 26 N.Y.2d 466 (N.Y. 1970) ......................................................................24, 26

*Songbird Jet Ltd., Inc. v. Amax, Inc.*, 581 F. Supp. 912 (S.D.N.Y. 1984)....................................34

*Spirit Airlines, Inc. v. Nw. Airlines, Inc.*, 431 F.3d 917 (6th Cir. 2005).......................................19

*Tchrs. Ins. & Annuity Ass'n of Am. v. Tribune Co.*, 670 F. Supp. 491 (S.D.N.Y. 1987) ...............................................................................................................28, 29, 31

*Times-Picayune Pub. Co. v. U.S.*, 345 U.S. 594 (1953) ...............................................................23

*Valencia ex rel. Franco v. Lee*, 316 F.3d 299 (2d Cir. 2003) ......................................................23

*Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398 (1990).........................................................................................................................13, 14

*Weiss v. Inc. Vill. of Sag Harbor*, 762 F. Supp. 2d 560 (E.D.N.Y. 2011) ...........................4, 6, 22

*Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156 (S.D.N.Y. 2015) .................................................................................................................4

## Statutes & Rules

15 U.S.C. § 1 ............................................................................................................................12, 20

15 U.S.C. § 2 ............................................................................................................................ *passim*

28 U.S.C. § 1367(c)(3)....................................................................................................................23

Fed. R. Civ. P. 12(b)(1)...........................................................................................................1

Fed. R. Civ. P. 12(b)(6)...............................................................................................1, 17, 20

Fed. R. Evid. 201(b).................................................................................................................4

Defendant JetBlue Airways Corporation ("JetBlue") respectfully submits this memorandum in support of its motion to dismiss the Amended Complaint of Fareportal Holdings Inc., Fareportal Inc., WK Travel, Inc. and Travelong, Inc. (collectively, "Fareportal"), dated March 4, 2021 (the "Amended Complaint" or "AC"), pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).

## PRELIMINARY STATEMENT

Fareportal's lawsuit is a desperate attempt to reverse JetBlue's perfectly legal and legitimate commercial decision to book more passengers on its own website instead of entering a contractual arrangement with Fareportal and its online travel agencies ("OTAs"). To try to achieve this goal, Fareportal asserts that JetBlue should be contractually bound to it on the basis of a term sheet that JetBlue never signed and that expressly provides that it is "non-binding" and "SUBJECT TO CONTRACT." Fareportal's apparent commercial disappointment is no substitute for an actual contract or well-pled factual allegations required to state claims for breach of contract and promissory estoppel.

Fareportal also strains to bring federal antitrust claims in an effort to achieve in court what it could not achieve commercially. But Fareportal's claims for monopolization and attempted monopolization under Section 2 of the Sherman Act rest entirely on conclusory, contradictory and implausible allegations. For example, Fareportal alleges in a conclusory fashion that JetBlue's decision not to enter a contract with Fareportal threatens the competitive integrity of air travel, yet it ignores that JetBlue's domestic market share is less than 5% and that numerous larger airlines also have chosen not to do business with Fareportal. Fareportal also speculates that JetBlue is motivated to "destroy" the OTA industry, but it concedes that JetBlue continues to do business with certain other OTAs with which JetBlue actually has contractual relationships (unlike with Fareportal). Further, while Fareportal makes wholly unsupported

1

allegations concerning hypothetical "harm" to consumers, it cannot plausibly allege that JetBlue has raised or could raise its fare prices simply by choosing not to list its flights on Fareportal's sites.  In particular, it cannot explain away the immutable fact that there are numerous other ways for consumers to compare air carrier prices, including on JetBlue's and other carriers' websites as well as well-known metasearch engines.

Accordingly, even when viewed under the standards applied to a motion to dismiss, the Amended Complaint fails to allege a cognizable antitrust claim for at least five, independent reasons.

*First*, Fareportal's alleged antitrust "scheme" is based on nothing more than farfetched conjecture and a brazen disregard for the realities of the air travel market and does not give rise to a plausible inference of any wrongdoing by JetBlue.  As such, the antitrust claims fail to clear the well-established pleading hurdle the Supreme Court laid out in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007).

*Second*, Fareportal lacks antitrust standing because it is neither JetBlue's competitor nor a consumer, and thus is unable to show that its purported injury is of the type that the antitrust laws were intended to prevent or that it flows from JetBlue's alleged wrongful acts.  At most, the Amended Complaint alleges harm to Fareportal's own business, which does not confer antitrust standing.

*Third*, Fareportal's entire antitrust claim is premised on the notion that JetBlue is legally required to enter a contract with Fareportal.  But firmly established Supreme Court precedent makes clear that, absent extraordinary circumstances not alleged here, JetBlue has the unilateral right to decide whether to do business with Fareportal.

*Fourth*, Fareportal's antitrust claims are defective for the independent reason that the Amended Complaint fails to adequately allege that JetBlue has acquired monopoly power in any relevant market or that there exists a dangerous probability that it will do so, as required for the monopolization and attempted monopolization claims, respectively.

*Fifth*, Fareportal fails to plausibly allege that JetBlue acted with specific intent to monopolize, which is a separate basis to dismiss the attempted monopolization claim.

Fareportal's contract and promissory estoppel claims are also equally defective and must be dismissed as a matter of law.

The breach of contract claim is predicated on a term sheet that is not binding because JetBlue never executed it and because the express and unambiguous terms of that term sheet manifest the parties' intent not to be bound. Fareportal thus cannot allege the most basic requirement of a breach of contract claim: the existence of a contract. Moreover, Fareportal has not and cannot show that JetBlue's decision to reassess its commercial strategy breached any obligation to negotiate in good faith that Fareportal seeks to impose on JetBlue.

Fareportal's threadbare promissory estoppel claim must similarly be dismissed as a matter of law for three independent reasons: (i) Fareportal's attempt to pass off preliminary contractual negotiations as a promise is at odds with the facts alleged and New York case law; (ii) Fareportal's allegations that the parties were engaged in contractual negotiations demonstrate that any reliance on any perceived promise by JetBlue would have been unreasonable; and (iii) Fareportal's allegations that the parties were engaged in contractual negotiations confirm that it suffered no injury, because Fareportal's investments—if any—are alleged to have been made for the purpose of securing a transaction that was being negotiated.

The Amended Complaint, which is Fareportal's second bite at the apple, should be dismissed in its entirety with prejudice.

## STATEMENT OF FACTS[1]

### A.    The Parties

JetBlue is an air carrier that operates flights in the U.S., the Caribbean, and Latin America.  *See* AC ¶ 67.  Its market share of the U.S. domestic air travel market is less than 5%.[2]

Fareportal runs OTAs, which are online platforms where consumers can search for and book flights, car rentals, and other travel services around the globe.  *See id.* ¶¶ 5, 55, 58–59, 70. Fareportal boasts that it is "proud to partner with over 600 airlines."[3]  However, there is no dispute that not all airlines sell tickets through Fareportal; for example, Southwest Airlines Co. ("Southwest") does not.[4]

---

[1] Unless otherwise indicated, the facts described herein are sourced from the Amended Complaint and are taken as true solely for purposes of this motion.  The Amended Complaint and documents referenced therein are attached as exhibits to the Transmittal Declaration of Matthew L. Craner, dated April 15, 2021 ("Craner Decl.").

[2] *See* Craner Decl. Exhibit ("Ex.") 2, U.S. Dep't. of Transportation, Bureau of Transportation Statistics ("DOT-BTS"), https://www.transtats.bts.gov/ (JetBlue's Airline Domestic Market Share (January – December 2020) is 4.7%).  When deciding this motion, the Court may consider JetBlue's market share because it is a fact of which judicial notice may properly be taken.  *See Weiss v. Inc. Vill. of Sag Harbor*, 762 F. Supp. 2d 560, 567 (E.D.N.Y. 2011); *Placide-Eugene v. Visiting Nurse Serv. of New York*, No. 12-CV-2785 ADS ARL, 2013 WL 2383310, at *12 (E.D.N.Y. May 30, 2013) (the court may take judicial notice of government statistics) (citations omitted).

[3] *See* Ex. 3, Fareportal, *A Little About Us*, https://www.fareportal.com/about/.  "For purposes of a 12(b)(6) motion to dismiss, a court may take judicial notice of information publicly announced on a party's website, as long as the website's authenticity is not in dispute and 'it is capable of accurate and ready determination.'"  *Doron Precision Sys., Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 179 n.8 (S.D.N.Y. 2006) (citing Fed. R. Evid. 201(b), other citations omitted).

[4] *See* CheapOair, https://www.cheapoair.com/ (listing no Southwest flights); OneTravel, https://www.onetravel.com/ (same).  *See Weiss*, 762 F. Supp. 2d at 567 (courts may consider facts of which judicial notice may properly be taken on a motion to dismiss); *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015) (collecting cases on the propriety of taking judicial notice of facts verified by internet searches).  In fact, Southwest does not sell through *any* OTA.  *See* Ex. 4 at 4, Southwest Airlines Co., *Corporate Travel Managed*, "Frequently Asked Questions: GDS: General Content," https://www.southwest.com/html/air/business-groups/corporate-travel/managed.html ("**Q: Can an OTA or a Meta Search agency get access to Southwest?**  A: OTAs and Meta Search agencies are not being approved by SWA to get content through Travelport GDS nor any other GDS provider.  *Southwest does not allow any travel agency to openly distribute our content via any online platform directly to consumers.*") (bold in original, italics added).  Southwest's domestic share is 17.4%.  *See supra* note 2.

### B.     JetBlue And Fareportal Have Never Had A Contractual Relationship

#### 1.     Prior To January 5, 2021, Fareportal Relied On Intermediary Global Distribution Systems To Sell JetBlue Tickets

While Fareportal alleges that it "and JetBlue have had a long and successful business relationship for nearly twenty years," AC ¶ 81, Fareportal and JetBlue have never entered into a contract.  Rather, Fareportal has relied on intermediary Global Distribution Systems ("GDSs") to obtain information about JetBlue flights and book JetBlue tickets on behalf of consumers.  *See id.* ¶¶ 56–57.  GDSs are third-party reservation systems that, for a fee, facilitate transactions between airlines and OTAs.  *Id.* ¶¶ 48, 56.  Thus, when a consumer booked a JetBlue ticket through Fareportal's OTAs, two middlemen (and their fees) stood between JetBlue and the consumer: Fareportal and the GDS.  *See id.* ¶ 56.  These intermediated sales were carried out pursuant to a "retail model," under which JetBlue would pay the GDS "based on the number of flight segments sold" and the GDS would in turn pay an incentive to Fareportal.  *Id.* ¶¶ 56, 114.

#### 2.     JetBlue And Fareportal Considered Building A Direct Distribution Connection And Entering Into A Direct Distribution Relationship

Over the course of the last decade, the airline industry developed an alternate technology, New Distribution Capability ("NDC"), which allows airlines to bypass GDSs and communicate directly with OTAs.  AC ¶ 86.  Although NDC is an industry standard, *id.*, implementing a direct NDC connection requires work on the part of both the airline and the OTA.  *See generally id.* ¶ 85 *et seq*.  Fareportal alleges that "Fareportal has been a market leader in adopting and implementing the NDC standard," *id.* ¶ 74, but that JetBlue did not have deep experience with NDC, *id.* ¶ 87.

Fareportal alleges that in June 2019, JetBlue advised it "that [JetBlue] would be seeking to phase in NDC," and that JetBlue and Fareportal subsequently discussed building a direct NDC connection to distribute JetBlue tickets.  *Id.* ¶ 87.  Fareportal alleges that that the "two parties'

technology teams met at Fareportal's New York City office in January of 2020 to discuss this integration," *id*. ¶ 90, after which "Fareportal's team started the integration process," so that "[a]fter several weeks of devoted labor to the process, Fareportal was able to confidently report to JetBlue that the integration process was going smoothly and that *Fareportal had the capability to execute NDC on its website as soon as an agreement was reached*," *id*. ¶ 91 (emphasis added).

Fareportal also alleges that the parties discussed a preliminary term sheet and the ultimate contractual agreement that would govern their potential new contractual relationship. *Id.* ¶ 100. With respect to the term sheet, Fareportal alleges that the parties exchanged drafts, and that on March 20, 2020, Sasha Barker, JetBlue's Manager of Distribution Strategy, sent Fareportal another iteration of the term sheet, indicating that JetBlue was "ready to sign it now," though it might require a two- to three-month delay "before beginning NDC development." *Id.* Barker's email invited further comment, asking, "Do you have any concerns about a delay?" Ex. 5 at 1.[5] Fareportal subsequently signed and returned this draft term sheet to Barker. AC ¶ 102. The Amended Complaint makes no allegation that JetBlue executed this writing.

The draft term sheet, which Fareportal did not include as an exhibit to the Amended Complaint, contained a header that provided in all capital letters that the document was "SUBJECT TO CONTRACT." Ex. 6.[6] At the end of this two-page document, the parties included the following notation: "Acknowledged and agreed to this *non-binding commercial term sheet*," (emphasis added) above signature blocks for Fareportal, on the one hand, and JetBlue's Vice President of Sales and Revenue Management, David Clark, on the other. *Id.*

---

[5] The Court may consider this email in considering this motion because it is quoted in the Amended Complaint and thus incorporated by reference in and integral to the Amended Complaint. *See Weiss*, 762 F. Supp. 2d at 567.

[6] The Court may consider the term sheet for the same reason it may consider Barker's email. *See id.* Moreover, the parties agree the Court may properly consider it. *See* Ex. 7, Mar. 16, 2021 Conf. Tr. at 24–25, 29.

### 3.   The Parties Never Implemented A Direct NDC Connection Or Entered Into A Binding Contract

At the same time that these preliminary discussions were taking place, the world was in the process of drastically changing.  March 2020 brought with it a wave of lockdowns as the world struggled to come to grips with the unprecedented global COVID-19 pandemic.  By May 2020, it had become apparent that the pandemic had and would have a significant impact on the airline industry.  Fareportal alleges that Barker and a representative of Fareportal spoke on May 13, 2020, and that on that call, "Barker indicated that, as a result of COVID-19 and delays in getting its final [application programming interfaces] ready, JetBlue would likely not be ready to proceed with NDC integration until the first quarter of 2021 at the earliest."  AC ¶ 103.

Less than three weeks later, JetBlue informed Fareportal on a June 1, 2020 call that JetBlue had concluded that it no longer made sense for it to continue work on implementing a direct NDC connection with Fareportal or enter into an agreement with Fareportal regarding the NDC integration.  *Id.* ¶ 107.  As part of its decision, JetBlue had re-assessed its prior distribution strategy and concluded that it no longer desired to sell its tickets through Fareportal OTAs and would stop allowing Fareportal to sell flights departing after January 5, 2021.  *Id.*  JetBlue informed Fareportal that this decision was informed by JetBlue's desire "to control the customer experience."  *Id.* ¶ 131.  By contrast, Expedia and Priceline, two OTAs with which JetBlue has contracts, continue to sell JetBlue flights.  *Id.* ¶ 108.

Despite JetBlue's clear and definitive message that it did not wish to enter into a commercial arrangement with Fareportal, Fareportal alleges it tried to resuscitate the possibility of an NDC deal with JetBlue.  *Id.* ¶¶ 109–10, 112–15.  Specifically, Fareportal alleges that although JetBlue had previously indicated that its ability to implement NDC had been adversely impacted by the pandemic, on June 4, 2020, Fareportal offered "to display JetBlue flights

through NDC and eliminate segment fees." *Id.* ¶ 123.  Fareportal alleges that this would have

provided JetBlue with a "No Cost solution for distribution." *Id.*  But this ignores the fact that

JetBlue would have needed to incur costs and invest additional time to implement NDC on its

end. *See id.* ¶¶ 87, 100, 103.

C.     **Fareportal Commences This Action**

Starting on June 1, 2020, when JetBlue informed Fareportal that it would not allow

Fareportal to sell flights departing after January 5, 2021, Fareportal's inventory of JetBlue flights

steadily decreased: on June 1, 2020, Fareportal could show customers JetBlue flights departing

up to six months into the future; on August 1, 2020, Fareportal could only show customers

JetBlue flights departing up to three months into the future; and on December 1, 2020, Fareportal

could only show JetBlue flights departing up to one month into the future.  *See* AC ¶ 107.  On

January 5, 2021, disappointed with JetBlue's previously communicated changed commercial

strategy and continued lack of interest in resuming commercial discussions, Fareportal

commenced the instant action, more than six months after JetBlue informed Fareportal that it

would no longer sell tickets through Fareportal's OTAs.  Complaint, ECF No. 1.  On March 4,

2021, in response to JetBlue's letter requesting a pre-motion conference regarding filing a

motion to dismiss, Fareportal filed the Amended Complaint.  ECF No. 18.  JetBlue now files this

motion to dismiss.

**ARGUMENT**

I.     **THE AMENDED COMPLAINT FAILS TO PLEAD AN ANTITRUST VIOLATION**

A.     **Fareportal's Alleged Anticompetitive Scheme Is Implausible**

To survive a motion to dismiss, plaintiffs must plead facts that "nudg[e] their claims

across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570; *see also Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009) (plaintiffs must plead factual allegations that "allow[] the court

to draw the reasonable inference that the defendant is liable for the misconduct alleged"). In the context of antitrust claims, courts must "tak[e] care" to closely scrutinize the complaint in order "to avoid the potentially enormous expense of discovery" in cases that fail to state a claim as a matter of law. *Twombly*, 550 U.S. at 559. Accordingly, Sherman Act Section 2 monopolization claims are routinely dismissed at the pleading stage where plaintiffs fail to plausibly plead anticompetitive conduct.[7]

Fareportal's specious allegations do not give rise to a plausible inference of any antitrust violation and should be dismissed. For example, Fareportal speculates that JetBlue's decision not to list its fares on Fareportal's websites will reduce demand for JetBlue's flights, *see* AC ¶¶ 123, 128–29. But reducing demand would necessarily ***decrease*** JetBlue's market share, thus directly undermining Fareportal's monopolization and attempted monopolization claims. To try to distract from these conflicting allegations, Fareportal concocts the absurd theory that JetBlue somehow is going to drive Fareportal out of business, *see id*. ¶ 117, destroy the entire OTA industry, *see id*. ¶¶ 11, 148, 155, and then use an apparent consumer information void to raise its fares, *see, e.g., id*. ¶11. These allegations are well beyond implausible.

As an initial matter, the Amended Complaint fails to allege any facts leading to a plausible inference that JetBlue can unilaterally destroy Fareportal by choosing not to list its flights on Fareportal's OTAs. Unsurprisingly, the Amended Complaint lacks any factual allegation that JetBlue represents a material part of Fareportal's business. Instead, it alleges in a vague and conclusory fashion that "[m]any Fareportal customers will . . . not return to Fareportal

---

[7] *See, e.g.*, *Arcesium, LLC v. Advent Software, Inc.*, No. 1:20-CV-04389 (MKV), 2021 WL 1225446, at *7 (S.D.N.Y. Mar. 31, 2021); *Michael E. Jones M.D., P.C. v. UnitedHealth Grp., Inc.*, No. 19-CV-7972 (VEC), 2020 WL 4895675, at *9 (S.D.N.Y. Aug. 19, 2020); *Full Circle United, LLC v. Skee-Ball, Inc.*, No. 11 CV 5476 (LB), 2014 WL 12829195, at *11 (E.D.N.Y. May 13, 2014); *Bookhouse of Stuyvesant Plaza, Inc. v. Amazon.com, Inc.*, 985 F. Supp. 2d 612, 623 (S.D.N.Y. 2013).

in the future." *Id.* ¶ 29.  But this speculation is undercut by the facts that JetBlue represents less than 5% of the domestic airline market, that Fareportal has long survived without the ability to list flights of other airlines with larger market shares, and that Fareportal admittedly partners with more than 600 airlines worldwide.  *See supra* notes 2–4.[8]

Unsurprisingly, Fareportal further fails to allege facts leading to a plausible inference that JetBlue can or desires to eliminate the entire OTA industry.  As the Amended Complaint acknowledges, JetBlue continues to do business with two large OTAs, Expedia and Priceline.  *See* AC ¶¶ 24, 30, 131.  But even if JetBlue did not do business with Expedia and Priceline, the Amended Complaint includes no allegation that JetBlue tickets represent a material part of those OTAs' businesses, and in fact alleges the contrary:  "Expedia and Priceline[] focus on selling consumers hotel bookings and bundled vacation packages that prioritize hotel bookings."  *Id.* ¶ 25.  The plain facts that render implausible the theory that JetBlue can unilaterally destroy Fareportal's business apply *a fortiori* to the larger OTA industry.

Fareportal's allegation that JetBlue can destroy price transparency and charge supracompetitive prices by declining to sell its tickets on Fareportal's OTAs is similarly implausible.  Fareportal spins this theory with references to "search costs," *id.* ¶ 124, and to an unidentified study by Charles River Associates that it alleges "found that OTAs aid entry of new airlines into City-Pair markets," *id.* ¶ 63, and that "[i]n the absence of access to complete information on competitive airline offerings, consumers are more likely to choose incumbent airlines even if they are charging higher prices," *id*.  But these allegations cannot overcome the well-known fact that consumers have unfettered access to many no-cost options for comparison

---

[8] Fareportal's allegation that "[o]ne of the largest OTAs targeted by JetBlue [in 2017], Vayama, has since ***effectively*** gone out of business," AC ¶ 19 (emphasis added), is unavailing because Fareportal fails to allege any facts to even suggest that JetBlue's unilateral decision to stop selling through Vayama was either an actual or a proximate cause of Vayama's business troubles, rather than any number of other possible issues.

shopping, including searching other OTAs like Expedia and Priceline (with which JetBlue has contracts), metasearch engines like Google Flights and Kayak, and airlines' own websites. Because these various search options are fully accessible to travelers, it is implausible that removing JetBlue flights from Fareportal's OTAs will impact the ability of price-sensitive customers, or any customer, to comparison shop and exert "price discipline" on JetBlue.

In short, because Fareportal has failed to "nudge[]" its antitrust claims "across the line from conceivable to plausible," those claims must be dismissed at the pleading stage under *Twombly*, 550 U.S. at 570.

### B.    Fareportal Lacks Antitrust Standing Because Its Purported Injury Does Not Flow From Harm To Competition

Antitrust standing—distinct from constitutional standing—is a threshold requirement that must be satisfied at the pleading stage.  *See Gatt Commc'ns, Inc. v. PMC Assocs., LLC*, 711 F.3d 68, 75–76 (2d Cir. 2013).  More specifically, an antitrust plaintiff must plausibly allege that it "suffered a special kind of antitrust injury."  *Id.* at 76 (internal quotation marks and citations omitted).  To plead antitrust injury, "the plaintiff must demonstrate that its injury is 'of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'"  *In re Aluminum Warehousing Antitrust Litig.*, 833 F.3d 151, 158 (2d Cir. 2016) (citing *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).  An injury "will not qualify as 'antitrust injury' unless it is attributable to an anti-competitive aspect of the practice under scrutiny. . . ."  *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990). Because Fareportal fails to plead antitrust injury, it lacks antitrust standing and its antitrust claims must be dismissed.

The gravamen of Fareportal's antitrust claims is that JetBlue has decided not to enter into a contractual relationship with Fareportal and has chosen not to sell its tickets through its OTAs,

which allegedly will cause Fareportal to lose sales and customers.  However, a "private plaintiff

seeking to state a claim for violation of sections 1 or 2 of the Sherman Act" must "demonstrate,

as a threshold matter, that the challenged action has had an ***actual adverse effect on competition***

***as a whole in the relevant market***; to prove it has been harmed as an individual competitor will

not suffice."  *George Haug Co., Inc. v. Rolls Royce Motor Cars Inc.*, 148 F.3d 136, 139 (2d Cir.

1998) (emphasis added) (internal quotation marks and citations omitted); *see also Arcesium, LLC*

*v. Advent Software, Inc.*, No. 1:20-CV-04389 (MKV), 2021 WL 1225446, at *7 (S.D.N.Y. Mar.

31, 2021) (granting motion to dismiss for lack of antitrust standing and holding that "[t]his case

cannot be maintained because there are no plausible allegations of market-wide harm, as opposed

to harm only to Plaintiff").  At most, the harm Fareportal purports to allege is harm to itself in

the form of lost sales and customers, not the market-wide harm that is necessary to establish

antirust injury.  *See Gatt Commc'ns*, 711 F.3d at 77 (distributor's "lost revenue resulting from

the [supplier] termination . . . is not an injury that flows from" the allegedly anticompetitive

conduct).

Even assuming that Fareportal could allege market-wide harm to competition, which the

Amended Complaint fails to do, Fareportal still could not plead the additional antitrust injury

requirement that its injury "flows from" the purported anticompetitive effect of JetBlue's

conduct rather than JetBlue's mere exercise of its commercial right not to contract with

Fareportal.  *See Balaklaw v. Lovell*, 14 F.3d 793, 797 (2d Cir. 1994) (injury must "reflect the

anticompetitive effect" of the violation) (citations omitted).  Simply put, JetBlue could have

exercised its commercial right to sell tickets directly to passengers regardless of what economic

position it had in the market.  *See Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117,

119–20 (2d Cir. 2007) (plaintiff did not allege antitrust injury because the harm in being cut off

as a distributor was "caused by the [defendant's] decision to terminate their relationship, something the [defendant] could have just as well done without having monopoly power") (citations omitted).[9]  Accordingly, even if the Amended Complaint's allegations are accepted as true, Fareportal lacks antitrust standing under well-established Second Circuit precedent, and its antitrust claims must be dismissed at this stage.

### C.   The Amended Complaint Fails To Allege Anticompetitive Conduct Because JetBlue Has No Duty To Deal With Fareportal

The Amended Complaint's core antitrust allegation is that JetBlue will not allow Fareportal to distribute JetBlue tickets.  Absent extraordinary circumstances not alleged here, however, it is firmly established that a unilateral refusal to deal is not actionable under the antitrust laws.  "The Sherman Act does not restrict the . . . right of [a] trader or manufacturer engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal." *Verizon Commc'ns Inc. v. Law Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (1990); *see also Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009) ("[B]usinesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing.").

Fareportal attempts to impose a "duty to deal" on JetBlue based on *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985).  But the Supreme Court has explained that *Aspen Skiing* represents a "limited exception" that is "at or near the outer boundary of § 2 liability" based on the unique facts of that case. *Trinko*, 540 U.S. at 409.  In the years since

---

[9] *See also G.K.A. Beverage Corp. v. Honickman*, 55 F.3d 762, 767 (2d Cir. 1995) (terminated distributor lacked antitrust standing because "the injuries 'all flow from the termination of its distributorship rather than any anticompetitive effects of'" defendant's purported monopolization of the upstream market (quoting *A.G.S. Elecs., Ltd. v. B.S.R. (U.S.A.), Ltd.*, 460 F. Supp. 707, 710 (S.D.N.Y. 1948), *aff'd*, 591 F.2d 1329 (2d Cir. 1978))); *Int'l Bus. Machs. Corp. v. Platform Sols. Inc.*, 658 F. Supp. 2d 603, 611 (S.D.N.Y. 2009) (terminated distributor/competitor lacked antitrust standing because injury did not flow from defendant's market power).

*Trinko* was decided, courts in this Circuit have rejected such claims on many occasions.[10]  This Court should follow suit and reject Fareportal's "duty to deal" claim because it would represent an unprecedented expansion of *Aspen Skiing*.

     *First*, whereas the defendant in *Aspen Skiing* was a monopolist, indisputably controlling three-fourths of the ski areas in Aspen, as explained below, the Amended Complaint does not and cannot plausibly allege that JetBlue has monopoly power in a relevant market.  *See* Part I.D below.

     *Second*, while "Aspen Skiing relied heavily on the fact that the plaintiff and defendant were the only participants in the market," *Arcesium*, 2021 WL 1225446 at *6 (citing *Aspen Skiing*, 472 U.S. at 589, 593), Fareportal and JetBlue are not the only participants in any conceivable market.  There are many other domestic airlines that compete with JetBlue and many other OTAs (not to mention traditional travel agencies and search engines) that compete with Fareportal.  Even if Fareportal were correct (which, as discussed below, it is not) that the relevant markets for assessing market power are the small number of routes in which JetBlue's market share of air passenger travel is approximately 40% or higher or approximately 70% or higher, those are not the only relevant routes for assessing whether JetBlue has a duty to deal with Fareportal.  In contrast to *Aspen Skiing*, where the parties' operations were limited to operating the four ski areas in Aspen, those specific routes make up a small portion of Fareportal's global business, and Fareportal is attempting to impose an obligation that extends

---

[10] *See, e.g., Arcesium*, 2021 WL 1225446, at *6–7; *In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 134–35 (2d Cir. 2014), *as corrected* (June 19, 2014); *Port Dock*, 507 F.3d at 126; *Apotex Corp. v. Hospira Healthcare India Priv. Ltd.*, No. 18-CV-4903 (JMF), 2020 WL 58247, at *4–5 (S.D.N.Y. Jan. 6, 2020); *Eatoni Ergonomics, Inc. v. Research In Motion Corp.*, 826 F. Supp. 2d 705, 709 (S.D.N.Y. 2011), *aff'd*, 486 F. App'x 186 (2d Cir. 2012); *Int'l Bus. Machs.*, 658 F. Supp. 2d at 611; *Olde Monmouth Stock Transfer Co. v. Depository Tr. & Clearing Corp.*, 485 F. Supp. 2d 387, 396 (S.D.N.Y. 2007); *Greco v. Verizon Commc'ns, Inc.*, No. 03 CV 718 (KMW), 2005 WL 659200, at *4 (S.D.N.Y. Mar. 22, 2005).

far beyond those routes.  In any event, even if those routes were the market at issue, Fareportal's

own allegations lead to an obvious inference that other airlines are providing services for the

other 30–60% of passengers on those routes.  These allegations alone are fatal to Fareportal's

claims.  *See Arcesium*, 2021 WL 1225446 at *6 (concluding that where "Plaintiff and Defendants

are not the only participants in the relevant markets," and "Plaintiff's own allegations, lead to a

reasonable inference that other companies are providing services for the other 30-40 percent" of

the market, "[t]hese distinctions strike at the heart of the *Aspen Skiing* exception").

*Third*, whereas "*Aspen Skiing* stands for the proposition that a business with market

power may be subject to a duty to deal with a smaller competitor," *In re Adderall*, 754 F.3d at

134, the Amended Complaint does not and cannot allege that JetBlue and Fareportal are

competitors.  Rather, Fareportal is at most a discontinued distributor.  It is well settled that

suppliers are free to decide how their product should be distributed, including by discontinuing a

distributor in order to more efficiently sell their products themselves.  Accordingly, there is no

"duty to deal" in such circumstances.  *See, e.g.*, *Port Dock*, 507 F.3d at 126 (rejecting *Aspen

Skiing* argument by a terminated distributor that also competed with supplier); *Apotex*, 2020 WL

58247, at *3–4 (rejecting *Aspen Skiing* argument where a vertically integrated supplier cut off

the supply of a critical input to its competitor).

*Fourth*, whereas in *Aspen Skiing*, "[t]he absence of a legitimate business reason for the

refusal to deal suggested that the reason for the defendant's action was intent to monopolize," *see

Port Dock*, 507 F.3d at 126 (citing *Aspen Skiing* at 472 U.S. at 608–09), the Amended Complaint

specifically alleges that JetBlue in fact did have a legitimate business reason.  *See Port Dock*,

507 F.3d at 126 (the Second Circuit's "integration cases show that [defendant's] expansion into

distribution was most likely in pursuit of increased efficiency, and [plaintiff] has not alleged any

facts that would plausibly suggest that [defendant's] purpose was anticompetitive.  There was thus an apparent legitimate business reason for [defendant's] refusal to deal.").  Notably, Fareportal alleges that JetBlue advised that its decision to cease selling tickets through Fareportal's OTAs was driven by a desire to "control the customer experience."  AC ¶ 131. Seeking to diminish the import of this key admission, Fareportal seeks to shoehorn its situation into *Aspen Skiing*'s extraordinary fact pattern by alleging that JetBlue rejected Fareportal's offer "to display JetBlue flights through NDC and eliminate segment fees, 'thereby providing a No Cost solution for distribution' for JetBlue."  *Id.* ¶ 123.  However, this allegation elides a crucial fact: fully implementing NDC is a resource-intensive undertaking that is costly, *see id.* ¶ 85, and the COVID-19 pandemic materially impacted JetBlue's ability to implement NDC, *see id.* ¶ 103 ("Barker indicated that, as a result of COVID-19 and delays in getting its final APIs ready, JetBlue would likely not be ready to proceed with NDC integration until the first quarter of 2021 at the earliest.").  That Fareportal, in an attempt to persuade JetBlue to resume negotiations, may have indicated a willingness to forego "segment fees" would not ensure that selling JetBlue tickets through an NDC integration that JetBlue had not yet implemented would be a "No Cost solution for distribution" for JetBlue.  In any event, even if connecting to Fareportal were costless, it would have been a perfectly legitimate business decision and strategy for JetBlue to want more customers to book directly with JetBlue on its own website than through a third party.

Because the Amended Complaint's allegations do not come close to the exceptional facts of *Aspen Skiing*, JetBlue has no duty to deal with Fareportal, and accordingly, Fareportal cannot establish that JetBlue has engaged in anticompetitive conduct, requiring dismissal of Fareportal's antitrust claims.

### D.    The Amended Complaint Does Not Sufficiently Plead That JetBlue Has Or Is Likely To Obtain Monopoly Power

To plead monopolization under Section 2, plaintiffs must demonstrate that the defendant possesses monopoly power in the relevant market.  *See PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002).  Monopoly power is the "ability to (1) price substantially above the competitive level and (2) to persist in doing so for a significant period without erosion by new entry or expansion."  *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 227 (2d Cir. 1999) (citations and internal quotation marks omitted).  Similarly, to state a claim for attempted monopolization, plaintiffs must plead "a dangerous probability of achieving monopoly power."  *PepsiCo*, 315 F.3d at 105.  Here, Fareportal does not adequately allege either that JetBlue has acquired monopoly power in any relevant market or that there exists a dangerous probability that it will do so.

### 1.    The Amended Complaint Is Devoid Of Factual Allegations Showing That JetBlue Can Charge Supracompetitive Prices

Fareportal does not allege that JetBlue has increased or charged supracompetitive prices or that prices in the alleged relevant markets have indeed increased.  Rather, Fareportal merely alleges that JetBlue has an enhanced "ability" to increase prices.  *See, e.g.*, AC ¶¶ 148, 155.  But allegations "that prices could rise . . . are not *factual* allegations, but instead are *speculative* and *conclusory* allegations that do not suffice to defeat a Rule 12(b)(6) motion to dismiss."  *Arcesium*, 2021 WL 1225446, at *7 (emphasis in original).

Unable to show an actual increase in prices, Fareportal conveniently ignores the easily ascertainable fact that JetBlue's market share is less than 5%, *see supra* note 2, and instead cherry picks a small number of JetBlue's routes, which it refers to as "City-Pair markets," in which it alleges JetBlue's market share of air passenger travel is purportedly approximately 40% or higher (it alleges that in the case of 20 of these "City-Pair" routes, JetBlue has a purported

market share of approximately 70% or higher).  AC ¶¶ 139–40.  While courts may draw an inference of monopoly power by considering market share as well as various other factors, including the strength of competition, barriers to entry, the probable development of the market, and elasticity of demand, *see Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 500–01 (2d Cir. 2004) (citations omitted), these allegations fail to show that JetBlue has market power.

*First*, Fareportal fundamentally fails to allege any facts showing that any of these limited hand-picked routes (or even all of these routes collectively) constitute a relevant market. Moreover, the Amended Complaint makes clear that Fareportal seeks to compel JetBlue to make flights on ***all*** of its routes available to Fareportal and not just flights within this small number of select routes.  This encompasses routes for which JetBlue has much smaller market shares and indisputably no market power based even on Fareportal's flawed and unsupported metrics.[11]

*Second*, to survive a "motion to dismiss, an alleged product market must bear a rational relation to the methodology courts prescribe to define a market for antitrust purposes—analysis of the interchangeability of use or the cross-elasticity of demand, and it must be plausible." *Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 237 (2d Cir. 2008) (internal quotation marks and citation omitted).  Fareportal cannot clear this high pleading hurdle with its unsupported allegation that "there are no reasonable substitutes for air travel between two cities." AC ¶ 138.  Simply put, Fareportal's market allegations gloss over the commercial realities faced by consumers.  For instance, Fareportal alleges that JetBlue has "a market share of approximately 70% or higher" on the White Plains to Orlando route, *id*. ¶ 140, but conveniently

---

[11] Nor does the purported market concentration bear any rational relationship with Fareportal's implausible theory of harm: if anything, the more concentrated a market is, the easier it is for a consumer to manually compare prices.

omits any allegation regarding JetBlue's market share of flights connecting the New York

metropolitan area with Orlando.  Especially in light of the Amended Complaint's focus on

purported harm to cost-sensitive consumers, *see id.* ¶ 130, Fareportal's intentional silence cannot

overcome the plain fact that a consumer seeking to travel between the New York area and

Orlando would naturally consider the many flight options to Orlando operated by the various

airlines departing from LaGuardia, Newark or JFK.  *See id.* ¶ 138 ("In major metropolitan areas

with multiple airports, these airports are grouped together if consumers view them as sufficient

substitutes.").  This is particularly true if fares for flights connecting White Plains and Orlando

increase.[12]

 *Third*, even assuming the routes Fareportal selects could conceivably constitute relevant

markets, the mere allegation that JetBlue has over 40% or even 70% market share on certain

routes is insufficient, absent more, to establish that JetBlue possesses market power.  *See*

*Bookhouse*, 985 F. Supp. 2d at 622 (dismissing monopolization claim where only allegation

suggesting defendant possessed "monopoly power is that its market share is 60%") (internal

citations omitted).

 *Fourth*, Fareportal's allegations regarding barriers to entry are similarly unavailing.

While the Amended Complaint alleges that entering a route requires a new entrant to "purchase

very expensive equipment; to obtain an FAA license, gates and takeoff slots at the relevant

airports; and to develop a consumer reputation," AC ¶ 144, this allegation ignores the fact that

the U.S. air travel market is replete with established players—several of which have domestic

---

[12] Fareportal's citation to the Sixth Circuit's decision in *Spirit Airlines, Inc. v. Nw. Airlines, Inc.*, 431 F.3d 917 (6th Cir. 2005) is not to the contrary and is factually inapposite.  That case, brought by one airline against one of its competitors, concerned allegedly targeted predatory pricing by a legacy carrier purportedly seeking to drive a specific low-cost competitor out of the Detroit–Boston and Detroit-Philadelphia routes.  Accordingly, in that case, unlike here, the analytical framework of City-Pair Routes to demonstrate market share was found to be in line with the scope of the claims at issue.

market shares that are multiple times that of JetBlue—that already have these resources.  Nor is JetBlue's frequent flyer program a cognizable barrier to entry as Fareportal alleges.  *Id.* ¶ 145; *see Glob. Disc. Travel Servs., LLC v. Trans World Airlines, Inc.*, 960 F. Supp. 701, 705 (S.D.N.Y. 1997) (concluding that "[i]f a consumer purchases an airline ticket on TWA for one trip, she or he is free to choose American, Continental, Delta, United, or another airline on the next trip.  Only customer preference for a product, not compulsion by the product itself . . . leads a customer to buy a TWA ticket as opposed to another airline ticket" and granting motion to dismiss Sherman Act Section 1 and 2 claims).

Because the Amended Complaint includes no well-pled allegations that JetBlue has market power, Fareportal's monopolization claim must fail as a matter of law.

### 2. Fareportal's Theory That JetBlue Is Likely To Obtain The Ability To Charge Supracompetitive Prices Is Implausible

Unable to show that JetBlue has market power in a relevant market, Fareportal alleges in a wholly conclusory fashion that "JetBlue will be able to raise its fares" once "consumers migrate away from OTAs."  AC ¶ 11.  But as shown above, this conclusory assertion has no factual basis and is plainly implausible.  Accordingly, Fareportal's attempted monopolization claim too must fail as a matter of law.  *See Arcesium*, 2021 WL 1225446, at *7 (allegations "that prices could rise . . . do not suffice to defeat a Rule 12(b)(6) motion to dismiss"); *Apotex*, 2020 WL 58247, at *7 (dismissing attempted monopolization claim, which requires "a lesser degree of market power," because plaintiff's allegations "make plain that there was never a 'dangerous probability' that [plaintiff] could insulate its prices from competition") (citations omitted).

### E. The Amended Complaint Fails To Allege That JetBlue Had The Requisite Specific Intent To Monopolize

To sustain an attempted monopolization claim, a plaintiff must plead that a defendant had a specific intent to monopolize.  *See PepsiCo*, 315 F.3d at 105.  The Amended Complaint does

not allege any facts to support an inference that JetBlue had the required specific intent to

monopolize, and the attempted monopolization claim must therefore be dismissed.

### 1.   The Amended Complaint's Conclusory And Contradictory Allegations Of Specific Intent Should Be Afforded No Weight

In its response to JetBlue's pre-motion letter seeking a court conference regarding the

instant motion to dismiss, Fareportal identified seven paragraphs in the Amended Complaint that

allegedly "expressly and repeatedly allege[] that JetBlue is acting with the intent to protect its

market power and raise prices."  Response Letter, ECF No. 19, at 3 (citing AC ¶¶ 1, 9, 11, 33,

125, 149, 154).  However, each of these allegations is nothing more than a conclusory assertion,

which this Court need not credit when deciding a motion to dismiss.[13]  *See Iqbal*, 556 U.S. at 678

("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is

inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action,

supported by mere conclusory statements, do not suffice."); *Rothstein v. UBS AG*, 708 F.3d 82,

94 (2d Cir. 2013) ("[W]e are not required to credit conclusory allegations or legal conclusions

couched as factual allegations.").

Nor can Fareportal rely on JetBlue's alleged decision in 2017 to stop selling tickets

through certain small OTAs to demonstrate specific anticompetitive intent in its present

pandemic-era decision, years later, to stop selling tickets through Fareportal.  *First*, the allegation

that JetBlue explored the possibility of contractually binding itself to Fareportal renders

---

[13] *See* AC ¶¶ 1 (referencing JetBlue's "plan" and "goal" without providing any factual basis for the assertion that JetBlue actually had such a goal or plan), 9 (making conclusory reference to an implausible "scheme"), 11 (alleging "plans to recoup [short-term losses] in the long term" without alleging any plausible mechanism for it to do so), 33 (baldly stating that "JetBlue decided that continuing to allow Fareportal to display JetBlue's flights and fares would undermine its ability to raise the prices it charges to American consumers," without alleging any factual basis to support that JetBlue had such a goal and without alleging any plausible mechanism for JetBlue to charge supracompetitive prices), 125 (referencing implausible scheme), 149 (baldly stating "JetBlue has acted with intent to illegally acquire, enhance, and maintain its monopoly over passenger air travel"), 154 (baldly stating that JetBlue has acted with "the specific intent to destroy competition and to acquire, enhance, and maintain monopoly power over passenger air travel").

implausible any inference that JetBlue had been patiently biding its time to destroy Fareportal and the entire OTA industry.  *Second*, Fareportal's attempt to rely on an out-of-context quotation of a 2017 earnings call to insinuate that "JetBlue admitted its true motivation . . . to stop its 'price-sensitive customers' from being able to use OTAs," AC ¶ 130; *see also*, *id.* ¶ 3, must be rejected because the full context of this earnings call reveals that JetBlue's stated intent in 2017 was to *lower costs*, **not** *raise prices*:

> In order to minimize distribution costs, we have been proactively reducing the number of online travel agencies that sell our tickets.  This is the first phase of a broader strategy to drive our most price-sensitive customers towards direct distribution, our lowest cost and best merchandise channel.  This strategy is an example of how we can lower our costs and better support low fares on jetblue.com.[14]

### 2. The Amended Complaint's Allegations That JetBlue Acted For Legitimate Business Reasons Confirm The Lack Of Specific Intent To Monopolize

Beyond the fact that the Amended Complaint includes no well-pled allegations that JetBlue acted with the specific intent to monopolize, the Amended Complaint's own allegations actually confirm that this was not the case.  Indeed, the Amended Complaint pleads that JetBlue had a legitimate business reason for seeking to deal directly with customers:  to "control the customer experience."  AC ¶ 131.  Another legitimate business reason is implicit in Fareportal's Amended Complaint allegations: the desire to eliminate intermediary fees.[15]  Such legitimate business reasons for ceasing to sell through Fareportal OTAs highlight the defective nature of the

---

[14] Ex. 8 at 7, JetBlue, *Q3 2017 Earnings Call Transcript,* Oct. 24, 2017.  In adjudicating this motion, this Court may properly consider the full text of this earnings call transcript, because it is incorporated in the Amended Complaint by reference and is "integral" to the Amended Complaint and relied upon in it.  *See Weiss*, 762 F. Supp. 2d at 567.  Additionally, courts considering motions to dismiss may take judicial notice of earnings call transcripts "to determine what statements they contain rather than to prove the truth of the documents' contents."  *Frankfurt-Tr. Inv. Luxemburg AG v. United Techs. Corp.*, 336 F. Supp. 3d 196, 205 (S.D.N.Y. 2018), *aff'd sub nom. Kapitalforeningen Lægernes Inv. v. United Techs. Corp*., 779 F. App'x 69 (2d Cir. 2019).

[15] *See, e.g.*, AC ¶ 56 (acknowledging that where OTAs use the GDS to sell airline tickets—as Fareportal historically did to sell JetBlue tickets—intermediary fees would be paid to the GDS and the OTA); *see also* discussion in Part I.C noting that additional investments in NDC would be necessary for a direct connection with Fareportal.

claim, as legitimate business aims "cannot bear out the specific intent essential to sustain an attempt to monopolize." *Times-Picayune Pub. Co. v. U.S.*, 345 U.S. 594 (1953); *see also Port Dock*, 507 F.3d at 126 (affirming dismissal of complaint, where defendant's "expansion into distribution was most likely in pursuit of increased efficiency, and [plaintiff had] not alleged any facts that would plausibly suggest that [defendant's] purpose was anticompetitive" so that there was "an apparent legitimate business reason for [defendant's] refusal to deal").

## II.     FAREPORTAL'S STATE LAW CLAIMS SHOULD BE DISMISSED FOR LACK OF FEDERAL JURISDICTION

As set forth in the Amended Complaint, Fareportal's deficient antitrust claims are the only basis for federal jurisdiction in this case. *See* AC ¶ 40. Accordingly, if the Court dismisses the antitrust claims, it should decline to exercise supplemental jurisdiction over the state law claims, which should be dismissed pursuant to 28 U.S.C. § 1367(c)(3). *See, e.g.*, *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 306 (2d Cir. 2003) (abuse of discretion for district court to retain jurisdiction when federal claims are dismissed early in litigation).

## III.    EVEN IF THIS COURT EXERCISES SUPPLEMENTAL JURISDICTION, FAREPORTAL'S STATE LAW CLAIMS SHOULD BE DISMISSED

### A.     Fareportal's Breach Of Contract Claim Should Be Dismissed

To survive a motion to dismiss, Fareportal must show (1) the existence of a contract, (2) performance of plaintiff's obligations under the contract, (3) breach of the contract by defendant, and (4) damages. *See EQT Infrastructure Ltd. v. Smith*, 861 F. Supp. 2d 220, 226 (S.D.N.Y. 2012) (internal citations omitted).

New York courts routinely dismiss breach of contract claims at the pleading stage for failure to state a claim. *See, e.g.*, *Gas Nat., Inc. v. Iberdrola, S.A.*, 33 F. Supp. 3d 373, 375 (S.D.N.Y. 2014) (dismissing breach of contract claim where plaintiffs did not plausibly allege defendant breached duty to negotiate in good faith); *Banco Espirito Santo de Investimento, S.A.*

*v. Citibank, N.A.*, No. 03 Civ. 1537, 2003 WL 23018888, at *4–5 (S.D.N.Y. Dec. 22, 2003) (dismissing breach of contract claim where defendant gave plaintiff "forthright, reasonable signals that it mean[t] to be bound only by" a specific written agreement).

This is precisely the case here.  The Amended Complaint fails to plead a claim for breach of contract as a matter of law for two independent reasons.

*First*, Fareportal does not and cannot allege the most fundamental element of any breach of contract claim: "the existence of a contract."  *EQT*, 861 F. Supp. 2d at 226.  While touting a purported "historical relationship" with JetBlue, Fareportal notably does not allege that it ever sold a single ticket pursuant to any contractual agreement with JetBlue.  Instead, its breach of contract claim rests entirely on the negotiation of a document it describes as a "letter of intent," which by its own terms was a "non-binding term sheet" that was "SUBJECT TO CONTRACT," and which JetBlue never executed.  Ex. 6.  Because the term sheet was never executed, it lacks any legal force.

*Second*, assuming *arguendo* that the term sheet had been executed or otherwise had legal effect, it would still not be a binding contract.  While Fareportal now seeks to cast the term sheet as a "Type II" preliminary agreement, the actual language of the term sheet and well-established case law refute this notion.  But even if the term sheet were determined to be a "Type II" preliminary agreement, the claim still cannot survive a motion to dismiss because Fareportal has not alleged any facts supporting its assertion that JetBlue's decision to not enter into a binding contract was motivated by bad faith.

### 1.    The Unexecuted Term Sheet Has No Legal Force

Under New York law, "[i]t is well settled that, if the parties to an agreement do not intend it to be binding upon them until it is reduced to writing and signed by both of them, they are not bound and may not be held liable until it has been written out and signed."  *Scheck v. Francis*, 26

N.Y.2d 466, 469–70 (N.Y. 1970) (collecting cases); *see also Attestor Value Master Fund v. Republic of Argentina*, 940 F.3d 825, 830 (2d Cir. 2019) (same).

Here, as evidenced by the signature blocks at the end of the term sheet, the parties manifested their clear intent that the term sheet should have no force absent ***both*** parties' signatures. *See* Ex. 6. The absence of any signature on JetBlue's behalf is fatal to Fareportal's breach of contract claim.

Fareportal attempts to overcome this fatal obstacle by alleging that Fareportal and JetBlue reached an oral agreement on "the outstanding commercial terms" on a March 11 teleconference. AC ¶ 96. But any such allegation of a binding agreement is discredited by the fact that the parties required a term sheet in a written and signed form that by its express language was not binding and was subject to entering into an actual contract.

Further grasping at straws, Fareportal points to an email communication in which, it alleges, Barker transmitted the term sheet to Fareportal, "confirm[ing] that JetBlue was 'ready to sign it now.'" *Id.* ¶ 100. While Fareportal alleges that this was the "final version" of the term sheet, *id.*, its own description of this exchange acknowledges that there was some uncertainty with respect to the finality of the terms, as Fareportal alleges that "Barker indicated that JetBlue might require a two to three month delay before beginning NDC development," *id.*, which would have been inconsistent with the schedule provided in the term sheet, *see* Ex. 6 at 1 (setting forth anticipated timeline). Indeed, Barker's words speak for themselves: "We are ready to sign it now ***but we need to make you aware that there is a strong possibility that we take a 2-3 month delay. Do you have any concerns about a delay?***" Ex. 5 at 1 (emphasis added). Barker's informal indication that JetBlue would be ready to sign the term sheet, while noting that the terms outlined in the term sheet could not be met and inviting additional comment, cannot

25

replace the parties' clearly-contemplated requirement that the signature of David Clark—a JetBlue senior officer—was required before the term sheet could be consummated.

The New York Court of Appeals' analysis in *Scheck v. Francis* highlights why Fareportal's claim fails. There, plaintiff Scheck engaged in contractual negotiations with defendant Francis, to enter into a new contract. 26 N.Y.2d at 469. After a final negotiation session, Francis's attorney mailed copies of the contract to Scheck, requesting him to sign all copies and have Francis sign them, and inviting Scheck to call with any questions or comments. *Id.* at 469 n.1. While Scheck alleged that he signed the contract, Francis never did. *Id.* at 469. Like Fareportal here, Scheck argued that Francis's lawyer's "letter constituted proof that the parties had agreed upon the terms of the contracts and" should be "accepted as a memorandum of those contracts." *Id.* at 470. The Court of Appeals rejected this argument, finding that it was clear that "the agreements were to take effect only after both parties had signed them." *Id.*

Similarly here, the signature blocks and Barker's own reference to an eventual signing, especially when coupled with Barker's question as to whether Fareportal would have any concerns regarding a delay in the timing laid out in the term sheet and inviting further comment, underscore that the term sheet could only take effect if both parties had signed it. As was the case in *Scheck*,

> [t]his combination of circumstances unquestionably gave the [Fareportal] an opportunity to decline to go through with the deal before [it] signed. Certainly, the defendant [JetBlue] enjoyed the same privilege, and [it] never did sign. In short, both parties must plainly have understood that the agreements were to take effect only after they had signed them and, until that time, the matter was still in the stage of negotiations.

*Id.* at 470. Accordingly, the term sheet had no legal effect because it was never executed by both parties, and JetBlue was entitled to decide not to consummate any agreement, which it chose to do. This fact alone defeats Fareportal's breach of contract claim.

### 2. Even If JetBlue Had Executed The Term Sheet, Fareportal's Breach Of Contract Claim Would Still Be Defective As A Matter Of Law

Separate from the dispositive fact that the term sheet was never executed, New York law is clear that where a writing "is clearly a preliminary, non-binding proposal to agree," as is the case here, that "conclusively negates plaintiff's breach of contract claim." *Aksman v. Xiongwei Ju*, 799 N.Y.S.2d 493, 495 (N.Y. App. Div. 2005); *see also Cohen v. Singer*, 4 F. App'x 38 (2d Cir. 2001) (affirming dismissal of breach of contract and promissory estoppel claims where writing "explicitly ma[de] binding agreement 'subject to and contingent upon' formal agreement between the parties"). Tellingly, Fareportal acknowledges that the unsigned "non-binding term sheet" is not a contract, contending instead that it is a "'Type II' preliminary agreement under New York law." Response Letter, ECF No. 19, at 1. Indeed, Fareportal goes so far as to concede that the term sheet "do[es] not commit the parties to their ultimate contractual objective," and argues only that it commits JetBlue "to negotiate the open issues in good faith in an attempt to reach the objective within the agreed framework." *Id.* (quoting *EQT*, 861 F. Supp. 2d at 227). But even this narrow claim still fails as a matter of law.

### (a) New York Courts Distinguish Between Binding "Type I" And "Type II" Preliminary Agreements

As the Second Circuit has explained, "where the parties contemplate further negotiations and the execution of a formal instrument, a preliminary agreement does not create a binding contract." *Brown v. Cara*, 420 F.3d 148, 153 (2d Cir. 2005) (quoting *Adjustrite Sys., Inc. v. GAB Bus. Servs., Inc.*, 145 F.3d 543, 548 (2d Cir. 1998)). "In some circumstances, however, preliminary agreements can create binding obligations." *Adjustrite*, 145 F.3d at 548. The extent of the obligations created depend on the preliminary agreement in question, and in general, "binding preliminary agreements fall into one of two categories." *Id.*

27

As part of the legal framework, New York courts have designated some writings meeting certain criteria as either "Type I" or "Type II" preliminary agreements. "Type I" preliminary agreements "reflect[] a meeting of the minds on 'all the issues perceived to require negotiation,'" and therefore bind "both sides to their ultimate contractual objective." *Brown*, 420 F.3d at 153 (citations omitted). Fareportal does not and cannot allege that the term sheet is a "Type I" agreement.

"Type II" preliminary agreements "do[] not commit the parties to their ultimate contractual objective but rather to the obligation to negotiate the open issues in good faith in an attempt to reach the . . . objective within the agreed framework." *Id.* (quoting *Adjustrite*, 145 F.3d at 548) (alterations in original). This "obligation" does not guarantee a final contract will be concluded; it is possible that no contract will be finalized if, for example, the parties encounter "good faith differences in the negotiation of the open issues" or "lose interest as circumstances change." *Tchrs. Ins. & Annuity Ass'n of Am. v. Tribune Co.*, 670 F. Supp. 491, 498 (S.D.N.Y. 1987) (Leval, J.). Therefore, a party to a "Type II" agreement "has no right to demand performance of the transaction." *Adjustrite*, 145 F.3d at 548.

>    ***(b)    The Four Corners Of The Term Sheet Unambiguously Reflect That It Is Not Even A "Type II" Preliminary Agreement***

The Second Circuit has identified five factors to be considered in determining whether a writing is a "Type II" preliminary agreement: "(1) the language of the agreement; (2) the context of the negotiations; (3) the existence of open terms; (4) partial performance; and (5) the necessity of putting the agreement in final form, as indicated by the customary form of such transactions." *Arcadian Phosphates, Inc. v. Arcadian Corp.*, 884 F.2d 69, 72 (2d Cir. 1989) (citing *Tribune*, 670 F. Supp. at 498–99).

"*The first factor, the language of agreement, is the most important*."  *Id.* (citing *Tribune*,

670 F. Supp. at 499) (emphasis added).  The Second Circuit has held that where the language of

an agreement shows that the parties did not intend to be bound, a court need look no further.  *See*

*id.*  Moreover, "[t]here is a strong presumption against finding binding obligation in agreements

which include open terms, call for future approvals and expressly anticipate future preparation

and execution of contract documents."  *Id.* at 73 (quoting *Tribune* at 499).  Here, the term sheet's

unambiguous language, which identifies the document as a "non-binding term sheet" and

includes a header stating in all capital letters that the document is "SUBJECT TO CONTRACT,"

confirms that the parties intended the term sheet would not be binding and "expressly anticipated

the future preparation and execution of contract documents."  *Tribune*, 670 F. Supp. at 499.  The

language of the term sheet noticeably contrasts with other writings New York courts have held to

be "Type II" agreements.  For example, in *Tribune*, the parties explicitly provided that the

writing at issue would be "a binding agreement," which the Second Circuit described as "critical

to Judge Leval's reasoning" and ultimate conclusion that the writing was a "Type II" preliminary

agreement.  *See Arcadian*, 884 F.2d at 72 (discussing 670 F. Supp. at 499).  Similarly, in *Brown*

*v. Cara*, the Second Circuit found persuasive a memorandum of understanding that "clearly

state[d] the parties' agreement to 'work together to develop, build, market, and manage [the Jay

Street Property]' and to 'work together in accordance with the terms and conditions outlined [in

the memorandum of understanding].'"  420 F.3d at 158.  In *Learning Annex Holdings, LLC v.*

*Whitney Educ. Grp., Inc.*, the "Type II" preliminary agreement described itself "as representing

'the good faith intentions of the parties, indicat[ing] the parties' intent to proceed in good faith

toward the contractual goal."  765 F. Supp. 2d 403, 415 (S.D.N.Y. 2011) (footnotes omitted).

And in *EQT*, where the court found the first factor to be ambiguous, the writing included an

express obligation to negotiate in good faith for a prescribed period and provided that certain other obligations would be binding on the parties.  861 F. Supp. 2d at 220.[16]

Significantly, the term sheet at issue here indisputably does not include any commitment by the parties to be bound, but rather expressly states the opposite, and materially differs from the writings in the cases where courts determined that "Type II" preliminary agreements exist. The clear manifested intent of the parties thus confirms that the term sheet is not a "Type II" agreement and further warrants dismissal of the breach of contract claim.

Although this Court "need not look [] further than the first factor," *Arcadian*, 884 F.2d at 72, the other factors also weigh in favor of finding that the term sheet is not a "Type II" preliminary agreement:

*Context of the negotiations*.  While Fareportal has peppered the Amended Complaint with allegations that the parties engaged in multiple communications during their discussions seeking to bolster an argument that this factor favors it, nothing in the Amended Complaint suggests that the parties, during the course of negotiations, sought to eliminate the term sheet's signature requirement.  *See CAC Grp. Inc. v. Maxim Grp. LLC*, 523 F. App'x 802, 805 (2d Cir. 2013).

*Existence of open terms*.  While this is frequently a neutral factor in determining whether a writing is a "Type II" preliminary writing, here the unsettled nature of the NDC integration timeline affirmatively weighs against finding that the term sheet was finalized or binding.

*Partial Performance*.  Fareportal strains to allege that it partially performed what would be its obligations under the final contract, *e.g.*, by asserting that it "started the integration process," AC ¶ 91, but Fareportal alleges it undertook this work *before* Barker returned the term

---

[16] Fareportal relies on *Brown v. Cara*, *Learning Annex* and *EQT* in their Response Letter.  ECF No. 19.  For the Court's convenience, the writings discussed in those opinions are Exs. 9, 10 and 11.

sheet, and, as discussed below, Fareportal alleges it undertook the work to confirm the viability of a final agreement.

*Necessity of putting the agreement in final form.*  As Fareportal itself alleges, the development, integration and rollout of NDC was a costly and complicated endeavor.  *See* AC ¶ 85.  Accordingly, the parties would have expected to execute a formal contract setting forth the parties' rights and obligations.

> ### (c)   *The Amended Complaint Fails To Plead That JetBlue Acted In Bad Faith In Choosing Not To Enter Into A Binding Contract*

Even assuming the term sheet here were a Type II preliminary agreement (which it is not), at most JetBlue would be obligated to negotiate in good faith and would not be bound to finalize a contract with Fareportal if it were to "lose interest as circumstances change."  *Tribune Co.*, 670 F. Supp. at 498.  As such, this claim fails for the additional reason that the Amended Complaint is devoid of any well-pled allegations that JetBlue's decision not to pursue the NDC integration was in bad faith.

While Fareportal spins a fanciful yarn and baldly states that JetBlue was acting in furtherance of a grand anticompetitive scheme, these allegations are wholly conclusory and cannot survive the motion to dismiss.  *See* Part I.A above.  Nor does Fareportal allege that JetBlue was dishonest—to the contrary, Fareportal alleges that JetBlue forthrightly informed Fareportal that there would be substantial delays before JetBlue could implement NDC, *see* AC ¶¶ 100, 103, and then, that JetBlue would not proceed with NDC implementation at all and instead would cease distributing tickets through Fareportal's OTAs, *see id.* ¶ 107.

## B.   **Fareportal's Promissory Estoppel Claim Is Defective As A Matter Of Law**

The allegations underlying Fareportal's promissory estoppel claim—that Fareportal spent time and energy working towards an NDC integration that was never consummated—are both

duplicative of and undermined by its breach of contract allegations.  To survive a dismissal of its promissory estoppel claim, Fareportal must allege "(i) a sufficiently clear and unambiguous promise; (ii) reasonable reliance on the promise; and (iii) injury caused by the reliance." *Castellotti v. Free*, 27 N.Y.S.3d 507, 513 (2016) (citations omitted).  The Amended Complaint's failure to plead any of these elements provides three independent grounds for dismissal.

> **1.    The Amended Complaint Fails To Allege A Requisite "Clear And Unambiguous" Promise**

Stripped of its hyperbole, the Amended Complaint does not allege any "clear and unambiguous" promise that JetBlue made.  Instead, the Amended Complaint alleges that JetBlue "advised Fareportal that it would be seeking to phase in NDC" and "told Fareportal that it was interested in partnering with Fareportal to develop NDC on its platform," AC ¶ 87, began to negotiate contractual terms regarding NDC integration, *id.* ¶ 89, participated through its technology team in a meeting to discuss this integration, *id.* ¶ 90, provided Fareportal with "access to its sample API and schema," *id.* ¶ 91, and "never expressed any concerns" regarding Fareportal's technical capabilities, *id.*

Even if accepted as true for purposes of this motion, at most these allegations amount to preliminary steps that two parties might take as they explored the possibility of entering into a contractual agreement.  New York courts have routinely rejected promissory estoppel claims in situations like this one, where the parties were in the process of negotiating preliminary agreements, or where they had even entered into preliminary agreements that were explicitly non-binding.  *See e.g.*, *Prestige Foods, Inc. v. Whale Sec. Co.*, L.P., 663 N.Y.S.2d 14, 15 (N.Y. App. Div. 1997) (plaintiffs' promissory estoppel claim was "flatly contradicted" by letter agreements that "expressly stated that neither party had any legal obligations to the other until both had executed and delivered an underwriting agreement"); *Frutico S.A. de C.V. v. Bankers*

*Tr. Co.*, 833 F. Supp. 288, 299 (S.D.N.Y. 1993) (no "clear and unambiguous promise" because the negotiation history "made it plain that any promise or agreement . . . was conditional upon the execution . . . of a written contract").[17]

### 2.    The Amended Complaint Fails To Allege Reasonable Reliance

For similar reasons, the Amended Complaint fails to allege that any purported reliance by Fareportal on an alleged promise made by JetBlue was reasonable.  Where parties are negotiating a contractual agreement and remain free to walk away, as was the circumstance here, those circumstances "flatly contradict[] plaintiffs' claims of reasonable reliance on defendant's promises to proceed with the transaction." *Prestige Foods*, 663 N.Y.S.2d at 15.

Further, even assuming *arguendo* that the term sheet was a "Type II" preliminary agreement, Fareportal concedes that JetBlue was not ultimately bound to enter into a final contract, Response Letter, ECF No. 19, at 1 ("Type II preliminary agreements '***do not commit the parties to their ultimate contractual objective*** but rather to the obligation to negotiate the open issues in good faith in an ***attempt*** to reach the objective within the agreed framework.'") (internal citations omitted) (emphasis added), further belying the reasonableness of any purported reliance here.

### 3.    The Amended Complaint Fails To Sufficiently Allege Any Injury

Separately, Fareportal fails to plead that it was injured by any purported reliance, as required to survive a motion to dismiss this claim. *See Iberdrola*, 33 F. Supp. 3d at 386.

Fareportal makes the generalized allegation that "[i]mplementing a Direct Connect costs roughly $100,000 for Fareportal per airline," AC ¶ 85, but the Amended Complaint is devoid of

---

[17] A contrary rule would make it impossible for parties to engage in contractual negotiations that require up-front investments, or engage in due diligence, without fear of being "'trapp[ed] . . . in surprise contractual obligations that they never intended' to undertake," a result courts must endeavor to avoid. *Cf. Adjustrite*, 145 F.3d at 548.

any allegation that Fareportal *actually* invested any money in this undertaking, let alone

$100,000.  Instead, Fareportal alleges that it undertook certain unspecified technical work,

merely alleging that the "two parties' technology teams met at Fareportal's New York City office

in January 2020 to discuss this integration," *id.* ¶ 90, after which "Fareportal's team started the

integration process," so that "[a]fter several weeks of devoted labor to the process, Fareportal

was able to confidently report to JetBlue that the integration process was going smoothly ***and***

***that Fareportal had the capability to execute NDC on its website as soon as an agreement was***

***reached***," *id.* ¶ 91 (emphasis added).  But Fareportal's allegation that it undertook work to be in

a position to demonstrate that it had the technical capacity to carry out NDC integration does not

help its claim.  Such a purported investment, made to secure a transaction that might not

ultimately be consummated, cannot constitute injury for the purposes of pleading a promissory

estoppel claim.  *See, e.g.*, *Chatterjee Fund Mgmt., L.P. v. Dimensional Media Assocs.*, 687

N.Y.S.2d 364 (N.Y. App. Div. 1999) ("detrimental reliance is also lacking inasmuch as the

performance of due diligence was a precondition to negotiation of the final contract.");  *cf.*

*Songbird Jet Ltd., Inc. v. Amax, Inc.*, 581 F. Supp. 912, 926 (S.D.N.Y. 1984) ("Every

businessman faces the risk that the substantial transaction costs necessary to bring about a

mutually beneficial contract will be lost if the negotiations fail to yield a satisfactory

agreement.").[18]

      In sum, because the Amended Complaint lacks any well-pled allegations of reasonable

and detrimental reliance on a sufficiently clear and unambiguous promise, Fareportal's

promissory estoppel claim must be dismissed as a matter of law.

---

[18] Nor has Fareportal alleged that they did not or could not use the work they allege they undertook for their own benefit or the benefit of other airlines.  This point was raised in JetBlue's pre-motion letter regarding the instant motion, ECF No. 16, and was wholly unaddressed in either Fareportal's Response Letter, ECF No. 19, or the Amended Complaint.

## CONCLUSION

For the foregoing reasons, Fareportal's Amended Complaint should be dismissed with

prejudice.

DATED:  April 15, 2021
         New York, New York

Respectfully submitted,

 /s/ Richard F. Schwed
Richard F. Schwed
Matthew L. Craner
Martha E. Vega-Gonzalez
SHEARMAN & STERLING LLP
599 Lexington Avenue
New York, NY  10022-6069
Telephone: (212) 848-4000
Facsimile: (212) 848-7179
Email: rschwed@shearman.com
Email: matthew.craner@shearman.com
Email: martha.vega-
gonzalez@shearman.com

*Attorneys for Defendant JetBlue Airways
Corporation*